**CASE NO. 24-1769**

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

B.A., mother of minors D.A. and X.A.;

D.A., a minor, by and through his mother, B.A.;
X.A., a minor, by and through his mother, B.A.,

*Plaintiffs-Appellants,*

v.

TRI COUNTY AREA SCHOOLS;
ANDREW BUIKEMA, in his individual capacity;
WENDY BRADFORD, in her individual capacity,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of Michigan
(1:23-cv-00423)

# APPELLANTS' OPENING BRIEF

SARA E. BERINHOUT
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut St., Ste. 900
Philadelphia, PA 19106
(215) 717-3473
sara.berinhout@thefire.org

CONOR T. FITZPATRICK
*Counsel of Record*
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, D.C. 20003
(215) 717-3473
conor.fitzpatrick@thefire.org

*Counsel for Appellants*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 24-1769 Case Name: B.A. v. Tri County Area Schools

Name of counsel: Conor T. Fitzpatrick, Sara E. Berinhout

Pursuant to 6th Cir. R. 26.1, Plaintiffs-Appellants D.A. and X.A., minors, by and through B.A.
*Name of Party*
makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

No.

CERTIFICATE OF SERVICE

I certify that on December 4, 2024 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/Conor T. Fitzpatrick

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... iv

STATEMENT REGARDING ORAL ARGUMENT .......... 1

JURISDICTIONAL STATEMENT .......... 2

STATEMENT OF THE ISSUES .......... 3

INTRODUCTION .......... 4

STATEMENT OF THE CASE .......... 7

D.A. and X.A. Attend Tri County Area Schools in Good Standing. .......... 7

"Let's Go Brandon" Is a Popular, Non-Profane, Anti-Biden Political Slogan. .......... 7

D.A. and X.A. Wear "Let's Go Brandon" Apparel to School to Express Their Political Views. .......... 11

The School District Never Experienced Disruption Due to "Let's Go Brandon" or Other Political Apparel. .......... 14

The School District Declines to Lift Its Ban on "Let's Go Brandon" Apparel, so D.A. and X.A. File Suit. .......... 17

The District Court Denies D.A. and X.A.'s Motion for Summary Judgment and Grants Summary Judgment for the School District and Its Employees. .......... 18

SUMMARY OF ARGUMENT .......... 19

ARGUMENT .......... 22

I. The Political Slogan "Let's Go Brandon" Is Not Profane. .......... 24

A. "Let's Go Brandon" falls outside the established cultural and legal boundaries of "profanity." .......... 26

B. *Fraser* provides no authority for censoring sanitized political expression like "Let's Go Brandon." .......... 32

C. The First Amendment protects students' right to nondisruptively wear apparel with the "Let's Go Brandon" political slogan. .......... 38

D. Teenagers can handle seeing a "Let's Go Brandon" sweatshirt. .......... 41

II. Even if "Let's Go Brandon" Is Ambiguously Profane, It Remains Protected Speech Because It Comments on a Matter of Political or Social Concern. .......... 44

A. *Fraser* applies only to plainly lewd and profane speech. .......... 44

B. Under *Morse*, the First Amendment does not permit school censorship of "ambiguously" lewd or profane political speech. .......... 48

1. Under *Marks*, Justice Alito's concurrence in *Morse* is controlling. .......... 49

2. This Court should follow the Third Circuit's approach and hold *Morse* and *Fraser* do not permit censorship of "ambiguously" profane student speech plausibly interpreted as social or political commentary. .......... 52

III. D.A. and X.A. Were Entitled to Summary Judgment Because There Is a Clearly Established First Amendment Right to Wear Political Apparel to School. ........ 56

A. The district court erred on the first prong of the qualified immunity analysis by holding D.A. and X.A. did not suffer a constitutional violation........ 57

B. *Tinker* clearly established D.A. and X.A.'s First Amendment right to nondisruptively wear "Let's Go Brandon" apparel. ........ 58

CONCLUSION ........ 61

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) ........ 41

*Anders v. Cuevas*,
984 F.3d 1166 (6th Cir. 2021) ........ 56

*Anderson v. Creighton*,
483 U.S. 635 (1987) ........ 60

*Ashcroft v. al-Kidd*,
563 U.S. 731 (2011) ........ 58, 60

*B.H. ex rel. Hawk v. Easton Area Sch. Dist.*,
725 F.3d 293 (3d Cir. 2013) ........ passim

*Barr v. Lafon,*
538 F.3d 554 (6th Cir. 2008) ........ 21, 25, 50

*Baynes v. Cleland*,
799 F.3d 600 (6th Cir. 2015) ........ 60

*Bethel Sch. Dist. No. 403 v. Fraser*,
478 U.S. 675 (1986) ........ passim

*Blick v. Ann Arbor Pub. Sch. Dist.*,
674 F. Supp. 3d 400 (E.D. Mich. 2023) ........ 10

*Board of Education v. Pico*,
457 U.S. 853 (1982) ........ 46, 47

*Boroff v. Van Wert City Bd. of Educ.*,
220 F.3d 465 (6th Cir. 2000) ........ 36, 37

*Bridges v. California*,
314 U.S. 252 (1941) ........ 39

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) ........ passim

*Chandler v. McMinnville Sch. Dist.*,
978 F.2d 524 (9th Cir. 1992) .......... 46, 47

*Citadel Broad. Co.*,
17 FCC Rcd 483 (2002) .......... 29

*Citizens United v. FEC*,
558 U.S. 310 (2010) .......... 23

*Cohen v. California*,
403 U.S. 15 (1971) .......... 20, 34, 54

*Corder v. Lewis Palmer Sch. Dist. No. 38*,
566 F.3d 1219 (10th Cir. 2009) .......... 50

*Defoe ex rel. Defoe v. Spiva*,
625 F.3d 324 (6th Cir. 2010) .......... 21, 50

*Doninger ex rel. Doninger v. Niehoff*,
527 F.3d 41 (2d Cir. 2008) .......... 46

*Erznoznik v. City of Jacksonville*,
422 U.S. 205 (1975) .......... 31

*FCC v. Pacifica Foundation*,
438 U.S. 726 (1978) .......... 45, 47

*FEC v. Wisc. Right to Life, Inc.*,
551 U.S. 449 (2007) .......... 23

*Ginsberg v. New York*,
390 U.S. 629 (1968) .......... 45, 47

*Guiles ex rel. Guiles v. Marineau*,
461 F.3d 320 (2d Cir. 2006) .......... 39

*Hannegan v. Esquire, Inc.*,
327 U.S. 146 (1946) .......... 40

*Hazelwood Sch. Dist. v. Kuhlmeier*,
484 U.S. 260 (1988) .......... passim

*Holzemer v. City of Memphis*,
621 F.3d 512 (6th Cir. 2010) .......... 58, 59

*Hope v. Pelzer*,
536 U.S. 730 (2002) .......... 59, 60

*Hustler Mag., Inc. v. Falwell*,
485 U.S. 46 (1988) .......... 24

*Jenkins v. Rock Hill Loc. Sch. Dist.*,
513 F.3d 580 (6th Cir. 2008) .......... 59

*Leonard v. Robinson*,
477 F.3d 347 (6th Cir. 2007) .......... 61

*Maben v. Thelen*,
887 F.3d 252 (6th Cir. 2018) .......... 23

*Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*,
594 U.S. 180 (2021) .......... 33, 56

*Marks v. United States*,
430 U.S. 188 (1977) .......... 49

*McKoy v. North Carolina,*
494 U.S. 433 (1990) .......... 51

*Moldowan v. City of Warren*,
578 F.3d 351 (6th Cir. 2009) .......... 57

*Morgan v. Swanson*,
659 F.3d 359 (5th Cir. 2011) .......... 50

*Morse v. Frederick*,
551 U.S. 393 (2007) .......... passim

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964) .......... 24, 39, 59

*Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. No. 204,*
523 F.3d 668 (7th Cir. 2008) .......... 50

*Procter & Gamble Co. v. Bankers Tr. Co.*,
78 F.3d 219 (6th Cir. 1996) ........ 23

*Rudd v. City of Norton Shores*,
977 F.3d 503 (6th Cir. 2020) ........ 39

*Snyder v. Phelps*,
562 U.S. 443 (2011) ........ 39, 55

*Stanley v. Georgia*,
394 U.S. 557 (1969) ........ 31

*Stucker v. Louisville Metro Gov't*,
No. 23-5214, 2024 WL 2135407 (6th Cir. May 13, 2024) ........ 57

*Texas v. Johnson*,
491 U.S. 397 (1989) ........ 31

*Thomas v. Bd. of Educ., Granville Cent. Sch. Dist.*,
607 F.2d 1043 (2d Cir. 1979) ........ 44

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503 (1969) ........ passim

*Tolan v. Cotton*,
572 U.S. 650 (2014) ........ 57

*United States v. Playboy Ent. Grp., Inc.*,
529 U.S. 803 (2000) ........ 22, 23

*W. Va. State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) ........ 22, 47

*Winters v. New York*,
333 U.S. 507 (1948) ........ 40

*Zamecnik v. Indian Prairie Sch. Dist. No. 204*,
636 F.3d 874 (7th Cir. 2011) ........ 37

**Statutes**

18 U.S.C. § 1464 ........ 48

**Congressional Records**

167 Cong. Rec. H5774-01, H5776 (2021) .......... 9, 35

167 Cong. Rec. H5880-01, H5880 (2021) .......... 9, 36

168 Cong. Rec. H5240-05, H5240 (2022) .......... 9, 36

**Other Authorities**

Alex Thompson & Allie Bice, *Dark Brandon Begins: How WH Aides Appropriated the Meme of Their Boss as an Underworld Kin*, POLITICO (Aug. 8, 2022) .......... 10

Annie Linskey, *How 'Let's Go Brandon' Became an Unofficial GOP Slogan*, Wash. Post (Nov. 15, 2021) .......... 8, 9

Benjamin Zimmer et al., *Among the New Words*, 97 Am. Speech 412 (2022) .......... 28

Carrie A. Beyer, *Fighting for Control: Movie Studios and the Battle over Third-Party Revisions*, 2004 U. Ill. L. Rev. 967 .......... 29

Colleen Long, *How 'Let's Go Brandon' Became Code for Insulting Joe Biden*, AP News (Oct. 30, 2021) .......... 27

Gail E. Baitinger, Congressional Research Service, *Words Taken Down: Calling Members to Order for Disorderly Language in the House* (August 13, 2019) .......... 35

J.K. Rowling, *Harry Potter and the Sorcerer's Stone* (Scholastic Books 1997) .......... 29

John Steinbeck, *East of Eden* (Penguin Books 1992) (1952) .......... 42

Kaia Hubbard, *Biden Leans Into "Dark Brandon" Meme After Chiefs' Super Bowl Win,* CBS News (Feb. 12, 2024) .......... 11

Maureen Breslin, *Trump Campaign Sells 'Let's Go Brandon' T-shirts*, The Hill (Oct. 28, 2021) .......... 9

Melissa Mohr, *Holy Sh*t, A Brief History of Swearing* (2013) .................. ........................................................................................ 25, 27, 28, 29

*Minced Oath*, Cambridge Advanced Learner's Dictionary & Thesaurus (2024) .............................................................................................. 28

Wynne Davis & Scott Simon, *Here's What 'Let's Go, Brandon' Actually Means and How it Made its Way to Congress*, NPR (Oct. 31, 2021)... 28

## STATEMENT REGARDING ORAL ARGUMENT

Under Federal Rule of Appellate Procedure 34(a) and Sixth Circuit Rule 34(a), Plaintiffs-Appellants respectfully request oral argument. This case raises important First Amendment questions, including the scope of public-school students' right to engage in nondisruptive expression by wearing political apparel to school. Plaintiffs-Appellants believe oral argument will enable all parties to clarify and more fully develop their arguments for the Court's benefit and consideration.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1343 because Plaintiffs-Appellants' claims arise under the First Amendment to the United States Constitution. This Court has jurisdiction over this case under 28 U.S.C. § 1291 because the district court's August 23, 2024, order was a final order dismissing Plaintiffs-Appellants' lawsuit in its entirety. Plaintiffs-Appellants timely filed a notice of appeal on September 4, 2024.

## STATEMENT OF THE ISSUES

1. Under *Tinker*, students have a First Amendment right to engage in nondisruptive expression by wearing political apparel to school, subject to narrow exceptions for sexually explicit speech and profanity. Did the district court err when it held the popular anti-Biden political slogan "Let's Go Brandon" constitutes "profanity"?

2. The Supreme Court has held political expression, and exposure to different viewpoints, is an important part of an American public-school education. Even if "Let's Go Brandon" is "ambiguously" profane, should the Sixth Circuit follow the Third Circuit and hold the First Amendment protects nondisruptive "ambiguously" profane speech in public schools if it comments on a matter of political or social concern?

3. Did *Tinker* and the Supreme Court's later decisions explaining the narrow exceptions to students' First Amendment rights clearly establish D.A. and X.A.'s right to wear nondisruptive political apparel to their public school, such that the district court erred by failing to grant them summary judgment on their damages claims against the government officials who censored them?

## INTRODUCTION

Fifty-five years ago, the Supreme Court affirmed students have a First Amendment right to wear politically expressive apparel in public schools. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508 (1969). The Court explained that an American education is about more than reading, writing, and arithmetic; it prepares students for the "hazardous freedom" of living in a country where their neighbors and coworkers might not think, talk, or pray the same way they do. *Id.* So at school, students retain their First Amendment right to engage in nondisruptive expression, subject to narrow exceptions like profanity.

The "Let's Go Brandon" political slogan, at issue here, is not profane. From bleeped swearwords on television to Kidz Bop albums, Americans know the difference between sanitized expression and a profane original. But the district court treated that distinction, which is well-grounded in American law and has existed since the earliest records of the English language, as though it does not exist. It held schools may censor "Let's Go Brandon" because the slogan "means 'Fuck Joe Biden.'"

That is not how profanity works. "Gosh darn," "fudge," and "shoot" do not "mean" their profane corollaries and are not equally censorable.

Our language and culture divide the profane from the socially acceptable by the presence of a taboo swearword. And while courts have struggled to decide what those words are in the modern age and determine how much blurring is necessary to neutralize them, a swearword, or the identifiable contours of one (e.g., "f*ck"), is the *sine qua non* of even arguable profanity. "Profanity" means something. It is not a standardless grab bag of censorship for school administrators to reach for when student expression seems undesirable.

Unlike actual profanity, the "Let's Go Brandon" political slogan airs freely and uncensored on the radio and network television. Unlike actual profanity, members of Congress can and have used "Let's Go Brandon" during floor speeches to express opposition to President Biden and his administration without violating strict rules of decorum. And President Biden's reelection campaign even gleefully repurposed the slogan for its own use. So far as we can find, Defendants (and the district court) are the only ones, anywhere, who believe "Let's Go Brandon" is legally indistinguishable from f***, c***, and p***. It's not.

The district court therefore erred by holding "Let's Go Brandon" constitutes censorable profanity and dismissing Plaintiffs D.A.'s and

X.A.'s claims for injunctive and declaratory relief against Defendant Tri County Area Schools' prohibition of "Let's Go Brandon" apparel. It similarly erred by denying Plaintiffs' motion for summary judgment. Additionally, the school employees who enforced the ban, Defendants Andrew Buikema and Wendy Bradford, are not entitled to qualified immunity because *Tinker* clearly established students' right to wear political clothing to school. Their reliance on a "profanity" exception to students' free speech rights is inapt. Just as no reasonable mind would consider the "clean" version of a music album profane, no reasonable official would consider "Let's Go Brandon" profanity.

The district court's approach—allowing every school district, administrator, and teacher to enforce their subjective notions of "profanity"—is unworkable, and a recipe for nationwide inconsistent enforcement and viewpoint discrimination. This Court should reverse.

## STATEMENT OF THE CASE

### D.A. and X.A. Attend Tri County Area Schools in Good Standing.

Plaintiffs-Appellants D.A. and X.A. attend Tri County High School ("TCHS") in Howard City, Michigan, part of Defendant-Appellee Tri County Area School District (the "School District"). During the 2021–2022 school year, when the relevant events occurred, D.A. was in sixth grade and X.A. was in eighth grade at Tri County Middle School ("TCMS"). (D.A. Decl. ¶ 4, RE 39-2, Page ID # 579; X.A. Dep., RE 39-5, Page ID # 594.)

D.A. and X.A. perform well in school and compete on their school's wrestling and track teams. (D.A. Dep., RE 39-4, Page ID ## 588, 590; X.A. Dep., RE 39-5, Page ID # 594; B.A. Dep., RE 39-6, Page ID # 600.) Their teachers and administrators describe them as "polite," "kind," and "a joy to have in class." (E-mail from Mindy Silverman to B.A., RE 39-7, Page ID # 602; Buikema Dep., RE 39-8, Page ID # 611.)

### "Let's Go Brandon" Is a Popular, Non-Profane, Anti-Biden Political Slogan.

"Let's Go Brandon" is a political slogan, and political slogans have a rich history in American politics. The Whig Party's 1840 slogan "Tippecanoe and Tyler Too" highlighted William Henry Harrison's

heroism in the Battle of Tippecanoe. Slogans can sting, too. In 1884, Republicans used "Ma, ma, where's my pa?" to remind voters that Democrat Grover Cleveland fathered a child out of wedlock. Barack Obama's "Yes We Can" and Donald Trump's "Make America Great Again" leave little doubt that the rhetorical power of pithy slogans remains strong in American discourse.

The political slogan "Let's Go Brandon" originated at an October 2021 NASCAR race in Talladega, Alabama. After Brandon Brown won the race, members of the crowd chanted "Fuck Joe Biden" during Brown's post-race interview. A commentator quick-wittedly remarked that the fans were shouting "Let's Go Brandon!"[1]

The phrase "Let's Go Brandon" quickly became part of the American cultural and political lexicon as a cleaned-up slogan to express displeasure with President Biden and his administration.[2] Shortly after

---

[1] *See* sunnymoza, Original|UNEDITED – Let's Go Brandon |#Let'sGoBrandon, YouTube (Oct. 18, 2021), https://youtu.be/_zUlhpaZkJw [https://perma.cc/LL8U-6FZW] (reposting live television footage).

[2] *See, e.g.*, Annie Linskey, *How 'Let's Go Brandon' Became an Unofficial GOP Slogan*, Wash. Post (Nov. 15, 2021, 6:00 AM), https://www.washingtonpost.com/politics/lets-go-brandon-republicans/2021/11/14/52131dda-4312-11ec-9ea7-3eb2406a2e24_story.html [https://perma.cc/2HDP-MRAA].

the race, the official Trump campaign began selling "Let's Go Brandon" shirts,[3] and the National Republican Congressional Committee sold "Let's Go Brandon" wrapping paper.[4] Sean Spicer, President Trump's former press secretary, described the slogan as "an amalgamation of everything that's going on. … It's about how the media has been complicit in supporting this administration. It's about Biden himself. It's about the left being triggered by everything that's going on. It's about cancel culture. It's about everything rolled into one."[5]

In Congress, elected officials embraced "Let's Go Brandon" as a way to convey strong disapproval of President Biden's administration and legislative initiatives. *See* 168 Cong. Rec. H5240-05, H5240 (daily ed. June 7, 2022) (statement of Rep. Douglas L. LaMalfa); 167 Cong. Rec. H5880-01, H5880 (daily ed. Oct. 26, 2021) (statement of Rep. Mary E. Miller); 167 Cong. Rec. H5774-01, H5776 (daily ed. Oct. 21, 2021) (statement of Rep. William J. Posey). "Let's Go Brandon" also airs

---

[3] *See, e.g.*, Maureen Breslin, *Trump Campaign Sells 'Let's Go Brandon' T-shirts*, Hill (Oct. 28, 2021, 7:32 PM), https://thehill.com/media/579039-trump-campaign-sells-lets-go-brandon-t-shirts [https://perma.cc/T375-UWYP].

[4] Linskey, *supra* note 2.

[5] *Id.*

uncensored on broadcast television (*see, e.g.*, videos at RE 39-15 to RE 39-18), AM/FM radio (*see, e.g.*, audio at RE 39-19 to RE 39-20), and national cable news, including discussions about this lawsuit (*see, e.g.*, videos at RE 39-21 to RE 39-22). Even President Biden used "Let's Go Brandon" during an interview. (NBC News at 0:10, 0:12, RE 39-23.)[6]

President Biden's supporters repurposed "Let's Go Brandon" in mid-2022 as "Dark Brandon"—a pro-Biden internet meme stylizing the President's likeness to portray him as a superhero protagonist.[7] In February 2024, President Biden shared the "Dark Brandon" meme on his X (née Twitter) account to poke fun at conspiracy theories claiming he fixed the outcome of the Super Bowl.[8] And the Biden-Harris reelection

---

[6] This Court, like the district court, can take judicial notice of these video and audio clips because their existence, not the truth of their content, is relevant. *See, e.g.*, *Blick v. Ann Arbor Pub. Sch. Dist.*, 674 F. Supp. 3d 400, 429 (E.D. Mich. 2023) (taking judicial notice of various news article links, including news story videos, of students protesting school employment decisions).

[7] Alex Thompson & Allie Bice, *Dark Brandon Begins: How WH Aides Appropriated the Meme of Their Boss as an Underworld Kin*, Politico (Aug. 8, 2022, 6:08 PM), https://www.politico.com/newsletters/west-wing-playbook/2022/08/08/how-a-meme-of-biden-as-an-underworld-king-became-appropriated-by-his-aides-00050405 [https://perma.cc/9MJ4-ZXNU].

[8] Joe Biden (@JoeBiden), X (Feb. 11, 2024, 10:50 PM), https://twitter.com/JoeBiden/status/1756888470599967000 [https://perma.cc/8357-Q8HQ]; Kaia Hubbard, *Biden Leans Into "Dark*

campaign sold a series of "Dark Brandon" merchandise on its website.[9]

**D.A. and X.A. Wear "Let's Go Brandon" Apparel to School to Express Their Political Views.**

In December 2021, D.A. and X.A. each received a "Let's Go Brandon" sweatshirt as a Christmas present from their mother. (B.A. Dep., RE 39-6, Page ID # 599.) The sweatshirt features the political slogan with red, white, and blue stars underneath:




(Buikema Resp. to Pls.' Req. Admis. No. 8, RE 39-24, Page ID # 693; Bradford Resp. to Pls.' Req. Admis. No. 6, RE 39-25, Page ID # 696

---

*Brandon" Meme After Chiefs' Super Bowl Win,* CBS News (Feb. 12, 2024, 11:31 AM), https://www.cbsnews.com/news/biden-dark-brandon-meme-chiefs-super-bowl-taylor-swift/ [https://perma.cc/Y5PN-TFPS].

[9] *See Dark Collection*, Victory Fund Website https://shop.joebiden.com/dark/ [https://perma.cc/8JN4-R433] (last visited Mar. 13, 2024).

(admitting this sweatshirt is what D.A. and X.A. wore to school).)

In February 2022, D.A. wore his "Let's Go Brandon" sweatshirt to TCMS to express his dissatisfaction with President Biden. D.A. testified he sees the "Let's Go Brandon" political slogan as a "respectful" way to convey his views about President Biden without using swearwords. (D.A. Dep., RE 39-4, Page ID # 589.) Defendant-Appellee Andrew Buikema, then assistant principal at TCMS, confronted D.A. in the hallway and instructed D.A. to remove the sweatshirt. (*Id.*; Buikema Dep., RE 39-8, Page ID # 611.) Buikema told D.A. "Let's Go Brandon" "means the F-word." (Buikema Dep., RE 39-8, Page ID # 611.) Because D.A. was also wearing a "Let's Go Brandon" t-shirt underneath, Buikema directed D.A. to remove both and change into school-provided clothing. (*Id.*) D.A. complied. (*Id.* at 609.)

A few weeks later, D.A. again wore his "Let's Go Brandon" sweatshirt to school to express his opposition to President Biden. (D.A. Decl. ¶ 7, RE 39-2, Page ID # 580.) Defendant-Appellee Wendy Bradford, a TCMS teacher, stopped D.A. in the hallway and told him "you might want to take that off," warning that "otherwise Mr. Buikema is right down the hallway, you can talk to him." (Bradford Dep., RE 39-27, Page

ID # 709.) D.A., fearing punishment, removed his sweatshirt. (D.A. Decl. ¶ 11, RE 39-2, Page ID # 580.)

On May 26, 2022, X.A. wore his "Let's Go Brandon" sweatshirt to TCMS to express his opposition to President Biden. (X.A. Decl. ¶¶ 5–6, RE 39-3, Page ID # 584.) Buikema called X.A. out of class and summoned him to the TCMS front office. (Buikema Dep., RE 39-8, Page ID # 611.) There, Buikema told X.A. he could not wear "Let's Go Brandon" apparel and ordered X.A. to remove the sweatshirt. (*Id.* at 609, 611.)

Both Buikema and Bradford testified that, throughout their interactions, D.A. remained "polite" and "kind." (*Id.* at 611; Bradford Dep., RE 39-27, Page ID # 709.) Likewise, Buikema testified X.A. was "super polite, kind, complied, and took [the sweatshirt] off." (Buikema Dep., RE 39-8, Page ID # 611.) Both testified that they ordered D.A. and X.A. to remove their "Let's Go Brandon" apparel because they consider the slogan "vulgar, profane, and pornographic," in violation of the dress code. (*Id.* at 609; Bradford Dep., RE 39-27, Page ID # 709.) Both acknowledged neither D.A. nor X.A. were breaking any other school rules. (Buikema Resp. to Pls.' Req. Admis. Nos. 4–5, RE 39-24, Page ID # 692; Bradford Resp. to Pls.' Req. Admis. No. 4, RE 39-25, Page ID # 696.)

Buikema testified he also asked a third student to remove a "Let's Go Brandon" sweatshirt in 2022. (Buikema Dep., RE 39-8, Page ID # 612.) Like D.A. and X.A., the third student complied with Buikema's request and remained "polite." (*Id.*)

Before Buikema and Bradford ordered D.A. and X.A. to remove their sweatshirts, the students had never been asked to remove apparel due to the dress code. (D.A. Dep., RE 39-4, Page ID # 590; X.A. Decl. ¶ 11, RE 39-3, Page ID # 584.) Although D.A. and X.A. wish to continue expressing their opposition to President Biden by wearing their "Let's Go Brandon" apparel to school, neither has for fear of future discipline. (D.A. Decl. ¶ 13., RE 39-2, Page ID # 580; X.A. Decl. ¶ 13, RE 39-3, Page ID # 584; TCMS Handbook 2022–2023, at 18, RE 39-10, Page ID # 638.)

**The School District Never Experienced Disruption Due to "Let's Go Brandon" or Other Political Apparel.**

It is uncontested that the School District never experienced disruption due to students using the "Let's Go Brandon" slogan or wearing apparel bearing the slogan. ([TCMS Principal Joe] Williams Dep., RE 39-13, Page ID # 667; Buikema Dep., RE 39-8, Page ID # 607; [TCHS Principal Tim] Goheen Dep., RE 39-14, Page ID # 677.) It is also uncontested that, before D.A., X.A., and another student began wearing

"Let's Go Brandon" apparel, the School District never experienced disruption due to students wearing political apparel to school or engaging in political discussions. (Williams Dep., RE 39-13, Page ID # 667; Bradford Dep., RE 39-27, Page ID # 707; Goheen Dep., RE 39-14, Page ID ## 677–78; Buikema Dep., RE 39-8, Page ID # 607.)

Immediately after D.A. and X.A. filed their lawsuit, the School District's then-superintendent Al Cumings instructed TCMS Principal Joe Williams to document every instance of a student wearing "Let's Go Brandon Apparel" and to interrogate each student about why they were wearing it. (Williams Dep., RE 39-13, Page ID # 669; Buikema Dep., RE 39-8, Page ID # 608.) Principal Williams then instructed all TCMS staff to alert his office if they saw a student wearing "Let's Go Brandon" apparel. (E-mail from Andrew Buikema to TCMS Staff (Apr. 26, 2023, 2:12:43 PM), RE 39-31, Page ID # 722.)

They did. Over the next few weeks, multiple students chose to wear "Let's Go Brandon" shirts to school, while others wrote the slogan or the initials "LGB" on their arm or hand. (Williams' Notes, RE 39-30, Page ID # 720.) Williams testified none of these students caused disruption or violated any other school rules with their passive political expression.

(Williams Dep., RE 39-13, Page ID ## 668, 670–72.) Yet Principal Williams still interrupted each student's studies to interrogate them in his office about what the phrase "meant" and why they chose to display it. (*Id.* at 668–72.) Principal Williams admitted he could not remember another time in his over twenty years as an administrator when he had called a student to his office for a "profanity" violation. (*Id.* at 665, 670.)

During his deposition, Principal Williams testified he considers "Let's Go Brandon" and even the "LGB" abbreviation to be profanity prohibited by the dress code. (*Id.* at 671.) But he conceded that if a student were to insist their "Let's Go Brandon" shirt was in reference to, for instance, former Detroit Tigers third baseman Brandon Inge, the student would not be automatically violating the dress code's provision on profanity. (*Id.*) And he conceded that if a student were to instead wear "LGB" intending to express "Let's Go Bears," the student would not be violating school rules. (*Id.*) Violation of the dress code turned not on what the students were saying, but on what the administrators believed the students were thinking when they said it.

**The School District Declines to Lift Its Ban on "Let's Go Brandon" Apparel, so D.A. and X.A. File Suit.**

On May 27, 2022, D.A. and X.A., through counsel, wrote the School District, cited *Tinker,* and demanded it lift the prohibition on "Let's Go Brandon" apparel. (Letter from Philip Glovick to Tri County Area Schools (May 27, 2022), RE 39-28, Page ID ## 711–13.) The School District responded, through counsel: "The District prohibits clothing or styles of expression that are vulgar or profane. The commonly known meaning of the slogan 'Let's Go Brandon' is intended to ridicule the President with profanity … 'Let's Go Brandon' is a transparent code for using profanity against the President." (Letter from Kara T. Rozin to Philip Paul Glovick (June 9, 2022), RE 39-29, Page ID # 715.)

Given the School District's refusal to lift the ban, D.A. and X.A. filed this lawsuit against the School District, Buikema, and Bradford on April 25, 2023. They asserted five causes of action, the following three of which are raised on appeal: a claim for injunctive and declaratory relief against the School District's prohibition of "Let's Go Brandon" apparel (Claim 3); a damages claim against Buikema and Bradford for violating D.A.'s and X.A.'s First Amendment rights (Claim 1); and a damages claim against

the School District under *Monell* for violating D.A.'s and X.A.'s First Amendment rights (Claim 2). (Compl., RE 1, Page ID ## 15–24.)[10]

**The District Court Denies D.A. and X.A.'s Motion for Summary Judgment and Grants Summary Judgment for the School District and Its Employees.**

On August 23, 2024, the Western District of Michigan held "Let's Go Brandon" constitutes "profanity" censorable by public schools. (Opinion and Order, RE 58, Page ID ## 959–62.) The district court, however, expressly stated it "d[id] not conclude" that "Let's Go Brandon" could be regulated as "lewd" or "offensive" speech under *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 682–83 (1986). (Opinion and Order, RE 58, Page ID # 959.)

It reasoned the political slogan "can hardly be considered the sort of robust political discourse protected by the First Amendment," because it "does not seek to engage the listener over matters of public concern in

[10] D.A.'s and X.A.'s other two claims challenged a prior School District dress code provision banning apparel which "calls undue attention to oneself." (Compl., RE 1, Page ID ## 24–27.) During summary judgment briefing, the School District repealed that policy, mooting the claims. (Defs.' Mot. Summ. J., RE 38, Page ID ## 394–95.) In their summary judgment briefing, D.A. and X.A. acknowledged the mootness of the claims following the repeal. (Pls.' Resp. to Defs.' Mot. Summ. J., RE 44, Page ID # 814 n.12.)

a manner that seeks to expand knowledge and promote understanding." (*Id.* at 967.) The district court therefore concluded the School District's prohibition of "Let's Go Brandon" apparel does not violate the First Amendment, granted summary judgment to the School District and its employees, and denied D.A. and X.A.'s motion for summary judgment. (*Id.* at 968–69.) D.A. and X.A. timely filed a notice of appeal.

## SUMMARY OF ARGUMENT

This case is about the First Amendment right of America's students to wear political apparel to school. In 1969, during the height of protests over the Vietnam War, the Supreme Court upheld students' right to wear highly controversial black armbands expressing opposition to the war. *Tinker*, 393 U.S. at 508–14. The Court held public schools may not confine students "to the expression of those sentiments that are officially approved." *Id.* at 511.

Here, the district court's opinion violates that basic principle. It allowed school censorship of apparel containing the popular political slogan "Let's Go Brandon," reasoning that because the slogan is a cleaned-up cultural reference to a "Fuck Joe Biden" chant, schools can censor the slogan as though it *is* "Fuck Joe Biden." That was error.

Defendants have the burden of justifying their censorship. *Id.* at 509. But they provided zero examples of anyone, anywhere, categorizing substitute sanitized expressions as equally profane to uncensored originals. That is because they are not. Sanitized expressions make the profane and sexually mature appropriate for younger audiences. That is why radio edits of songs and television edits of R-rated movies exist. And it is why, when kids are present, parents say (or try to say) "heck" and "shoot" instead of other words.

The Supreme Court explained that "the First Amendment gives a high school student the classroom right to wear Tinker's armband, but not Cohen's ['Fuck the Draft'] jacket." *Fraser*, 478 U.S. at 682 (citing *Cohen v. California*, 403 U.S. 15 (1971)). This makes good sense. Kids can't say "fuck" at school. But under the district court's holding, a school could even prohibit a student from wearing an anti-draft jacket saying "Cohen's Jacket" on the basis it "means" "Fuck the Draft." That is simply not how profanity—or language—works. And nothing in *Tinker* or *Fraser* gives school officials such broad censorial powers over nondisruptive political speech.

Even if the district court believed "Let's Go Brandon" is "ambiguously" profane, it should have applied the en banc Third Circuit's test in *B.H. ex rel. Hawk v. Easton Area School District*, 725 F.3d 293, 298 (3d Cir. 2013) to conclude the slogan retains First Amendment protection as commentary on a political matter. But the district court refused to follow *B.H.* because it believes the Third Circuit erred in treating Justice Alito's concurrence in *Morse v. Frederick*—upon which *B.H.* relies—as controlling. (Opinion and Order, RE 58, Page ID ## 966–67 (discussing *Morse v. Frederick*, 551 U.S. 393, 422 (2007) (Alito, J., concurring)).) That was error, too. This Court, along with multiple other Circuits, has already held Justice Alito's concurrence is the controlling opinion. *See Barr v. Lafon,* 538 F.3d 554, 564 (6th Cir. 2008) (treating "Justice Alito's concurrence" as the basis for *Morse*'s "narrow" holding); *Defoe ex rel. Defoe v. Spiva*, 625 F.3d 324, 332–33, 333 n.5 (6th Cir. 2010) (same). Had the district court correctly applied *Morse* and this Court's understanding of it, the court would have held the First Amendment protected D.A.'s and X.A.'s political expression of wearing anti-Biden "Let's Go Brandon" sweatshirts.

The district court therefore erred by granting Defendants summary judgment. And it erred again in denying D.A. and X.A.'s summary judgment motion. Not only are they entitled to an injunction against the School District's prohibition on "Let's Go Brandon" apparel, but *Tinker*, *Fraser*, and *Morse*, among others, clearly established the students' First Amendment right to passively wear the sweatshirts to school, meaning Buikema and Bradford are not entitled to qualified immunity.

Running a school is no easy task. Public schools have "important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943). That schools "are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *Id.* This Court should reverse.

## ARGUMENT

"When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions," including its censorship of student speech. *United States v. Playboy Ent. Grp., Inc.*,

529 U.S. 803, 816–17 (2000) (citing *Tinker*, 393 U.S. at 509). There is a "good reason" why the government—whether located at 1600 Pennsylvania Avenue or in the principal's office—bears that burden: Suppressing speech "exacts an extraordinary cost." *Id.* at 817. "It is through speech that our convictions and beliefs are influenced, expressed, and tested," and it is "through speech that our personalities are formed and expressed." *Id.*

For that reason, "First Amendment standards … must give the benefit of any doubt to protecting rather than stifling speech." *Citizens United v. FEC*, 558 U.S. 310, 327 (2010) (quoting *FEC v. Wisc. Right to Life, Inc.*, 551 U.S. 449, 469 (2007)).

Because of the importance of First Amendment rights, this Court "review[s] First Amendment questions de novo." *Procter & Gamble Co. v. Bankers Tr. Co.*, 78 F.3d 219, 226–27 (6th Cir. 1996). And it likewise reviews a district court's summary judgment decisions de novo. *Maben v. Thelen*, 887 F.3d 252, 263 (6th Cir. 2018). The Court determines "whether the evidence presents a sufficient disagreement to require submission to a jury" and "draw[s] all reasonable inferences in favor of the non-moving party." *Id.*

## I. The Political Slogan "Let's Go Brandon" Is Not Profane.

The First Amendment protects the anti-Biden "Let's Go Brandon" political slogan. From "the early cartoon portraying George Washington as an ass," jabs at "Lincoln's tall, gangling posture," and caricatures of "Teddy Roosevelt's glasses and teeth," the Constitution has kept watchful guard over attempts to police how Americans talk about our leaders. *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 54–55 (1988). The Constitution embodies America's "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). The "Let's Go Brandon" political slogan—used everywhere from campaign rallies to the floor of Congress in order to convey disapproval of President Biden and his administration—fits squarely within our nation's deeply rooted tradition of peaceful dissent.

It is well settled that "minors are entitled to a significant measure of First Amendment protection." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011) (quotation omitted). Likewise in public schools. While

First Amendment rights apply "in light of the special characteristics of the school environment," students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker*, 393 U.S. at 506. To censor student expression, schools must ordinarily demonstrate actual or reasonably forecast "substantial disruption of or material interference with school activities." *Id.* at 514.

Absent substantial disruption, schools have limited ability to restrict speech. This makes sense. If a school cannot show a student's expression is impacting classwork or school operations, the school necessarily has a lessened interest in policing it. So, the Supreme Court has held schools may censor student expression absent substantial disruption only if the student's speech falls within narrow exceptions for "vulgar,[11] lewd, indecent, or plainly offensive" speech or for "promoting illegal drug use." *Barr*, 538 F.3d at 563–64 (citing *Fraser*, 478 U.S. at 683–85; *Morse*, 551 U.S. at 409).[12] These narrow exceptions reflect the

---

[11] "Vulgar … has become a synonym for swearing." Melissa Mohr, *Holy Sh*t, A Brief History of Swearing* 11 (2013).

[12] The Court has recognized a third exception for student speech "bear[ing] the imprimatur of the school," such as a school newspaper, so long as its "actions are reasonably related to legitimate pedagogical concerns." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271–73

commonsense understanding that school is not an appropriate place for students to use swearwords, engage in sexually explicit speech, or encourage drug use.

But here, even though Defendants acknowledge D.A.'s and X.A.'s "Let's Go Brandon" sweatshirts caused no disruption during the months the students wore them (Defs.' Resp. to Pls.' Mot. Summ. J., RE 46, Page ID ## 836–37), the district court nevertheless held the School District may prohibit the political slogan because it constitutes "profanity." (Opinion and Order, RE 58, Page ID #961.) It does not. "Let's Go Brandon," like the radio-friendly edit of a hit single, is intentionally sanitized expression designed to be suitable for all audiences. This type of expression is not "profane" by any measure. The district court erred in holding otherwise.

### A. "Let's Go Brandon" falls outside the established cultural and legal boundaries of "profanity."

The "Let's Go Brandon" political slogan is not "profanity" under any reasonable or historical understanding of the term. Socially unacceptable words and phrases (now usually grouped together as "profanity") broadly

---

(1988). That exception is not at issue here (and the district court and Defendants do not contend otherwise).

fit within one of two categories: swearwords and religious vain oaths. *See* Mohr, *supra* note 11, at 3–9. "Let's Go Brandon" is neither.

Swearwords "vividly reveal taboo body parts, actions, and excretions that culture demands we conceal, whether by covering with clothing, shrouding in privacy, or flushing down the toilet." *Id.* at 7. George Carlin's "Seven Words You Can't Say on Television" are classic swearwords. *See id.* at 15. Vain oaths are taboo because they invoke the power of the Almighty. So, words and phrases like *damn* (short for damnation), *Goddamn* (same, with added clarity for who will be doing the damning), and *hell* (invoking the concept of damnation) are often considered unacceptable in polite conversation. "Over the centuries, these two spheres of the unsayable—the religious and the sexual/excremental … have given rise to all the other 'four letter words' with which we swear." *Id.* at 3.

"Let's Go Brandon," on the other hand, is a purposely non-profane substitute expression, often called euphemism.[13] "Euphemism is the

[13] The Associated Press and National Public Radio refer to the "Let's Go Brandon" slogan as a "euphemism." *See, e.g.*, Colleen Long, *How 'Let's Go Brandon' Became Code for Insulting Joe Biden*, AP News (Oct. 30, 2021, 5:08 PM), https://apnews.com/article/lets-go-brandon-what-does-it-mean-republicans-joe-biden-ab13db212067928455a3dba07756a160

opposite of swearing." *Id.* at 197. "Swearwords work because they carry an emotional charge derived from their direct reference to taboo objects, orifices, and actions." *Id.* By contrast, "euphemisms exist to cover up those same taboos, to disguise or erase the things that prompt such strong feelings." *Id.* Euphemisms are "anti-obscenities." *Id.*[14]

English speakers throughout history have turned to these types of substitute expressions to avoid the social taboo of profanity. They convey a sense of urgency, outrage, or otherwise discuss sensitive topics while staying inside cultural norms for polite conversation. Two hundred years ago, Victorians referred to trousers as "unmentionables" because "their shape revealed a man's legs, and a man's having legs implied that he very

---

[https://perma.cc/3DBF-CJY9]; Wynne Davis & Scott Simon, *Here's What 'Let's Go, Brandon' Actually Means and How it Made its Way to Congress*, NPR (Oct. 31, 2021, 3:49 PM), https://www.npr.org/2021/10/30/1050782613/why-the-lets-go-brandon-chant-turned-meme-can-be-heard-on-the-floor-of-congress [https://perma.cc/BW9Z-S6TU].

[14] Some categorize "Let's Go Brandon" as a "minced oath," a non-profane expression retaining some aspect of the root of the profane original. (e.g., "heck" for "hell" and "shoot" for "shit"). *See Minced Oath*, Cambridge Advanced Learner's Dictionary & Thesaurus (2024); Benjamin Zimmer et al., *Among the New Words*, 97 Am. Speech 412, 416 (2022) (categorizing "Let's Go Brandon" as a "minced oath"). Both euphemisms and minced oaths are centuries-old, established methods for rendering sensitive words and topics appropriate for an all-ages audience.

likely had other body parts up there." *Id.* at 191. In modern times, we use (or try to use) substitute, sanitized phrases like "fudge" and "gosh darn" to express strong emotion without using profanities.[15]

Sanitizing socially taboo words and expressions for general audiences is why radio edits of songs and Kidz Bop exist. And it's how PG-13– and R-rated movies air on television. *See generally* Carrie A. Beyer, *Fighting for Control: Movie Studios and the Battle over Third-Party Revisions*, 2004 U. Ill. L. Rev. 967, 985–86. For example, in *Citadel Broadcasting Co.*, the FCC explained why the radio edits to Eminem's Grammy-winning song "The Real Slim Shady"—which scrubbed and sanitized the original's profanity and sexually explicit language—meant the clean version "was not patently offensive, and thus not actionably indecent." 17 FCC Rcd 483, 486 (2002).

Yet the district court found Defendants "reasonably interpreted" the "Let's Go Brandon" political slogan as profane. (Opinion and Order, RE 58, Page ID # 943.) It is not reasonable, however, to interpret the

[15] Even in the magical world of *Harry Potter*, the wizarding community refers to the evil Lord Voldemort as "You-Know-Who" and "He Who Must Not Be Named" to sanitize discussion for polite conversation. *See, e.g.*, J.K. Rowling, *Harry Potter and the Sorcerer's Stone* 10–11, 85 (Scholastic Books 1997).

clean version of an album as "explicit." Nor is it reasonable to categorize a movie, sanitized to air on network television, as equally lewd or profane as the R-rated original. That is how sanitization *works*.

Compare and contrast actual profanity with the "Let's Go Brandon" political slogan. Students cannot say f*** or s*** at school, regardless of whether they are referring to an elected official or the Green Bay Packers. That is because, as explained above, society deems certain words and expressions taboo and unacceptable for normal conversation. But here, Principal Williams testified there is no automatic prohibition on students expressing "Let's Go Brandon" *if*, for example, they promise they're saying it to support Detroit Tigers third baseman Brandon Inge and not to criticize President Biden. (Williams Dep., RE 39-13, Page ID # 671.) He similarly testified that while students are not permitted to express "LGB" if they mean to criticize President Biden, no such restriction exists if the student assures him they intend to express "Let's Go Bears." (*Id.*)

The School District is thus policing *thought*, not expression. And that is a five-alarm First Amendment fire. The Supreme Court has been crystal clear that the government may regulate certain types of speech, but never the thoughts behind it. In schools, "officials cannot suppress

expressions of feelings with which they do not wish to contend." *Tinker*, 393 U.S. at 511 (quotation omitted). That is because "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). While giving the government the ability "to control the moral content of a person's thoughts" may seem noble to some, "it is wholly inconsistent with the philosophy of the First Amendment." *Stanley v. Georgia*, 394 U.S. 557, 565–66 (1969). And "the values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214 (1975).

The School District is claiming entitlement to ban "Let's Go Brandon" from school based not on words used, but words imagined. The understanding of "profanity" has, for centuries, turned on the former. Defendants offer no examples to the contrary. That means Defendants failed to meet their burden to demonstrate an exception to D.A. and X.A.'s First Amendment right to nondisruptive political speech. This Court should reverse.

### B. *Fraser* provides no authority for censoring sanitized political expression like "Let's Go Brandon."

The district court erred by treating *Fraser* as an untethered grant of authority for schools to censor speech they subjectively find inappropriate. It is not. The Supreme Court explained in *Fraser*, *Hazelwood*, and *Morse* that the student's expression in *Fraser* materially differed from the passive expression in *Tinker* because in *Fraser*: (1) the student's speech was unrelated to a political viewpoint, (2) he spoke from the lectern of a mandatory school assembly, (3) he used sexually explicit language, and (4) the student's expression would have violated congressional decorum rules.

*Fraser* involved a student delivering a speech laden with sexual innuendo at a mandatory school assembly. 478 U.S. at 677–78. The student used "an elaborate, graphic, and explicit sexual metaphor" to endorse a student council candidate, *id.* at 678, proclaiming him "a man who is firm—he's firm in his pants," and promising he would "take[] his point and pound[] it in" and "go to the very end—even the climax, for each and every one of you," *id.* at 687 (Brennan, J., concurring in the judgment). During the speech, "some students hooted and yelled," while others "by gestures graphically simulated the sexual activities pointedly

alluded to in [the student's] speech." *Id.* at 678 (majority op.). The Court held the First Amendment did not shield the student from punishment and distinguished his remarks from *Tinker* in key respects.

First, the Court has repeatedly emphasized the "marked distinction" between the non-political student council assembly speech in *Fraser* and the political message of the anti-war armbands in *Tinker*. *Fraser*, 478 U.S. at 680; *Morse*, 551 U.S. at 404. The distinction between political and non-political speech is critical because American public schools serve as "nurseries of democracy." *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 190 (2021). Our "Nation's future depends on leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection." *Tinker*, 393 U.S. at 512 (cleaned up). Students living and learning among the "multitude of tongues" prepares them to "grow up and live in this relatively permissive, often disputatious, society." *Id.* at 508–09. In short, students wearing political apparel to school is part of an American education in a way that a profanity-for-the-sake-of-profanity shirt (or sexually explicit student council speech) is not.

Second, unlike Mary Beth and John Tinker, who passively wore controversial anti-war armbands during the school day, Matthew Fraser directed his expression at a captive student audience during a mandatory assembly. *Id.* at 677. Contrasting *Tinker* with *Fraser*, the Supreme Court in *Hazelwood* distinguished between suppression of "a student's personal expression that happens to occur on the school premises" and "educators' authority over school-sponsored … activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." 484 U.S. at 271. Fraser's student council speech fell into the latter category, so the school could exercise "greater control" over the expression and "'disassociate itself'" from remarks it viewed as inappropriate. *Id.* (quoting *Fraser*, 478 U.S. at 685). Indeed, while an offended viewer of political clothing in a hallway may simply "avert[] their eyes," *Cohen*, 403 U.S. at 21, a student listening to a speech at a mandatory school assembly has no such recourse.

Third, Fraser's assembly speech, unlike the Tinkers' armbands, used "graphic" and "explicit" sexual language. *Fraser*, 478 U.S. at 678; *see also Hazelwood*, 484 U.S. at 271 n.4 ("The decision in *Fraser* rested on the 'vulgar,' 'lewd,' and 'plainly offensive' character of a speech

delivered at an official school assembly.") Again contrasting with *Tinker*, *Fraser* explained, "This Court's First Amendment jurisprudence has acknowledged limitations … where the speech is sexually explicit and the audience may include children." 478 U.S. at 684.

Finally, the *Fraser* Court noted the student's assembly speech would have violated the rules of the U.S. Senate and House of Representatives. 478 U.S. at 681–82. It reasoned, "Can it be that what is proscribed in the halls of Congress is beyond the reach of school officials to regulate?" *Id.* at 682.

By contrast, multiple members of Congress have used the "Let's Go Brandon" slogan during floor speeches to convey strong disapproval of President Biden and his legislative initiatives without breaching profanity or decorum rules.[16] On October 21, 2021, Florida Congressional Representative William J. Posey used the "Let's Go Brandon" slogan to punctuate a floor speech opposing President Biden's "Build Back Better Plan." 167 Cong. Rec. at H5776. Illinois Congressional Representative

[16] *See generally* Gail E. Baitinger, Cong. Rsch. Serv., R45866, *Words Taken Down: Calling Members to Order for Disorderly Language in the House* (August 13, 2019) (describing "the standing rules of the House of Representatives" on "disorderly language" and consequences for its use).

Mary E. Miller ended a speech in the House of Representatives by saying, "Our response to a weaponized Federal Government is loud and clear. In the spirit of freedom, we say: Let's go, Brandon." 167 Cong. Rec. at H5880. And on June 7, 2022, Representative Douglas L. LaMalfa of California finished his remarks on food security with, "I guess that is why everybody is leading the charge these days in cheering for: Let's go, Brandon." 168 Cong. Rec. at H5240.

In sum, each of the four factors the Supreme Court has said separates *Tinker* from *Fraser* equally distinguishes D.A's and X.A.'s "Let's Go Brandon" sweatshirts from *Fraser*.

The district court also relied on *Boroff v. Van Wert City Board of Education*, 220 F.3d 465, 471 (6th Cir. 2000), for the proposition that, under *Fraser*, schools may ban "symbols and words that are patently contrary to the school's educational mission." (Opinion and Order, RE 58, Page ID # 964.) But *Boroff* is inapposite twice over. First, *Boroff* involved the non-political speech of a Marilyn Manson band t-shirt,[17] so it is immediately inapt due to that "marked distinction." *Fraser*, 478 U.S. at

[17] "Marilyn Manson is the stage name of 'goth' rock performer Brian Warner ... [who] is widely regarded as a user of illegal drugs." *Boroff*, 220 F.3d at 466.

680. Second, the student's shirt "advocated, albeit obliquely, the use of illegal drugs, a form of advocacy in the [K–12] school setting that can be prohibited without evidence of disruption." *Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 877 (7th Cir. 2011) (discussing *Boroff* and citing *Morse*, 551 U.S. at 406–10).

Importantly, as Justice Alito explained seven years after *Boroff*, the argument that the First Amendment allows an amorphous "educational mission" exception to student expressive rights is not supported by precedent. *Morse*, 551 U.S. at 423 (Alito, J., concurring). Were it the law, he noted, the school district in *Tinker* would have simply "defined its educational mission to include solidarity with our soldiers." *Id.*[18]

A freestanding "educational mission" exception to students' free speech rights cannot be squared with *Tinker*'s command that students retain their First Amendment rights in school. That is because schools always believe *their* censorship is furthering their educational mission. The exception would swallow the rule.

---

[18] Though the issue has not (so far as we can find) been presented to this Court, other circuits have held *Morse* rendered *Boroff* a dead letter. *See, e.g.*, *B.H.*, 725 F.3d at 316 (listing *Boroff* as an example of a case that "before *Morse* ... adopted th[e] broad interpretation" of *Fraser*, but is now "incompatible with the Supreme Court's teachings").

### C. The First Amendment protects students' right to nondisruptively wear apparel with the "Let's Go Brandon" political slogan.

Because the "Let's Go Brandon" political slogan does not fall within *Fraser*'s narrow exception for profanity, D.A.'s and X.A.'s sweatshirts, like the Tinkers' anti-war armbands, retained full First Amendment protection. But the district court discounted the political resonance of D.A.'s and X.A.'s expression, holding "Plaintiffs did not engage in speech on public issues." (Opinion and Order, RE 58, Page ID # 967.) Not so. "Let's Go Brandon" is a well-known political slogan voicing opposition to President Biden and his administration, heard everywhere in recent years from the well of the U.S. House of Representatives to campaign rallies. The only way "Let's Go Brandon" makes any sense to a listener is if they understand its status as an anti-Biden slogan.

The district court insisted "hurling personal insults and uttering vulgarities or their equivalents towards one's political opponents … can hardly be considered the sort of robust political discourse protected by the First Amendment." (*Id.*) As an initial matter, "Let's Go Brandon" no more constitutes "uttering vulgarities" about someone than calling them a "so-and-so" or a "you know what."

But more importantly, the district court is wrong about the scope of the First Amendment. Insulting public officials, even in the harshest terms, is core protected political speech. *See, e.g.*, *N.Y. Times*, 376 U.S. at 270; *Bridges v. California*, 314 U.S. 252, 270 (1941). As this Court explained, "The great public outcry against the Sedition Act of 1789, which allowed the government to punish 'malicious' writings designed to bring public officials into 'disrepute,' emphatically exemplifies" the First Amendment right to criticize public officials. *Rudd v. City of Norton Shores*, 977 F.3d 503, 513 (6th Cir. 2020). So "in public debate, we must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment." *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (cleaned up).

That protection holds in public schools. For example, the Second Circuit held the First Amendment protected a student's right to wear a shirt calling President George W. Bush a "Crook," "Cocaine Addict," "AWOL, Draft Dodger," and "Lying Drunk Driver." *Guiles ex rel. Guiles v. Marineau*, 461 F.3d 320, 322, 330–31 (2d Cir. 2006). As the Supreme Court explained in *Morse*, "political speech … is at the core of what the First Amendment is designed to protect." 551 U.S. at 403 (cleaned up).

The district court reasoned the "Let's Go Brandon" slogan "does not seek to engage the listener over matters of public concern in a manner that seeks to expand knowledge and promote understanding." (Opinion and Order, RE 58, Page ID # 967.) But the Supreme Court has made clear the First Amendment bars the government from making normative judgments about which expression is worthy of being heard. "What seems to one to be trash may have for others fleeting or even enduring values." *Hannegan v. Esquire, Inc.*, 327 U.S. 146, 158 (1946). Discussing the perceived lesser value of playing video games to reading classics, Justice Scalia explained, "Reading Dante is unquestionably more cultured and intellectually edifying than playing Mortal Kombat. But these cultural and intellectual differences are not *constitutional* ones." *Brown*, 564 U.S. at 796 n.4. Even if a court can see in a particular expression "nothing of any possible value to society …, [it is] as much entitled to the protection of free speech as the best of literature." *Id.* (alteration in original) (quoting *Winters v. New York*, 333 U.S. 507, 510 (1948)).

The *Tinker* Court was unequivocal that public school students "may not be confined to the expression of those sentiments that are officially approved." 393 U.S. at 511. That is because the First Amendment's

protections do not "belong only to speakers whose motives the government finds worthy; its protections belong to all, including to speakers whose motives others may find misinformed or offensive." *303 Creative LLC v. Elenis*, 600 U.S. 570, 595 (2023).

Whether it's "Tippecanoe and Tyler, Too," "Ma, ma, where's my pa?" "Yes We Can," "Make America Great Again," or "Let's Go Brandon," slogans play a starring role in American political history and expression. Our First Amendment forever bars the government from requiring we submit slogans to a board of censors for an assessment of whether our chant "seeks to expand knowledge and promote understanding." (Opinion and Order, RE 58, Page ID # 967.) The district court got the law, and American history, wrong.

### D. Teenagers can handle seeing a "Let's Go Brandon" sweatshirt.

West Michigan's teenagers can handle seeing "Let's Go Brandon" on a sweatshirt at school. Writing for the Court in *Brown*, Justice Scalia noted that "high-school reading lists are full" of disturbing imagery. 564 U.S. at 796. "Homer's Odysseus binds Polyphemus the Cyclops by grinding out his eye with a heated stake," and "[i]n the Inferno, Dante and Virgil watch corrupt politicians struggle to stay submerged beneath

a lake of boiling pitch." *Id.* (citing Homer's Odyssey and Dante's Inferno). In John Steinbeck's *magnum opus* East of Eden, wife and mother Cathy Trask shoots husband Adam and flees her family to become the madam of a brothel catering to sexual sadism. John Steinbeck, *East of Eden* 202, 314–322 (Penguin Books 1992) (1952).

It defies belief that teenagers could navigate Dante's *Inferno* and Cathy Trask's brothel in the classroom but have their education disturbed by seeing a "Let's Go Brandon" hoodie in the hallway. David Moshman, Plaintiffs' unrebutted expert in adolescent psychology, explained why. "Children begin recognizing that others can have different ideas than they do about the age of 4 years." (Moshman Expert Report, RE 39-32, Page ID # 728.) "By the age of 7 or 8 years, if not earlier, children understand that they are responsible for their actions, and by the age of 11 or 12 years they have a deeper understanding of what this entails." (*Id.*) So "there was no reason for school officials to expect" that "Let's Go Brandon" apparel would disturb the educational atmosphere. (*Id.*)

Citing studies on teenage cognitive development, Dr. Moshman explained, "There is no reason to think middle or high school students

are any different from adults in their understanding of what it means for someone to have a message on their shirt and how one ought to react to that, or are more likely than adults to react disruptively … Of course any message could possibly lead to unexpected reactions, but this is true regardless of age." (*Id.*) Defendants did not name an expert witness, nor have they challenged Dr. Moshman's conclusions about the absence of any effect of "Let's Go Brandon" apparel on the school environment.

There is "no doubt a State possesses legitimate power to protect children from harm … but that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794. Defendants perhaps wish students were not using a political slogan conveying such antipathy towards a sitting president. But "school officials cannot suppress expressions of feelings with which they do not wish to contend." *Tinker*, 393 U.S. at 511 (internal quotation omitted).

"Let's Go Brandon" is not profane. And the First Amendment prohibits Defendants from censoring the political "feeling" behind it. This Court should reverse.

## II. Even if "Let's Go Brandon" Is Ambiguously Profane, It Remains Protected Speech Because It Comments on a Matter of Political or Social Concern.

### A. *Fraser* applies only to plainly lewd and profane speech.

Not only is *Fraser* distinguishable four times over, *see* discussion *supra* Section I.B, its holding restricts only *plainly* lewd or profane speech. So even if the Court believes "Let's Go Brandon" could be considered "ambiguously" profane—i.e., "speech that a reasonable observer *could* interpret as either [profane] or non-[profane]," *B.H.*, 725 F.3d at 306 (emphasis added)—the slogan retains First Amendment protection.

*Fraser* is not, as the district court's opinion suggests, a standardless allowance for schools to restrict speech they subjectively deem inappropriate. As Justice Brennan explained, "School officials do not have limitless discretion to apply their own notions of indecency. Courts have a First Amendment responsibility to insure [sic] that robust rhetoric is not suppressed by prudish failures to distinguish the vigorous from the vulgar." *Fraser*, 478 U.S. at 689–90 (Brennan, J., concurring) (cleaned up) (quoting *Thomas v. Bd. of Educ., Granville Cent. Sch. Dist.,* 607 F.2d 1043, 1057 (2d Cir. 1979)). The Supreme Court reaffirmed that principle

in *Morse* when it rejected a school's attempt to use *Fraser* to punish a student for displaying a "BONG HiTS 4 JESUS" banner. 551 U.S. at 409. The Court held the school district's interpretation of *Fraser* as a license to punish speech it deems "offensive" "stretches *Fraser* too far." *Id.*

The district court's opinion likewise "stretches *Fraser* too far." *Fraser* expressly tied its reasoning and holding to prior decisions "acknowledg[ing] limitations on the otherwise absolute interest of the speaker in reaching an unlimited audience where the speech is sexually explicit and the audience may include children." 478 U.S. at 684.

The *Fraser* Court first pointed to *Ginsberg v. New York*, 390 U.S. 629 (1968), which upheld a statute banning the sale of nudity-laden adult magazines to minors. *Id.* There, the Court held states may permissibly adopt a lessened "obscenity" standard for minors regarding "sex material," explaining it "was rational for the legislature to find that the minors' exposure to such material might be harmful." *Ginsberg*, 390 U.S. at 638–40.

The *Fraser* Court also cited *FCC v. Pacifica Foundation*, 438 U.S. 726, 729 (1978), which upheld the FCC's power to regulate an "indecent but not obscene" uncensored radio broadcast of George Carlin's *Seven*

*Words You Can't Say on Television* monologue during the daytime, reasoning children would likely be listening. *Fraser*, 478 U.S. at 684. And the *Fraser* Court pointed, *id.*, to *Board of Education v. Pico*, 457 U.S. 853 (1982), which acknowledged schools may remove "pervasively vulgar" books. *Pico*, 457 U.S. at 871 (plurality op.).

In short, as the en banc Third Circuit explained, "*Fraser* did no more than extend these obscenity-to-minors cases to another place where minors are a captive audience—schools." *B.H.*, 725 F.3d at 305; *see also Doninger ex rel. Doninger v. Niehoff,* 527 F.3d 41, 49 (2d Cir. 2008) (cabining *Fraser*'s holding to the type of "vulgar, lewd, and sexually explicit language that was at issue in that case"); *Chandler v. McMinnville Sch. Dist.,* 978 F.2d 524, 530 (9th Cir. 1992) (interpreting *Fraser* as permitting restriction of only "per se vulgar, lewd, obscene, or plainly offensive" speech).

Neither *Fraser*, nor any case *Fraser* relied upon, held public schools have free-floating authority to subjectively deem material "profane" or "inappropriate" and banish it from school. "*Fraser* addressed only a school's power over speech that was plainly lewd—not speech that a reasonable observer could interpret either as lewd or non-lewd." *B.H.*,

725 F.3d at 306. And "it remains the job of judges … to determine whether a reasonable observer could interpret student speech" as plainly lewd or profane. *Id.* at 308; *see also Chandler*, 978 F.2d at 530 (rejecting school's position that pro-union "scab" buttons could be regulated under *Fraser*, explaining, "these buttons cannot be considered per se vulgar, lewd, obscene, or plainly offensive within the meaning of *Fraser*"). That is because local school boards must exercise their "important, delicate, and highly discretionary functions" within the limits of the First Amendment. *Barnette*, 319 U.S. at 637; *Tinker*, 393 U.S. at 507 (holding same).

The political slogan "Let's Go Brandon" cannot "reasonably" be viewed as plainly lewd or profane under the guideposts *Fraser* used to demarcate "sexually explicit, indecent, or lewd speech." *Fraser*, 478 U.S. at 684. It bears no resemblance to the nude magazines in *Ginsberg*, the "pervasively vulgar" books discussed in *Pico*, or George Carlin's uncensored *Seven Words You Can't Say on Television* monologue from *Pacifica*. Unlike Carlin's monologue, which *Fraser* explained, the government could restrict from over-the-air radio, "Let's Go Brandon" is omnipresent on terrestrial broadcast radio and television, media on

which federal law may constitutionally prohibit airing "indecent, profane, or obscene" speech. 18 U.S.C. § 1464; s*ee supra* pp. 9–10. And it bears no resemblance to Fraser's sexually explicit speech delivered to a captive audience at a mandatory school assembly.

The district court (and Defendants) points to no metrics or standards by which "Let's Go Brandon" could be considered plainly profane. The district court held the school's say-so is dispositive. The First Amendment and Supreme Court precedent say it is not.

### B. Under *Morse*, the First Amendment does not permit school censorship of "ambiguously" lewd or profane political speech.

Because the "Let's Go Brandon" political slogan is not plainly profane and comments on a political matter (opposition to President Biden), the First Amendment protects it. *Morse* further solidified D.A.'s and X.A.'s right to even "ambiguously" profane political speech. Like *Fraser*, *Morse* recognized a narrow *Tinker* exception (i.e., a category of student speech regulable even when no substantial disruption occurs): speech that "can reasonably be regarded as encouraging illegal drug use." *Morse*, 551 U.S. at 397. The *Morse* Court justified the exception based on schools' "compelling" interest in "deterring drug use by school children,"

which "can cause severe and permanent damage to the health and well-being of young people." *Id.* at 407.

Importantly, Justices Alito and Kennedy, the linchpin votes for *Morse*, "join[ed] the opinion of the Court on the understanding … it provides *no support* for any restriction of speech that can plausibly be interpreted as commenting on any political or social issue." *Id.* at 422 (Alito, J., concurring) (emphasis added). And because their votes were necessary to establishing a majority, that limitation controls. *See Marks v. United States*, 430 U.S. 188, 193 (1977).

The Third Circuit distilled the point: Justice Alito's concurrence necessarily means "the *Fraser* exception does not permit" schools to restrict "ambiguously lewd, vulgar, or profane" student speech if it is "plausibly interpreted as political or social commentary." *B.H.*, 725 F.3d at 307, 309–10, 315.

1. Under *Marks*, Justice Alito's concurrence in *Morse* is controlling.

The district court erred by failing to treat Justice Alito's concurrence in *Morse* as controlling. It refused to follow the framework in *B.H.* for "ambiguously" lewd or profane student speech (discussed more fully below) by reasoning that "[t]he Third Circuit relied on Justice Alito's

concurring opinion to reach its holding" and "[t]he Seventh Circuit … has rejected the argument that Justice Alito's concurrence controls." (Opinion and Order, RE 58, Page ID ## 966–67) (citing *Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. No. 204,* 523 F.3d 668, 673 (7th Cir. 2008)). But the district court's analysis is at odds with the law of this Circuit.

This Court, along with every other circuit to address the question *except* the Seventh Circuit, agrees Justice Alito's concurrence controls. *Barr,* 538 F.3d at 564 (treating "Justice Alito's concurrence" as the basis for *Morse*'s "narrow" holding); *Defoe*, 625 F.3d at 332–33, n.5 (same); *see also B.H.*, 725 F.3d at 312 ("Justices Alito and Kennedy's concurrence … controls the majority opinion in *Morse*."); *Morgan v. Swanson*, 659 F.3d 359, 403 (5th Cir. 2011) (en banc) (affirming Justice Alito's *Morse* concurrence is "controlling"); *Corder v. Lewis Palmer Sch. Dist. No. 38,* 566 F.3d 1219, 1228 (10th Cir. 2009) (treating "Justice Alito's concurrence" as the basis for *Morse*'s "narrow holding"). Only the Seventh Circuit concluded, "without citation or support," that the *Morse* concurrence does not control. *B.H.*, 725 F.3d at 313 n.17 (citing *Nuxoll,* 523 F.3d at 673).

This Court (and the Third, Fifth, and Tenth Circuits) got it right. It makes sense that Justices Alito and Kennedy's *Morse* concurrence narrows the majority opinion. "Had they known that lower courts would ignore their narrower understanding of the majority opinion—or had the majority opinion expressly gone farther than their limitations—then, by their own admission, they would not have joined the majority opinion." *Id.* at 312. Disregarding express limitations would mean four Justices could "fabricate a majority by binding a fifth to their interpretation of what they say, even though he writes separately to explain his own more narrow understanding." *McKoy v. North Carolina,* 494 U.S. 433, 462 n.3 (1990) (Scalia, J., dissenting).

The controlling *Morse* concurrence makes plain what the majority opinion already strongly implied: The Supreme Court's decision "provides no support for any restriction of speech that can plausibly be interpreted as commenting on any political or social issue." *Morse*, 551 U.S. at 422. And it expressly rejects the argument—embraced by the district court here—that "the First Amendment permits public school officials to censor any student speech that interferes with a school's 'educational mission.'" *Id.* at 423. (*See* Opinion and Order, RE 58, Page ID # 954 ("[A] court must

consider both the First Amendment interests of the students and the educational mission of the schools.”)) And while the Supreme Court approved a public school’s ability to “ban speech advocating illegal drug use” so long as it cannot “plausibly be interpreted as commenting on any political or social issue,” the Court regards “such regulation as standing at the far reaches of what the First Amendment permits.” *Morse*, 551 U.S. at 422, 425. The School District’s ban on a non-profane political slogan extends well beyond those “far reaches.”

2. <u>This Court should follow the Third Circuit’s approach and hold *Morse* and *Fraser* do not permit censorship of “ambiguously” profane student speech plausibly interpreted as social or political commentary.</u>

This Court should follow the en banc Third Circuit’s holding that the *Morse* concurrence’s carveout—that a school’s regulatory authority over speech promoting illegal drug use *ends* where political speech begins—applies equally to “ambiguously” profane expression. *B.H.*, 725 F.3d at 314. Justice Alito’s controlling *Morse* concurrence categorized speech advocating drug use as a “grave” and “unique threat to the physical safety of students,” yet still made an exception for speech “plausibly … interpreted as commenting on any political or social issue.” *Id.* (quoting *Morse*, 551 U.S. at 425 (Alito, J. concurring)). The Third

Circuit reasoned, "One need not be a philosopher of Mill or Feinberg's stature to recognize that harmful speech posing an 'immediately obvious' threat to the 'physical safety of students' presents a far graver threat to the educational mission of students—thereby warranting less protection—than ambiguously lewd speech that might undercut teaching 'the appropriate form of discourse' to students." *Id.* (quoting *Morse*, 551 U.S. at 424 (Alito, J. concurring); *Fraser*, 478 U.S. at 683).

The Third Circuit held that "*Fraser*, as modified by the Supreme Court's later reasoning in *Morse*, … sets up the following framework:

> (1) Plainly lewd speech, which offends for the same reasons obscenity offends, may be categorically restricted regardless of whether it comments on political or social issues,
>
> (2) Speech that does not rise to the level of plainly lewd but that a reasonable observer could interpret as plainly lewd may be categorically restricted as long as it cannot plausibly be interpreted as commenting on political or social issues, and
>
> (3) Speech that does not rise to the level of plainly lewd and that could plausibly be interpreted as commenting on political or social issues may not be categorically restricted."

*Id.* at 298; *see also id.* at 307 (making clear the test applies to "ambiguously lewd, vulgar, or profane" student speech).

Applying that framework, the Third Circuit held middle school students have a First Amendment right to wear breast cancer awareness bracelets with the slogan "I ♥ boobies! (KEEP A BREAST)" because the bracelets were at most "ambiguously" lewd and commented on a matter of social concern. *Id.* at 297–98. The court, linking *Morse* and *Fraser*, explained, "because we conclude that the slogan is not plainly lewd and is plausibly interpreted as commenting on a social issue, the bracelets are protected under *Fraser*. As a result, we need not determine whether a reasonable observer could interpret the bracelets' slogan as lewd." *Id.* at 320 n.22.

*B.H.* accurately enforces *Tinker*'s holding that political expression deserves special protection because exposure to different ideas "is not only an inevitable part of the process of attending school; it is also an important part of the educational process." *Tinker*, 393 U.S. at 512. This special protection applies equally to the "Let's Go Brandon" slogan. "We cannot lose sight of the fact that, in what otherwise might seem a trifling and annoying instance of individual distasteful abuse of a privilege, these fundamental societal values are truly implicated." *Cohen*, 403 U.S. at 25. And by distinguishing between the political message of the anti-war

armbands in *Tinker* and a sexually explicit student council speech, *Fraser* "reflects the longstanding notions that … 'speech on matters of public concern … is at the heart of the First Amendment's protection.'" *B.H.*, 725 F.3d at 314 (quoting *Snyder*, 562 U.S. at 451–52). The Supreme Court "has never held that schools may bore willy-nilly through that bedrock principle." *Id.*

The Third Circuit's approach ensures nondisruptive student political expression which is not plainly lewd or profane remains in the marketplace of ideas, available for students to accept or reject as they see fit. And *Tinker* stands ready as a circuit-breaker, enabling schools to step in if student expression causes, or is reasonably forecast to cause, substantial disruption to the school day. "[S]chools cannot avoid teaching our citizens-in-training how to appropriately navigate the 'marketplace of ideas.' Just because letting in one idea might invite even more difficult judgment calls about other ideas cannot justify suppressing speech of genuine social value." *Id.* at 324 (citing *Tinker*, 393 U.S. at 511).

The "Let's Go Brandon" political slogan is not profane for the reasons set forth in Section I. But even if the Court finds it is "ambiguously" profane, the First Amendment protects the slogan because

it comments on a matter of political concern. In that instance, too, the Court should reverse.

## III. D.A. and X.A. Were Entitled to Summary Judgment Because There Is a Clearly Established First Amendment Right to Wear Political Apparel to School.

Because the First Amendment protects D.A.'s and X.A.'s right to nondisruptively wear "Let's Go Brandon" apparel to school, the district court erred in failing to grant them summary judgment on their equitable claims against the ban. For the same reason, it erred in failing to grant D.A. and X.A. summary judgment as to liability on their damages claims against Buikema and Bradford.

Although the district court declined to rule on qualified immunity (Opinion and Order, RE 58, Page ID # 968 n.11), this Court should hold Buikema and Bradford are not entitled to qualified immunity because they "(1) violated a constitutional right that (2) was clearly established." *Anders v. Cuevas*, 984 F.3d 1166, 1175 (6th Cir. 2021). *Tinker*, interpreted through *Fraser*, *Hazelwood*, *Morse*, and *Mahanoy*, clearly established D.A. and X.A.'s First Amendment right to engage in the "silent, passive expression of opinion, unaccompanied by any disorder or

disturbance" of wearing apparel with the "Let's Go Brandon" political slogan to school. *Tinker*, 393 U.S. at 508.

### A. The district court erred on the first prong of the qualified immunity analysis by holding D.A. and X.A. did not suffer a constitutional violation.

The facts "taken in the light most favorable" to D.A. and X.A., show Defendants violated a constitutional right. *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (reversing summary judgment qualified immunity dismissal because the lower court "failed to view the evidence … in the light most favorable" to the plaintiff). As explained in Sections I and II, Buikema and Bradford violated D.A.'s and X.A.'s First Amendment rights when they instructed D.A. and X.A. to remove "Let's Go Brandon" apparel despite the lack of actual or forecasted substantial disruption and in the absence of facts establishing the applicability of a First Amendment exception.[19]

[19] The district court did not decide whether the School District is subject to liability under *Monell* (Claim II of the Complaint). If this Court agrees that D.A. and X.A. wearing "Let's Go Brandon" sweatshirts was protected nondisruptive political expression, it should remand the *Monell* determination to the district court. *See Moldowan v. City of Warren*, 578 F.3d 351, 392–93 (6th Cir. 2009) (affirming only individuals may claim qualified immunity); *see also Stucker v. Louisville Metro Gov't*, No. 23-5214, 2024 WL 2135407, at *13 (6th Cir. May 13, 2024) ("remand[ing] for

### B. *Tinker* clearly established D.A. and X.A.'s First Amendment right to nondisruptively wear "Let's Go Brandon" apparel.

D.A. and X.A. satisfy the second prong for defeating qualified immunity because they had a clearly established right to engage in the "silent, passive" expression of wearing political apparel to school. *Tinker*, 393 U.S. at 508.

A right is clearly established when the contours of constitutional protection are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Holzemer v. City of Memphis*, 621 F.3d 512, 527 (6th Cir. 2010) (cleaned up). In the Sixth Circuit, those contours are established by "binding precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits that is directly on point." *Id.* (cleaned up). Overcoming qualified immunity "do[es] not require a case directly on point." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). So "a public official c[an] still be on notice that his conduct violates established law even in novel factual

---

the district court to consider in the first instance whether the evidence" supports "Plaintiffs' *Monell* claim").

circumstances." *Holzemer*, 621 F.3d at 527 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

Core First Amendment principles and Supreme Court precedent provided Buikema and Bradford fair notice their censorship violated the Constitution. "[T]he right to criticize public officials is clearly protected by the First Amendment." *Jenkins v. Rock Hill Loc. Sch. Dist.*, 513 F.3d 580, 588 (6th Cir. 2008). That right includes the ability to make "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *N.Y. Times*, 376 U.S. at 270.

In 1969, the Supreme Court codified in *Tinker* what had already been "the unmistakable holding of this Court for almost 50 years": that the First Amendment right to criticize government officials and policies through expressive apparel remains in effect in public schools so long as the students are not substantially disrupting the school day. 393 U.S. at 506. The Court held "school officials do not possess absolute authority over their students" and may not "confine[]" them "to the expression of those sentiments that are officially approved." *Id.* at 511. *Tinker* clearly established as a baseline that students retain their First Amendment

rights, and the school bears the burden of establishing an exception. *Id.* at 509.

The only possibly relevant exception to D.A.'s and X.A.'s First Amendment rights is *Fraser*'s carveout for "profanity." But, as explained in Section I, no reasonable official would equate intentionally sanitized, substitute words and phrases to actual "profanity."

This Court has stressed "the Supreme Court's explicit rulings that neither a 'materially similar,' 'fundamentally similar,' or 'case directly on point'—let alone a factually identical case—is required" to defeat qualified immunity. *Baynes v. Cleland*, 799 F.3d 600, 614 (6th Cir. 2015) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Hope*, 536 U.S. at 742–43; *al-Kidd*, 563 U.S. at 741). Instead, "the Supreme Court … requires that the contours of a right" be "sufficiently clear under preexisting law." *Id.*

*Tinker* clearly established the "contours" of public-school students' First Amendment right to engage in nondisruptive expression by wearing political apparel to school so long as it is not plainly lewd or profane. And no reasonable official would interpret a sanitized, common political slogan like "Let's Go Brandon" as unprotected "profane" speech in the

same category as George Carlin's uncensored *Seven Words You Can't Say on Television* monologue. The Court should accordingly hold that Buikema and Bradford are not entitled to qualified immunity. *See, e.g.*, *Leonard v. Robinson*, 477 F.3d 347, 359 (6th Cir. 2007) (denying qualified immunity to police officer who arrested a speaker at a city council meeting because "no reasonable police officer" would believe the speech lacked constitutional protection).

## CONCLUSION

D.A. and X.A. respectfully request this Court reverse the district court's order denying their motion for summary judgment and granting Defendants' motion for summary judgment.

Dated: December 4, 2024

/s/ Conor T. Fitzpatrick
CONOR T. FITZPATRICK
*Counsel of Record*
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, D.C. 20003
(215) 717-3473
conor.fitzpatrick@thefire.org

SARA E. BERINHOUT
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut St., Ste. 900
Philadelphia, PA 19106
(215) 717-3473

sara.berinhout@thefire.org

*Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7) because, excluding the parts of the document exempted by the Fed. R. App. P. 32(f): this document contains 11,808 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

Dated: December 4, 2024

/s/ Conor T. Fitzpatrick

Conor T. Fitzpatrick
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION

## CERTIFICATE OF SERVICE

The undersigned certifies that on December 4, 2024, an electronic copy of the Appellants' Opening Brief was filed with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF system. The undersigned also certifies all parties in this case are represented by counsel who are registered CM/ECF users and that service of the brief will be accomplished by the CM/ECF system.

Dated: December 4, 2024

/s/ Conor T. Fitzpatrick

CONOR T. FITZPATRICK
*Counsel of Record*
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, D.C. 20003
(215) 717-3473
conor.fitzpatrick@thefire.org

SARA E. BERINHOUT
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut St., Ste. 900
Philadelphia, PA 19106
(215) 717-3473
sara.berinhout@thefire.org

*Counsel for Appellants*

## PLAINTIFFS-APPELLANTS' DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Pursuant to 6. Cir. R. 30(b), Plaintiffs-Appellants hereby designate the following filings in the district court's electronic record to be relevant documents for purposes of this appeal:

**U.S. District Court**
**Western District of Michigan (Southern Division)**
**CIVIL DOCKET FOR CASE #: 1:23-cv-00423**

| DESCRIPTION OF ENTRY | DATE FILED | RECORD ENTRY NO. | Page ID # Range |
|---|---|---|---|
| Complaint | 04/25/23 | 1 | 1–29 |
| Defendants' Motion for Summary Judgment | 03/22/24 | 38 | 355–97 |
| D.A. Declaration | 03/22/24 | 39-2 | 578–81 |
| X.A. Declaration | 03/22/24 | 39-3 | 582–84 |
| D.A. Deposition Transcript Excerpts | 03/22/24 | 39-4 | 585–90 |
| X.A. Deposition Transcript Excerpts | 03/22/24 | 39-5 | 591–95 |
| B.A. Deposition Transcript Excerpts | 03/22/24 | 39-6 | 596–600 |
| ParentVUE email to B.A. | 03/22/24 | 39-7 | 601–602 |
| Buikema Deposition Transcript Excerpts | 03/22/24 | 39-8 | 603–12 |
| 2022–2023 TCMS Handbook | 03/22/24 | 39-10 | 629–44 |
| Williams Deposition Transcript Excerpts | 03/22/24 | 39-13 | 662–73 |
| Goheen Deposition Transcript Excerpts | 03/22/24 | 39-14 | 674–80 |
| CBS News Sacramento video clip | 03/22/24 | 39-15 | 681 |
| Noticias Telemundo video clip | 03/22/24 | 39-16 | 682 |
| Fox 5 D.C. video clip | 03/22/24 | 39-17 | 683 |
| ABC 10 News video clip | 03/22/24 | 39-18 | 684 |

| | | | |
|---|---|---|---|
| Mark Blazor Show audio clip | 03/22/24 | 39-19 | 685 |
| WABC Brian Kilmeade audio clip | 03/22/24 | 39-20 | 686 |
| CNN Tonight video clip | 03/22/24 | 39-21 | 687 |
| FOX News video clip | 03/22/24 | 39-22 | 688 |
| NBC News video clip | 03/22/24 | 39-23 | 689 |
| Buikema Response to Plaintiffs' Requests for Admission | 03/22/24 | 39-24 | 690–93 |
| Bradford Response to Plaintiffs' Requests for Admission | 03/22/24 | 39-25 | 694–97 |
| Bradford Deposition Transcript Excerpts | 03/22/24 | 39-27 | 703–09 |
| May 27, 2022, Cease & Desist Letter | 03/22/24 | 39-28 | 710–13 |
| June 9, 2022, School District Response to Plaintiffs' Cease & Desist Letter | 03/22/24 | 39-29 | 714–18 |
| Williams' Notes | 03/22/24 | 39-30 | 719–20 |
| Apr. 26, 2023, Email to All Staff | 03/22/24 | 39-31 | 721–22 |
| Moshman Expert Report | 03/22/24 | 39-32 | 723–47 |
| Plaintiffs' Response to Motion for Summary Judgment | 04/26/24 | 44 | 765–815 |
| Defendants' Response to Motion for Summary Judgment | 04/26/24 | 46 | 824–63 |
| (Amended) Opinion and Order | 08/23/24 | 58 | 943–69 |
| Notice of Appeal | 09/04/24 | 59 | 970–71 |