## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

B.A., mother of minors D.A. and X.A.;

D.A., a minor, by and through his mother, B.A.;
X.A., a minor, by and through his mother, B.A.,

*Plaintiffs-Appellants,*

v.

TRI COUNTY AREA SCHOOLS;
ANDREW BUIKEMA, in his individual capacity;
WENDY BRADFORD, in her individual capacity,

*Defendants-Appellees.*

_____

On Appeal from the United States District Court
for the Western District of Michigan
(1:23-cv-00423)

## BRIEF OF FIRST AMENDMENT SCHOLARS AS
## *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLANTS

Michael J. Grygiel
Daniela del Rosario Wertheimer (*Pro hac vice* application forthcoming)
CORNELL LAW SCHOOL FIRST AMENDMENT CLINIC
Myron Taylor Hall
Ithaca, NY 14853
Tel.: (607) 255-8518

*Attorneys Pro Bono Publico for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

IDENTITY AND INTEREST OF AMICI CURIAE ........................... viii

SOURCE OF AUTHORITY TO FILE ............................................... viii

INTRODUCTION .................................................................................1

ARGUMENT .........................................................................................4

   I.     THE DISTRICT COURT'S FAILURE TO APPLY TINKER WAS
        CONSTITUTIONAL ERROR ................................................. 4

     A. *Tinker* Places the Constitutional Burden On Public Schools To
        Justify the Punishment Of In-School Student Expression .........................4

     B. D.A.'s and X.A.'s "Let's Go Brandon" Sweatshirts Are Political
        Speech.......................................................................................6

     C. D.A.'s and X.A.'s Nondisruptive Political Message Is Protected
        Under *Tinker* ...........................................................................9

   II.    *FRASER* IS LIMITED TO PROFANE, NON-POLITICAL SPEECH
        THAT RISKS BEING ASSOCIATED WITH THE SCHOOL ............. 11

     A. *Fraser*'s Narrow Rationale Does Not Apply To Plaintiffs' Political
        Speech.......................................................................................11

     B. D.A.'s and X.A.'s "Let's Go Brandon" Sweatshirts Are Not Profane ....13

     C. D.A.'s and X.A.'s "Let's Go Brandon" Sweatshirts Are Individual,
        Not School-Associated, Expression .........................................16

   III.   A BRIGHT-LINE RULE PROTECTING STUDENTS'
        NONDISRUPTIVE POLITICAL SPEECH WILL PREVENT
        BROAD SCHOOL CENSORSHIP.........................................18

     A. *Morse* Applies Only To Non-Political Speech That Encourages
        Illegal Drug Use .......................................................................18

     B. Coded Profanity and Non-Graphic Sexualized Student Speech
        Offering Commentary On Political and Social Issues Cannot Be
        Punished In the Absence Of a *Tinker* Disruption.....................20

IV.   MIDDLE SCHOOL IS A CRITICAL TIME FOR STUDENTS'
      GROWTH AS INFORMED CITIZENS................................................. 23

CONCLUSION ....................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*D.A. ex rel. B.A. v. Tri County Area Schools*,
No. 1:23-CV-423, 2024 WL 3924723 (W.D. Mich. Aug. 23, 2024).........2, 4, 13

*Barber v. Dearborn Public Schools*,
286 F.Supp.2d 847 (E.D. Mich. 2003) ..............................................17

*Cuff ex rel. B.C. v. Valley Central School District*,
677 F.3d 109 (2d Cir. 2012) ......................................................12, 24

*Barr v. Lafon*,
538 F.3d 554 (6th Cir. 2008) ......................................................21, 22

*Bethel School District No. 403 v. Fraser*,
478 U.S. 675 (1986)...............................................................*passim*

*Castorina v. Madison County School Board*,
246 F.3d 536 (6th Cir. 2001) ....................................................17, 23

*Chandler v. McMinnville School District*,
978 F.2d 524 (9th Cir. 1992) ..........................................................16

*Federal Communications Commission v. Pacifica Foundation*,
438 U.S. 726 (1978)................................................................14, 15

*Guiles ex rel. Guiles v. Marineau*,
461 F.3d 320 (2d. Cir 2006) ....................................................*passim*

*B.H. ex rel. Hawk v. Easton Area School District*,
725 F.3d 293 (3d. Cir. 2013) ....................................................20, 22

*Hazelwood v. Kuhlmeier*,
484 U.S. 260 (1988)......................................................................17

*Kutchinski v. Freeland Community School District*,
69 F.4th 350 (6th Cir. 2023) ..........................................................18

*Mahanoy Area School District v. B.L. ex rel. Levy*,
594 U.S. 180 (2021)........................................................................1

*McCullough v. Maryland*,
    17 U.S. 316 (1819)............................................................................15

*Morse v. Frederick*,
    551 U.S. 393 (2007)....................................................*passim*

*Snyder v. Phelps*,
    562 U.S. 443 (2011)........................................................21

*Thomas v. Board of Education, Granville Cenral School District*,
    607 F.2d 1043 ......................................................26, 27

*Tinker v. Des Moines Independent Community School District*,
    393 U.S. 503 (1969)....................................................*passim*

*United States v. Stevens*,
    559 U.S. 460 (2010)........................................................22

*West Virginia State Board of Education v. Barnette*,
    319 U.S. 624 (1943)..........................................................4

**Federal Statutes**

20 U.S.C. § 1232f(a)................................................................26

**Other Authorities**

Andrew Bacher-Hicks, Stephen B. Billing, David J. Deming, *Proving the School-to-Prison Pipeline: Stricter middle schools raise the risk of adult arrests*, EDUCATION NEXT (2021)....................................25

Angela Serratore, *President Cleveland's Problem Child*, Smithsonian Magazine (Sep. 26, 2013) <https://www.smithsonianmag.com/history/president-clevelands-problem- child-100800/ ........................................................14

Annie Linskey, *How 'Let's Go Brandon' Became an Unofficial GOP Slogan*, THE WASHINGTON POST (Nov. 15, 2021) https://www.washingtonpost.com/politics/lets-go-brandon-republicans/2021/11/14/ 52131dda-4312-11ec-9ea7-3eb2406a2e24_story.html..................................................2

Blake Hounshell & Leah Askarinam, *'Let's Go, Brandon' Zooms From Vulgar Meme to Campaign Ad*, THE N.Y. TIMES (Jan. 12, 2022) https://www.nytimes.com/2022/01/12/us/politics/lets-go-brandon-meme-gop.html.................................................................2, 9

Carolyn Joyce Mattus, *Is it Really My Space: Public Schools and Student Speech on the Internet after Layschock v. Hermitage School District and Snyder v. Blue Mountain School District,* 16 B.U.J. SCI. & TECH. L. 318, 333 n. 136 (2010) ....................................................5

Christina LiCalsi, David Osher, Paul Bailey, *An Empirical Examination of the Effects of Suspension and Suspension Severity on Behavioral and Academic Outcomes,* AMERICAN INSTITUTE FOR RESEARCH (2020) ...............................................................................................25

Clay Calvert, *Mixed Messages, Muddled Meanings, Drunk Dicks, and Boobies Bracelets: Sexually Suggestive Student Speech and the Need to Overrule or Radically Refashion Fraser*, 90 DENV. U. L. REV. 131, 145-46 (2012).......................................................................11, 20, 21

Colleen Long, *How "Let's Go Brandon' Became Code for Insulting Joe Biden*, ASSOCIATED PRESS (Oct. 30, 2021) https://apnews.com/article/lets-go-brandon-what-does-it-mean-republicans-joe-biden-ab13db212067928455a3dba07756a160......................2, 7

Emily Gold Waldman, *Badmouthing Authority: Hostile Speech About School Officials and the Limits of School Restrictions*, 19 WM. & MARY BILL RTS. J. 591, 654 (2011)..................................................................25

Emily Gold Waldman, *No Jokes About Dope: Morse v. Frederick's Educational Rationale*, 81 UMKC L. REV. 685, 690 (2013) ............................12

Erwin Chemerinsky, *How Will Morse v. Frederick Be Applied?*, 12 LEWIS & CLARK L. REV. 17, 25 (2008)..............................................................18

Joe Biden (@JoeBiden), X (Feb. 11, 2024) https://x.com/JoeBiden/status/1756888470599967000........................................8

Joseph A. Tomain, *Cyberspace Is Outside the Schoolhouse Gate: Offensive, Online Student Speech Receives First Amendment Protection*, 59 DRAKE L. REV. 97, 104 (2010) ............................................12, 26

Judith Torney-Purta, Rainer Lehmann, Hans Oswald, and Wolfram Schulz, *Citizenship and Education in Twenty-eight Countries*, INT'L ASS'N FOR EVALUATION OF EDUCATIONAL ACHIEVEMENT 7 (2001)................................................................23

Kenneth R. Pike, *Locating the Mislaid Gate: Revitalizing Tinker by Repairing Judicial Overgeneralizations of Technologically Enabled Student Speech*, 2008 BYU L. R. 971 (2008).........................................5

Leora Harpaz, *Internet Speech and the First Amendment Rights of Public School Students*, 2000 BYU Educ. & L.J. 123 (2000)............................5

Lindsay Lowe, *"Let's Go Brandon' Explained*, TODAY (Nov. 3, 2021) https://www.today.com/ news/what-does-let-s-go-brandon-mean-t237389 ....................................................................2, 8

Mary-Rose Papandrea, *Student Speech Rights in the Digital Age*, 60 FLA. L. REV. 1027, 1089 (2008) .................................................22, 24

Matt Flegenheimer, *What's a 'Covfefe'? Trump Tweet Unites a Bewildered Nation*, The N.Y. Times (May 31, 2017) https://www.nytimes.com/2017/05/31/us/politics/covfefe-trump-twitter.html ................................................................15

Matt Leach, *Florida Gov. DeSantis trolls President Biden, signs bills limiting vaccine mandates in Brandon, FL*, Fox News (Nov. 18, 2021) https://www.foxnews.com/politics/florida-desantis-trolls-president-biden-brandon-vaccine-mandates ......................................8

Matthew Rozsa, *From "OK" to "Let's Go Brandon"* Salon (Nov. 7, 2021) https://www.salon.com/2021/11/07/from-ok-to-lets-go-brandon-a-short-history-of-insulting-presidential-nicknames/..........................15

Michael J. Grygiel, *Back to the Future: The Second Circuit's First Amendment Lessons for Public Student Digital Speech*, 71 Syracuse L. Rev. 1, 37 (2021) .................................................16, 17

Rachel Tillman, *Dark Brandon*, SPECTRUM NEWS (Sep. 01, 2022) https://ny1.com/nyc/all-boroughs/news/2022/09/01/joe-biden-let-s-go-brandon-donald-trump-dark-maga ................................................8

Robert C. Post, *Between Governance and Management: The History and Theory of the Public Forum*, 34 UCLA L. REV. 1713, 1773 (1987) ................................................................................................6

Salena Zito, *How 'Let's Go Brandon' Became a Swipe at Joe Biden — and National Media*, N.Y. POST (Nov. 2, 2021) https://nypost.com/2021/11/02/how-lets-go-brandon-became-a-swipe-at-joe-biden-and-national-media/; ...........................................................2, 9

# IDENTITY AND INTEREST OF AMICI CURIAE

*Amici* are legal scholars who have a strong interest in promoting the sound interpretation of the First Amendment consistent with the constitutional values that are served by the protection of free expression — including the political speech rights of public school students. They are concerned that the decision below impermissibly extends the authority of public school officials to penalize students for in-school expressions of political viewpoints that are neither profane nor disruptive to the learning process, which violates the First Amendment. *Amici* are listed in the Appendix.[1]

# SOURCE OF AUTHORITY TO FILE

*Amici* have moved for leave to file this brief pursuant to Federal Rule of Appellate Procedure 29(b)(3).*

---

\* This brief was researched and written with the assistance of Robert Plafker, Alexandra Kapilian, and Alex Strohl, law students in the Cornell Law School's First Amendment Clinic.

---

[1] *Amici*'s institutional affiliations are for identification purposes only and do not represent endorsements of the brief by the respective institutions.

**INTRODUCTION**

For more than half a century, public school students in the United States have been entitled to freely express their political views inside the "schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). The Supreme Court lauds public schools as "nurseries of democracy," which train future leaders who need "wide exposure" to a "robust exchange of ideas." *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 190 (2021); *Tinker*, 393 U.S. at 512 ("The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, [rather] than through any kind of authoritative selection.") (internal quotation marks and citations omitted). Yet, by deferring to a school's interpretation of a popular phrase as "profane," the District Court's decision has permitted broad censorship of nondisruptive student political speech based merely on the sensibilities of two school officials. This ruling erodes the very core of constitutional protection for public student speech established in *Tinker*.

The court below erroneously upheld the Tri County Area Schools' ban on sweatshirts worn by two middle school students, D.A. and X.A. (sometimes referred to herein as "Plaintiffs"), which featured the political slogan "Let's Go Brandon." The District Court's decision hinged on whether the display of the "Let's Go Brandon" phrase was "'closely akin to 'pure speech,''" like the political expression

protected in *Tinker*, or whether it constituted profane speech, which is proscribable. *D.A. ex rel. B.A. v. Tri Cnty. Area Schs.*, No. 1:23-cv-423, 2024 WL 3924723, at *7 (W.D. Mich. Aug. 23, 2024). The slogan — which contains no actual profanity — originated in the public domain on October 2, 2021, after driver Brandon Brown won a NASCAR race.[2] During a post-race television interview with the winner, the spectators in the background audibly chanted "F*** Joe Biden."[3] With admirable presence of mind, the reporter observed that the crowd was chanting "Let's Go Brandon."[4] Post-report, and as elaborated below, the phrase took on a life of its own and became entrenched in national political discourse.[5] An expression of anti-

---

[2]    *See* Annie Linskey, *How 'Let's Go Brandon' Became an Unofficial GOP Slogan*, THE WASHINGTON POST (Nov. 15, 2021) https://www.washingtonpost.com/politics/lets-go-brandon-republicans/2021/11/14/52131dda-4312-11ec-9ea7-3eb2406a2e24_story.html; *see also* Colleen Long, *How 'Let's Go Brandon' Became Code for Insulting Joe Biden*, ASSOCIATED PRESS (Oct. 30, 2021) https://apnews.com/article/lets-go-brandon-what-does-it-mean-republicans-joe-biden-ab13db212067928455a3dba07756a160; Lindsay Lowe, *'Let's Go Brandon' Explained*, TODAY (Nov. 3, 2021) https://www.today.com/news/what-does-let-s-go-brandon-mean-t237389; Salena Zito, *How 'Let's Go Brandon' Became a Swipe at Joe Biden — and National Media*, N.Y. POST (Nov. 2, 2021) https://nypost.com/2021/11/02/how-lets-go-brandon-became-a-swipe-at-joe-biden-and-national-media/; Blake Hounshell & Leah Askarinam, *'Let's Go, Brandon' Zooms From Vulgar Meme to Campaign Ad*, THE N.Y. TIMES (Jan. 12, 2022) https://www.nytimes.com/2022/01/12/us/politics/lets-go-brandon-meme-gop.html

[3]    *See id.*

[4]    *See id.*

[5]    *See id.*

President Biden sentiment for some, and an exclamation of distrust of liberal media outlets for others, "Let's Go Brandon" has been used as a rallying cry among various political groups over the last three years.[6]

In evaluating Tri County Area Schools' decision to ban Plaintiffs' "Let's Go Brandon" sweatshirts, the lower court failed to apply *Tinker*'s "substantial disruption" test, as required when schools seek to prohibit student expression within the school environment that communicates a political message. *Tinker*, 393 U.S. at 508-09. Indeed, the decision below jettisoned *Tinker*'s requirement that the school must show the speech would cause "substantial disruption of or material interference with school activities" before on-campus student speech can be penalized. *See id.* at 514. Instead, the court unjustifiably deferred to the interpretation of Tri County Area School officials that Plaintiffs' "Let's Go Brandon" sweatshirts signaled a profane meaning. In so doing, the lower court departed from longstanding public student constitutional free speech principles and upheld the censorship of Plaintiffs' political expression.

---

[6] *See id.*

# ARGUMENT

## I. THE DISTRICT COURT'S FAILURE TO APPLY TINKER WAS CONSTITUTIONAL ERROR

### A. *Tinker* Places the Constitutional Burden On Public Schools To Justify the Punishment Of In-School Student Expression.

In *Tinker*, the Supreme Court established that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." 393 U.S. at 506. While the "constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings," *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986), the Supreme Court has long emphasized the importance of protecting student speech as essential to the nation's interest in training future citizens. *See West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943) ("[E]ducating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the mind at its source and teach youth to discount important principles of our government as mere platitudes."). In its misplaced zeal to ban a political slogan that school officials deemed a "transparent code[] for profanity," the school district disserved this constitutional goal. *D.A.*, 2024 WL 3924723, at *3.

*Tinker* arose when school authorities became aware that students planned to publicize their objections to the Vietnam War by wearing black armbands. 393 U.S. at 504. In response, school administrators adopted a policy prohibiting students from wearing armbands on school premises. *Id.* When two high school students and a

middle school student wore the black armbands to school, they were suspended. *Id*. In overturning the suspensions, the Supreme Court held that wearing an armband "for the purpose of expressing certain views" was symbolic expression "closely akin to 'pure speech'" "entitled to comprehensive protection under the First Amendment." *Id*. at 505-06. By banning the armbands, the school officials had "punish[ed] petitioners for a silent, passive expression of opinion, unaccompanied by any disorder or disturbance on the part of petitioners." *Id.* at 508.

*Tinker* explicitly renounced the school's prohibition of a particular political viewpoint.[7] *Id*. at 510-11. Absent "any facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities," the decision established that public schools could not restrict student speech, even within the school environment. *See id*. at 511, 512-13, 514. Exercising non-deferential judicial review, the *Tinker* Court placed the burden on school officials to satisfy its "substantial disruption" test.[8] To discharge this

---

[7]     Kenneth R. Pike, *Locating the Mislaid Gate: Revitalizing Tinker by Repairing Judicial Overgeneralizations of Technologically Enabled Student Speech*, 2008 BYU L. R. 971, 979-80 (2008) ("The speech at issue in *Tinker* stands as a classic example of core political expression. The petitioners wore black armbands to school to 'publicize their objections to the hostilities in Vietnam and their support for a truce.'").

[8]     Carolyn Joyce Mattus, *Is it Really My Space: Public Schools and Student Speech on the Internet after Layschock v. Hermitage School District and Snyder v. Blue Mountain School District*, 16 B.U.J. SCI. & TECH. L. 318, 333 n.136 (2010) (noting that in *Tinker* "the Supreme Court did not defer to the school's judgment"); Leora Harpaz, *Internet Speech and the First Amendment Rights of Public School*

evidentiary requirement, school officials must demonstrate that restrictions on students' political views are "caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker*, 393 U.S. at 508. In short, "[i]n the absence of a showing of constitutionally valid reasons to regulate [student] speech, students are entitled to freedom of expression of their views." *Id.* at 511. The ruling below erodes the expansive conception of students' expressive liberty recognized in *Tinker* as necessary to protect the diversity of viewpoints encountered in this "relatively permissive, often disputatious, society." *Id.* at 509.

### B. D.A.'s and X.A.'s "Let's Go Brandon" Sweatshirts Are Political Speech.

The lower court's disregard of *Tinker*'s "substantial disruption" test was constitutional error because D.A.'s and X.A.'s choice to wear "Let's Go Brandon" sweatshirts was protected political expression. Plaintiffs' Motion for Summary

---

*Students*, 2000 BYU Educ. & L.J. 123, 128 (2000) ("[T]he Court imposed a significant burden on the school to justify silencing student speech despite the need for school authorities to exercise substantial control over students during the school day."); Robert C. Post, *Between Governance and Management: The History and Theory of the Public Forum*, 34 UCLA L. Rev. 1713, 1773 (1987) ("The constitutional standard adopted by the Court required the school to present evidence sufficient to convince a judge that plaintiffs' speech was incompatible with the educational process. In effect, then, the Court in *Tinker* held that the constitutionality of the school's regulation would be determined by *independent judicial review* of whether the regulation was necessary for the attainment of the school's educational objectives.") (emphasis supplied).

Judgment, R. 39, Page ID #542-544. By wearing the sweatshirts, D.A. and X.A. expressed their dissatisfaction with President Biden. *Id.* D.A.'s and X.A.'s expression of a political opinion was entitled to the same "comprehensive protection under the First Amendment" as that enjoyed by the students' black armbands in *Tinker*, 393 U.S. at 505-06.

The phrase "Let's Go Brandon" is unquestionably invested with political meaning, despite the lower court's assertion otherwise. After the NASCAR race incident, "Let's Go Brandon" became a Republican protest slogan against President Biden. As Plaintiffs highlighted, at least three Republican congressmen have included the phrase "Let's Go Brandon" in speeches on the floor of the House of Representatives to express their opposition to the Biden administration, while other members of Congress have also used the slogan on social media. Plaintiffs' Motion for Summary Judgment, R. 39, Page ID #539-540. Further, Congressman Jeff Duncan made headlines for wearing a "Let's Go Brandon" mask on the House floor.[9] On November 18, 2021, Florida Governor Ron DeSantis chose to sign several anti-vaccination mandate bills in Brandon, Florida, in an apparent reference to the "Let's

---

[9] Colleen Long, *How 'Let's Go Brandon' Became Code for Insulting Joe Biden*, ASSOCIATED PRESS (Oct. 30, 2021) https://apnews.com/article/lets-go-brandon-what-does-it-mean-republicans-joe-biden-ab13db212067928455a3dba07756a160.

Go Brandon" phrase, which even appears on political campaign merchandise and in anti-Biden rap songs.[10]

Nor was the political salience of the sloganeering one-sided. Eventually, Democrats also embraced the catch phrase, appropriating it for their own political use by incorporating "Let's Go Brandon" into President Biden's "Dark Brandon" persona to celebrate everything from the President's legislative accomplishments to the Kansas City Chiefs Super Bowl win.[11] President Biden himself took up the cause: he signed off a Christmas call from a constituent with "Let's Go Brandon," joked at the annual White House Correspondents' Dinner about the phrase, and sold re-election campaign merchandise featuring the laser-eyed "Dark Brandon" persona.[12]

While the lower court stated that the only evidence D.A. and X.A offered to support the invocation of "Let's Go Brandon" as a political message was a

---

[10] Lindsay Lowe, *'Let's Go Brandon' Explained*, TODAY (Nov. 3, 2021) https://www.today.com/news/what-does-let-s-go-brandon-mean-t237389; Matt Leach, *Florida Gov. DeSantis trolls President Biden, signs bills limiting vaccine mandates in Brandon, FL*, Fox News (Nov. 18, 2021) https://www.foxnews.com/politics/florida-desantis-trolls-president-biden-brandon-vaccine-mandates.

[11] Rachel Tillman, *Dark Brandon*, SPECTRUM NEWS (Sep. 01, 2022) https://ny1.com/nyc/all-boroughs/news/2022/09/01/joe-biden-let-s-go-brandon-donald-trump-dark-maga.

[12] *Id.*; Joe Biden (@JoeBiden), X (Feb. 11, 2024) https://x.com/JoeBiden/status/1756888470599967000.

*Washington Post* article, myriad news outlets across the political spectrum have explored the evolution of this phrase over time.[13]  The use of "Let's Go Brandon" to express overt partisan messages by both Republicans and Democrats demonstrates beyond question that D.A.'s and X.A.'s speech was political expression.

### C. D.A.'s and X.A.'s Nondisruptive Political Message Is Protected Under *Tinker*.

This case is controlled by *Tinker* because Tri County Middle School officials failed to justify their banishment of the "Let's Go Brandon" sweatshirts from the school environment on the grounds that the sweatshirts created or reasonably might have created a "substantial disruption of or material interference with school activities." *Tinker*, 393 U.S. at 514.  In *Tinker,* the Court highlighted that there was "no indication that the work of the schools or any class was disrupted" by the armbands.  *Id.* at 508.  While a few students directed hostile remarks to the students who wore armbands, "there were no threats or acts of violence on school premises." *Id.*

---

[13]     Long, *supra* note 9; Lowe, *supra* note 10; Salena Zito, *How 'Let's Go Brandon' Became a Swipe at Joe Biden — and National Media*, N.Y. POST (Nov. 2, 2021) https://nypost.com/2021/11/02/how-lets-go-brandon-became-a-swipe-at-joe-biden-and-national-media; Blake Hounshell & Leah Askarinam, *'Let's Go, Brandon' Zooms From Vulgar Meme to Campaign Ad*, THE N.Y. TIMES (Jan. 12, 2022) https://www.nytimes.com/2022/01/12/us/politics/lets-go-brandon-meme-gop.html.

Here, by Defendants' own admission, the school district provided no evidence that the "Let's Go Brandon" sweatshirts resulted in any school disruption or interference with the learning environment either during or after the four-month period in which the students wore them to school. Plaintiffs Motion for Summary Judgment, R. 39, Page ID #545, 550. There was no showing that teachers halted or altered lessons due to the "Let's Go Brandon" sweatshirts, and the "slogan did not cause altercations" among any students. *Id*., R. 39, Page ID #545. Tellingly, "[n]either the School District nor its administrators received complaints about D.A. and X.A. wearing 'Let's Go Brandon' apparel." *Id*., R. 39, Page ID # 545. The sweatshirts proved less disruptive than *Tinker*'s protected armbands as there was not even any evidence of hostile remarks directed to D.A. and X.A. *Tinker*, 393 U.S. at 508. Thus, like the student war protestors in *Tinker*, D.A. and X.A neither "intrude[d] upon the work of the school [n]or the rights of other students." *Id*. When D.A. and X.A. wore their "Let's Go Brandon" sweatshirts, they silently and passively expressed a political opinion without compromising pedagogical objectives or disrupting the school environment. Communication of their message is therefore squarely protected by *Tinker*.

The *only* reason proffered by the school district for demanding removal of the sweatshirts was that two school officials considered the slogan "Let's Go Brandon"

vulgar and profane.[14]   Plaintiffs Motion for Summary Judgment, R. 39, Page ID
#543.   While this may indicate the administrators' personal feelings of "discomfort
and unpleasantness" (*Tinker*, 393 U.S. at 509) provoked by speech they disagreed
with, the school made no showing that students wearing the "Let's Go Brandon"
sweatshirts caused any sort of disruption or interference, much less a "substantial"
or "material" one, to the school.   Thus, the school failed to show a constitutionally
valid reason for prohibiting D.A. and X.A.'s political speech.   *Tinker*, 393 U.S. at
511.

## II.   *FRASER* IS LIMITED TO PROFANE, NON-POLITICAL SPEECH THAT RISKS BEING ASSOCIATED WITH THE SCHOOL

### A. *Fraser*'s Narrow Rationale Does Not Apply To Plaintiffs' Political Speech.

*Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986), maintains *Tinker*'s
protection of nondisruptive political speech that is not plainly vulgar or profane.   The
decision emphasized that Fraser's "vulgar and lewd speech" delivered to a captive
audience at a mandatory school assembly was "unrelated to any political viewpoint."

---

[14]   Reliance on a school official's notion of what constitutes "vulgarity" is
constitutionally problematic to the extent it "reflects class-based distinctions
between highbrow and lowbrow culture. . . . That First Amendment protection
should hinge on such a distinction strikes one as antithetical to the ideal that all
individuals, no matter how properly or inarticulately they express their sentiments,
are deserving of equal free speech rights."   Clay Calvert, *Mixed Messages, Muddled
Meanings, Drunk Dicks, and Boobies Bracelets: Sexually Suggestive Student Speech
and the Need to Overrule or Radically Refashion Fraser*, 90 DENV. U. L. REV. 131,
145-46 (2012) (hereinafter "*Mixed Messages*").

*Id.* at 685; *see also Guiles ex rel. Guiles v. Marineau*, 461 F.3d 320, 330 (2d. Cir 2006) ("Indeed the *Fraser* court distinguished its holding from *Tinker* in part on the absence of any political message in Fraser's speech."). In addition, the *Fraser* Court noted that the school could take steps "to disassociate itself" from vulgar and offensive speech when that speech was delivered in a school-hosted forum for the purpose of educating both the student speaker *and* his audience.[15] *Fraser*, 478 U.S. at 685. Thus, *Fraser* allows schools to censor only non-political, graphically vulgar and lewd speech presented in school-sponsored forums or other school-controlled settings.[16] In short, "*Fraser* explained what every parent already knows" — *i.e.*, that school authorities are allowed to regulate the lewd and offensive speech of students in school settings "because of 'society's countervailing interest in teaching students the boundaries of socially appropriate behavior.'" *Cuff ex rel. B.C. v. Valley Cent.*

---

[15] Emily Gold Waldman, *No Jokes About Dope: Morse v. Frederick's Educational Rationale*, 81 UMKC L. REV. 685, 690 (2013) ("the punishment would serve as a lesson to this student-speaker — *and other student-listeners* — about the habits and manners of civility as values in themselves") (emphasis added) (footnote omitted).

[16] Legal scholars have emphasized the narrowness of *Fraser*'s contextualized holding. *See, e.g.*, Joseph A. Tomain, *Cyberspace Is Outside the Schoolhouse Gate: Offensive, Online Student Speech Receives First Amendment Protection*, 59 DRAKE L. REV. 97, 104 (2010) ("*Fraser* holds that three factors are important for schools to assert jurisdiction over student speech: (1) there must be a captive audience; (2) the speech must involve lewd or indecent sexual content; and (3) the school must have a need to disassociate itself from the speech.").

*Sch. Dist.*, 677 F.3d 109, 118 (2d Cir. 2012) (quoting *Fraser*, 478 U.S. at 681) (Pooler, J., dissenting).

**B. D.A.'s and X.A.'s "Let's Go Brandon" Sweatshirts Are Not Profane.**

The lower court incorrectly reasoned that "[i]f schools can prohibit students from wearing apparel that contains profanity, schools can also prohibit students from wearing apparel that can reasonably be interpreted as profane." *D.A.*, 2024 WL 3924723, at *9. This leap of logic cannot be reconciled with *Fraser*, which limits the First Amendment's protection of in-school student speech only when it is graphically lewd, vulgar, or profane. By focusing on Plaintiffs' apparent understanding of the profane origins of "Let's Go Brandon" (*D.A.*, 2024 WL 3924723, at *2), the District Court impermissibly deferred to school officials' subjective interpretation of the implicit message Plaintiffs' sweatshirts were perceived to convey. In effect, the school district was allowed to punish Plaintiffs not for the language they actually used, but for the language they chose *not* to use. By accepting what school authorities deemed Plaintiffs' offensive (albeit unspoken) message as the reason for punishing their speech, the decision below abandoned *Tinker*'s objective standard intended to ensure that student speech is evaluated based on the disruption it causes to the educational process rather than on school disapproval of or hostility to the viewpoint of the speaker.

Unlike the assembly oratory delivered to a captive audience in *Fraser*, D.A.'s and X.A.'s sweatshirts may not be placed off limits for the same reasons that profanity is off limits. *Fraser*, 478 U.S. at 684-85; *Guiles*, 461 F.3d at 328. "Let's Go Brandon" does not include any of George Carlin's "Seven Dirty Words" or any other plainly profane language. *F.C.C. v. Pacifica Found.*, 438 U.S. 726, 770 (1978). Whether "Let's Go Brandon" could be read as *implicitly* profane speech misses the constitutional mark because listeners can plausibly interpret it to have a political meaning — discontent with the Biden administration.

Here, the implied profane meaning attributed to Plaintiffs' speech by school officials is attenuated owing to the unquestionably political nature of their sloganeering. Despite "Let's Go Brandon's" genesis as a repurposing of "F*** Joe Biden," the phrase has taken on political meanings uncabined from literal profanity and is regularly used in political contexts. Uncouth and offensive slogans are nothing new in the political space. Opponents of President Grover Cleveland used the slogan "Ma, Ma Where's my Pa?" to allege that the candidate fathered an illegitimate child.[17] Amidst the Watergate and Monica Lewinsky scandals of Presidents Nixon and Clinton, critics used the slogans "Tricky Dick" and "Slick Willie" to characterize the respective

---

[17]    Angela Serratore, *President Cleveland's Problem Child*, Smithsonian Magazine (Sep. 26, 2013) https://www.smithsonianmag.com/history/president-clevelands-problem- child-100800/.

Presidents as untrustworthy.[18]  Finally, politicians often turn previously meaningless phrases into political slogans.  For example, despite its nonsensical meaning, former President Trump's infamous "covfefe" tweet was transformed into both a pro- and anti-Trump slogan.[19]  As these and other political slogans show, a phrase like "Let's Go Brandon" can reasonably mean many things to different people.  Indeed, the Supreme Court recognized centuries ago that "[s]uch is the character of human language, that no word conveys to the mind, in all situations, one single definite idea." *McCullough v. Maryland*, 17 U.S. 316, 414 (1819).  The First Amendment prohibits school administrators from selectively punishing student speech based on one of those meanings.

Schools cannot censor speech that could reasonably be construed either as profane *or* non-profane when it plausibly communicates a political message because suggestive commentary like "Let's Go Brandon" is clearly part of our democracy's "exposition of ideas" with real "social value." *Pacifica Found.*, 438 U.S. at 746 (citation omitted).  This social value is manifest when once profanely-coded expressions join the ranks of acceptable conversation.  SNAFU turns from a World

---

18      Matthew Rozsa, *From "OK" to "Let's Go Brandon"*, Salon (Nov. 7, 2021) https://www.salon.com/2021/11/07/from-ok-to-lets-go-brandon-a-short-history-of-insulting-presidential-nicknames/.

19      Matt Flegenheimer, *What's a 'Covfefe'? Trump Tweet Unites a Bewildered Nation*, The N.Y. Times (May 31, 2017) https://www.nytimes.com/2017/05/31/us/politics/covfefe-trump-twitter.html.

War II soldiers' coarse lament into an everyday office buzzword; "Let's Go Brandon" evolves from mocking a NASCAR reporter into widespread criticism or occasional praise of a sitting President. If student speech must be sanitized to the degree insisted upon by Defendants, discourse on important political and social issues would be restricted to the arid recitation of bland and innocuous information, to students' detriment as engaged citizens.

### C. D.A.'s and X.A.'s "Let's Go Brandon" Sweatshirts Are Individual, Not School-Associated, Expression.

Unlike in *Fraser*, there was no need for the school district to dissociate itself from the political viewpoint displayed on D.A.'s and X.A.'s sweatshirts because "the message expressed was clearly personal to the speaker[s], conveyed on a private article of clothing that [t]he[y] chose to wear." Michael J. Grygiel, *Back to the Future: The Second Circuit's First Amendment Lessons for Public Student Digital Speech*, 71 SYRACUSE L. REV. 1, 73 (2021). Further, their message was "displayed in a manner commonly used to convey silently an idea, message, or political opinion to the community." *Chandler v. McMinnville School Dist.*, 978 F.2d 524, 530 (9th Cir. 1992). Thus, "[t]here would seem to be little if any risk" that the sweatshirts' message "would be misconstrued as endorsed by the school district, and the school's interest in inculcating habits of civil discourse was surely less with respect to a message displayed as part of an individual wardrobe choice than in a student speech

delivered to a mandatory school assembly."[20]  Grygiel, *Back to the Future*, 71 SYRACUSE L. REV. at 73.  This Court has recognized this very point in rejecting the notion that a school supports or sponsors individualized student expression. *Castorina v. Madison Cnty. Sch. Bd.*, 246 F.3d 536, 543 (6th Cir. 2001) (rejecting argument that school could be perceived as endorsing student's display of Confederate flag if it failed to ban t-shirt bearing the flag's image). Here, the lower court paid no heed to the critical First Amendment distinction between a student's expressive activities that might reasonably be perceived as associated with the school or bearing its imprimatur and "a student's personal expression that happens to occur" on school grounds such as Plaintiffs' sweatshirts, removing them from *Fraser*'s purview.  *Hazelwood v. Kuhlmeier*, 484 U.S. 260, 271 (1988). This, too, was constitutional error.

---

[20]     *Barber ex rel. Barber v. Dearborn Pub. Schs.*, 286 F.Supp.2d 847, 856 (E.D. Mich. 2003) ("no reasonable person could conclude that a school endorses the messages on its students' clothing").

### III. A BRIGHT-LINE RULE PROTECTING STUDENTS' NONDISRUPTIVE POLITICAL SPEECH WILL PREVENT BROAD SCHOOL CENSORSHIP

#### A. *Morse* Applies Only To Non-Political Speech That Encourages Illegal Drug Use.

*Morse v. Frederick*, 551 U.S. 393 (2007), permits schools to regulate non-political speech that encourages illegal drug use.[21]  In *Morse*, a high school suspended a student for holding up a banner that read "Bong Hits 4 Jesus." *Id*. at 397-98.  The Court supported the school's right to punish the student because his speech "was reasonably viewed as promoting illegal drug use." *Id.* at 409.  Importantly, and pertinent here, Chief Justice Roberts's majority opinion emphasized that *Morse*'s banner was "plainly not a case about political debate." *Id.* at 403.  Political speech therefore retains robust protection in schools, even when it conveys a message that may be deemed "offensive" under *Fraser*. *Id.* at 409 ("After all, much political and religious speech might be perceived as offensive to some.").

---

[21]     *See Kutchinski v. Freeland Cmty. Sch. Dist.*, 69 F.4th 350, 356-57 (6th Cir. 2023) (*Morse* permits school regulation of "speech during school or at a school-sponsored event that schools 'reasonably regard as promoting illegal drug use'") (citing *Morse*, 551 U.S. at 408); *see also* Erwin Chemerinsky, *How Will Morse v. Frederick Be Applied?*, 12 LEWIS & CLARK L. REV. 17, 25 (2008) (*Morse* should be read narrowly because "[i]t was a 5-4 decision and two of the Justices in the majority — Alito and Kennedy — emphasized that the holding is just about the ability of schools to punish student speech encouraging drug use. The opinion should be read no more broadly than that.").

Justice Alito amplified this point in his *Morse* concurrence, joining the majority opinion only insofar as it "provide[d] no support for any restriction of speech that can plausibly be interpreted as commenting on any political or social issue." *Id.* at 422 (Alito, J., concurring). To hold otherwise in the name of protecting a school's educational mission could "easily be manipulated in dangerous ways." *Id.* at 423. For instance, Justice Alito highlighted how the public school in *Tinker* "could have defined its educational mission to include solidarity with our soldiers and their families and thus could have attempted to outlaw the wearing of black armbands on the ground that they undermined this mission."[22] *Id.* Deference to a public school's self-defined "educational mission" gives elected or appointed school officials "a license to suppress speech on political and social issues based on disagreement with the viewpoint expressed. . . . [which] strikes at the very heart of the First Amendment." *Id.* Limiting *Morse* to non-political speech that promotes illegal activity limits school officials' ability to abuse their censorial authority.

---

[22] In similarly rejecting a broad reading of *Fraser*'s "educational mission" rationale prior to the Supreme Court's decision in *Morse*, the *Guiles* court noted that such an expansion would negate *Tinker* by affording school officials wide discretion to punish student speech that employs objectionable or inappropriate language deemed incompatible with prevailing social or political norms. *Guiles*, 461 F.3d at 328 ("the rule of *Tinker* would have no real effect because it could have been said that the school administrators in *Tinker* found wearing anti-war armbands offensive and repugnant to their sense of patriotism and decency").

## B. Coded Profanity and Non-Graphic Sexualized Student Speech Offering Commentary On Political and Social Issues Cannot Be Punished In the Absence Of a *Tinker* Disruption.

As a matter of constitutional principle, this Court should clarify that ambiguous public school student expression "tinged with sexual innuendos or double entendres" is immunized from school punishment under the First Amendment when it includes commentary on a political or social issue unless it results in a disruption that would satisfy *Tinker*.[23] Calvert, *Mixed Messages*, 90 DENV. U. L. REV. at 167. *See also B.H. ex rel. Hawk v. Easton Area School District*, 725 F.3d 293, 306 (3d. Cir. 2013) (holding that schools could not prohibit "I ♥ Boobies! (KEEP A BREAST)" bracelets because they were not explicitly profane and commented on the social issue of breast cancer awareness). By following the constitutional demands of *Tinker* and Justice Alito's directive in *Morse*, the First Amendment protects nondisruptive student speech that comments on political and social issues when it is not graphically profane. *Morse*, 551 U.S. at 422 (Alito, J., concurring). And by adopting this bright-line rule, the Court will ensure that

---

[23]     To ensure adequate protection for student speech that conveys ambiguous sexualized messages or double entendres while also addressing political and social issues, Professor Calvert advocates a three-step rule that would modify *Fraser* by incorporating the point emphasized by Justice Alito's concurrence in *Morse*. *See* 90 DENV. U. L. REV. at 167-68. Thus, even student speech that can reasonably be construed as coded profanity or veiled sexual expression but that also comments on matters of political and social relevance receives presumptive First Amendment protection, unless it causes a disruption that satisfies *Tinker*'s evidentiary requirements. *Id.*

ambiguous student speech with a plausible political meaning "is protected under the First Amendment and may only be regulated if a school meets the *Tinker* standard." *See Barr v. Lafon*, 538 F.3d 554, 569 n.7 (6th Cir. 2008) (noting that *Tinker's* "substantial disruption," not *Fraser's* "vulgar" or "plainly offensive" standard governed regulation of Confederate flag t-shirts). This rule squares *Tinker*, *Fraser*, and *Morse* by ensuring that schools can continue to function without suppressing any nondisruptive political speech that contributes to students' understanding of and participation in our democracy.[24]

Other circuits have endorsed this approach in evaluating students' crass and vulgar political expression. The Second Circuit, for example, rejected a broad reading of *Fraser* when a middle school sought to ban a student's t-shirt critical of then-President Bush. *Guiles*, 461 F.3d at 322. The t-shirt, featuring images and text criticizing Bush as a former alcohol and cocaine abuser, was worn by the plaintiff-student weekly for two months without complaint. *Id*. The school did not act until a parent, known to hold conservative political beliefs, complained to school administrators about the t-shirt. *Id*. Because the t-shirt concerned a crude parody of President Bush, rather than *Fraser's* "vulgarity, obscenity, and profanity," the court

---

[24]    *See* Calvert, *Mixed Messages*, 90 DENVER U. L. REV. at 168-70 (illustrating how this rule would protect student apparel with politically or socially relevant messages while allowing schools to band distasteful apparel worn purely for humor or shock value).

applied *Tinker's* "substantial disruption" test. *Id*. at 328. Finding no substantial disruption, the *Guiles* court rejected the school's prohibition.

Similarly, in *Hawk*, the Third Circuit recognized that this bright-line rule protects speech at "the heart of the First Amendment," 725 F.3d at 314 (quoting *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) — nondisruptive political speech — while allowing schools to prevent "the evil to be restricted." *Id*. at 316 (quoting *United States v. Stevens*, 559 U.S. 460, 470 (2010)) in the form of plainly lewd, vulgar, or profane speech. In the same manner, and by adhering to the distinction it has already recognized in *Barr v. Lafon*, this Court can protect students from the capricious impulses of elected school officials who face community pressure to impose their constituents' views on their students, which will inevitably lead to the suppression of critical, resistant, and controversial viewpoints.[25]

The danger of school administrators engaging in majoritarian censorship, exacerbated in this social media age, is real. The right of students to be free from government censorship is too important to allow schools to suppress unpopular viewpoints by end-running *Tinker*, which would present "an egregious violation of

---

[25] Mary-Rose Papandrea, *Student Speech Rights in the Digital Age*, 60 FLA. L. REV. 1027, 1089 (2008) (hereinafter "*Student Speech Rights*") ("As Justice Alito recognized in his *Morse* concurrence, however, giving school broad authority to suppress speech in the name of promoting their educational mission is dangerous. Given that public students already face compulsory attendance laws, the risk of improper governmental indoctrination is high.") (footnote omitted).

the First Amendment." *Castorina*, 246 F.3d at 540. Under the bright-line rule advocated by *amici*, schools still have ways to protect the legitimate function-sensitive interests that may justify in-school restrictions on student speech. If a particular student's political message is substantially disruptive, schools would be justified in proscribing it — but they need to do their *Tinker* homework and prove the disruption. They cannot merely hypothesize about what language seems too offensive for a student to wear on a sweatshirt. The First Amendment flatly prohibits such an outcome. *Tinker*, 393 U.S. at 508 ("in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression").

## IV.   MIDDLE SCHOOL IS A CRITICAL TIME FOR STUDENTS' GROWTH AS INFORMED CITIZENS

Middle schools play a critical role in the educational process that provides students the tools they need to function as informed citizens in our democracy. Our nation's tradition of allowing robust student expression has resulted in its public school students becoming among the most civically engaged in the world. Judith Torney-Purta, Rainer Lehmann, Hans Oswald, & Wolfram Schulz, *Citizenship and Education in Twenty-eight Countries*, INT'L ASS'N FOR EVALUATION OF EDUCATIONAL ACHIEVEMENT 7, 9 (2001). "Schools that model democratic values by promoting an open climate for discussing issues . . . are effective in promoting

both civic knowledge and engagement," and students who learn in speech-positive classrooms report being more likely to vote once they graduate. *Id.* at 8-9.

In this regard, schools ought to be a place for students to practice democracy. The Supreme Court has noted that the public school system is a space for that practice because it provides a "marketplace of ideas" for students. *Tinker*, 393 U.S. at 512.

> Allowing the marketplace of ideas to flourish at school . . . helps prepare students to be participants in [a] democracy that cherishes the free exchange of ideas and diversity of viewpoint. Given that young people spend the bulk of their time in school acquiring knowledge and developing their belief systems, the theory of the marketplace of ideas has particularly strong currency for them. Communication among young people and with adults plays an important role in their development. Children would be ill-equipped to participate in the marketplace of ideas without childhood exposure to a variety of views and practice in shifting through them to determine the truth.

Papandrea, *Student Speech Rights*, 60 FLA. L. REV. at 1078-79 (internal quotations and footnotes omitted).

Democracy is often messy business, and students should feel empowered to navigate it in ways that do not substantially disrupt their classmates' learning environment. *Cuff,* 677 F.3d at 124 (Pooler, J., dissenting) (students "learn by fumbling their way to finding the boundaries between socially permissible, and even encouraged, forms of expression . . . and impermissible and offensive remarks that merely threaten and alienate those around them"). By encouraging this navigation

process, schools allow students to develop tolerance and resiliency when confronting dissenting views, foster critical thinking skills necessary to work through complex issues, and learn they will one day be able meaningfully to participate in society as informed and engaged citizens.[26]

Unfortunately, students who are punished for exercising their First Amendment rights can face enduring consequences that begin during middle school. Defying a principal's order to remove a piece of clothing could mean suspension. Suspensions in middle school, which isolate students and reduce their time in the classroom, have lasting impacts on future behavior and educational outcomes.[27] Even less severe disciplinary measures could result in reportable records. *See, e.g.*, Tri County Middle School Handbook (2024) ("Every student at TCMS has a cumulative folder . . . [including] behavioral history."). Further, school conduct records are often unspecific. An admissions official reviewing a disciplinary record

---

[26] Emily Gold Waldman, *Badmouthing Authority: Hostile Speech About School Officials and the Limits of School Restrictions*, 19 WM. & MARY BILL RTS. J. 591, 654 (2011) ("[L]istening to other students' dissenting speech — and observing the way that school officials respond to it — can also be an educationally valuable experience that helps prepare students for citizenship.").

[27] *See generally* Christina LiCalsi, David Osher, & Paul Bailey, *An Empirical Examination of the Effects of Suspension and Suspension Severity on Behavioral and Academic Outcomes*, AMERICAN INSTITUTE FOR RESEARCH (2020); Andrew Bacher-Hicks, Stephen B. Billing, David J. Deming, *Proving the School-to-Prison Pipeline: Stricter middle schools raise the risk of adult arrests*, EDUCATION NEXT (2021).

might have no idea whether a student wore a sweatshirt featuring a benign political slogan that caused no disruption or shouted vile profanities in the midst of a school-sponsored program.

Middle school conduct records frequently travel with students to high school, as FERPA requires public schools to retain such records for at least three years. 20 U.S.C. § 1232f(a). As a result, students may be denied opportunities to take honors classes, enroll in academic enrichment programs, or be admitted to charter or magnet schools. Educational opportunities, which often require the recommendation of a school counselor or prior teachers familiar with the student's reputation, can dramatically change students' lives. Colleges are more competitive than ever, so students are forced to prepare for college earlier in their educational lives, such that a minor suspension or misconduct record could have far-reaching detrimental impacts going forward. Given the potentially damaging consequences of acquiring a disciplinary record, *Tinker* does not permit school administrators to punish students whose speech they deem offensive, even when that determination is made in good faith.[28]

---

[28]    *Thomas v. Bd. of Educ., Granville Cent. Sch. Dist.*, 607 F.2d 1043, 1051 (2d Cir. 1979) (noting student speech overregulation bias "regardless of the intentions of well-meaning school officials"); *see also* Tomain, *supra* note 15, at 175 ("Administrators may truly believe they are acting in the best interests of the school and the students. Regardless, this good faith belief does not overcome human nature, especially when the school administrator has a natural inclination to protect the school and its administrators from unsavory speech.") (footnotes omitted).

Schools operate in the best interests of their students by protecting their First Amendment rights to express political and social issues as engaged citizens who can take full advantage of the academic opportunities ahead of them. To be sure, whether a school "condemns or tolerates" student speech "will have significance for the future of that school and of its students." *Thomas v. Bd. of Educ.*, 607 F.2d at 1057 (Newman, J., concurring). And it will also have consequences for the society those students live in, and for the political system that shapes their lives.

## CONCLUSION

For the reasons stated herein, *Amici* respectfully urges this Court to reverse the District Court's order.

Dated: December 11, 2024

Respectfully Submitted,

By: *Michael J. Grygiel*

Michael J. Grygiel
Daniela del Rosario Wertheimer (*Pro hac vice* application forthcoming)
CORNELL LAW SCHOOL FIRST AMENDMENT CLINIC
Myron Taylor Hall
Ithaca, NY 14853
Tel.: (607) 255-8518

*Attorneys Pro Bono Publico for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(b)(4) and 32(a)(7)(B) because: this brief contains 5,038 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(i) and 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because: this brief has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Times New Roman font.

Michael J. Grygiel

## CERTIFICATE OF FILING AND SERVICE

I, Michael J. Grygiel, hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system on December 11, 2024. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

Michael J. Grygiel