**CASE NO. 24-1769**

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

B.A., mother of minors D.A. and X.A.;

D.A., a minor, by and through his mother, B.A.;
X.A., a minor, by and through his mother, B.A.,

*Plaintiffs-Appellants,*

v.

TRI COUNTY AREA SCHOOLS;
ANDREW BUIKEMA, in his individual capacity;
WENDY BRADFORD, in her individual capacity,

*Defendants-Appellees*

On Appeal form the United States District Court
for the Western District of Michigan
(1:23-cv-00423)

**AMICUS CURIAE BRIEF OF THE MICHIGAN ASSOCIATION OF
SCHOOL BOARDS IN SUPPORT OF DEFENDANTS-APPELLEES AND
AFFIRMANCE OF DISTRICT COURTS DECISION**

Daniel Feinberg (P69956)
*Counsel of Record*
Brad Banasik (P57420)
MICHIGAN ASSOCIATION
OF SCHOOL BOARDS
1001 Centennial Way, Ste 400
Lansing, MI 48917
(517) 327-5900
dfeinberg@masb.org
*Attorneys for Amicus Curiae*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 24-1769          Case Name: B.A v. Tri County Area Schools

Name of counsel:  Daniel Feinberg

Pursuant to 6th Cir. R. 26.1, Michigan Association of School Boards
                                         *Name of Party*

makes the following disclosure:

1.   Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the
     identity of the parent corporation or affiliate and the relationship between it and the named
     party:

No.

2.   Is there a publicly owned corporation, not a party to the appeal, that has a financial interest
     in the outcome?  If yes, list the identity of such corporation and the nature of the financial
     interest:

No.

### CERTIFICATE OF SERVICE

I certify that on _____ the foregoing document was served on all
parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not,
by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Daniel Feinberg
DANIEL FEINBERG
Attorney for Amicus Curiae

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

# **TABLE OF CONTENTS**

DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST

TABLE OF CONTENTS…………………………………………………………i

TABLE OF AUTHORITIES………………………………………………………..ii

IDENITITY AND INTEREST OF AMICUS CURIAE……………………………1

FEDERAL RULES OF APPELATE PROCEDURE
RULE 29(a)(4)(E) STATEMENT………………………………………………..2

ARGUMENT……………………………………………………………………….3

I.      Schools have the authority under their jurisdiction to
regulate vulgar speech -not just swearing- regardless of
where it falls on the hierarchy of protected speech…………………………...3

II.    Based on its etymology, the phrase "Let's Go Brandon"
means "Fuck Joe Biden."……………………………………………………9

III.   Not allowing students to wear vulgar sweatshirts that have a
euphemism for "Fuck Joe Biden" is not a violation of the
student's First Amendment right to free speech……………………………..11

IV.   Conclusion………………………………………………………………14

CERTIFICATE OF COMPLIANCE………………………………………………....15

CERTIFICATE OF SERVICE……………………………………………………16

DESIGNATION OF RELEVANT CIRCUIT COURT DOCUMENTS…………...17

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Ambach v. Norwick*, 441 U.S. 68 (1979)…………………………………………....6

*Bethel School District vs. Fraser* 478 U.S. 675 (1986)………………….....3,4,5,6,7,8

*Bd. of Ed .of Hendrick Hudson Cntrl. Sch. Dist. v. Rowley*, 458 U.S. 176 (1982)…..11

*Boroff v. Van Wert City Board of Education,* 220 F.3d 465 (CA 6, 2000)…………..8,9

*Cohen* v. *California*, 403 U.S. 15 (1971)……………………………………………5

*Epperson v. Arkansas*, 393 U.S. 97 (1968)……………………………………...11

*Guiles v Marineau*, 461 F.3d 320 (2nd Cir. 2006)………………………………..12

*Hazelwood School District v Kuhlmeier* 484 U.S. 260 (1987)…………………...5,11

*Mahanoy Area Sch. Dist. V. B.L.* 594 U.S. 180 (2021)………………………….3,8,9

*Morse v Frederick*, 551 U.S. 393 (2007)…………………………………..5,12,13

*New Jersey* v. *T. L. O.*, 469 U.S. 325 (1985)…………………………………...5

*Thomas* v. *Bd. of Ed., Granville Cntrl. Sch. Dist.*,
607 F.2d 1043, 1057 (CA 2, 1979)………………………………………………..6

*Tinker v Des Moines Indep. Cmty. Sch. Dist.* 393 U.S. 503 (1969)………….3,4,6,7,8

*Wood v. Strickland*, 420 U.S. 308 (1975)………………………………………..11

## Other Authorities

*Amended Opinion and Order Granting Defendants Motion for Summary*
*Judgement and Denying Plaintiffs' Motion for Summary Judgement*…………........10

*Black's Law Dictionary,* 11th Ed (2019) …………………………………………9,10

C. Beard and M. Beard, New Basic History of the United States at 228 (1968)……..3

*Defendants, Tri County Area Schools, Andrew Buikema and*
*Wendy Bradford's Motion for Summary Judgment*……………………………..10,11

J.K. Rowling, *Harry Potter and the Sorcerer's Stone* (Scholastic Books 1997)…...10

## IDENTITY AND INTEREST OF AMICUS CURIAE

The Michigan Association of School Boards (MASB) is a voluntary, non-profit association consisting of approximately 600 local and intermediate school district boards of education throughout the State of Michigan, which includes nearly all of the state's public school districts. Officially organized in 1949, MASB's goal is to advance the quality of public education in this state, promote high educational program standards, help school board members keep informed about education issues, represent the interest of boards of education, and promote public understanding about school boards and citizens involvement in schools. MASB is recognized as a major voice in influencing education issues at the state level. Consequently, for 75 years, MASB has worked to provide quality educational leadership services for Michigan Boards of Education and to advocate for student achievement and public education.

MASB is filing this *Amicus Curiae* brief to address the contours of our students First Amendment free speech rights as they balance against the responsibilities placed on our schools to strengthen America's representative democracy through educating children on how to engage in actual political discourse instead of coded, vulgar epithets.

## FEDERAL RULES OF APPELATE PROCEDURE
## <u>RULE 29(a)(4)(E) STATEMENT</u>

Pursuant to Rule 29(a)(4)(E) of the Federal Rules of Appellate Procedure,

*Amicus Curiae* states the following:

i.   No party's counsel authored this brief in whole or in part.

ii.  No party or party's counsel contributed money that was intended to fund

preparing or submitting this *Amicus Curiae* brief.

iii. No person other than *Amicus Curiae* and their counsel contributed money

to fund the preparation or submission of this brief.

# **ARGUMENT**

"America's public schools are the nurseries of democracy. Our representative democracy only works if we protect the "marketplace of ideas." *Mahanoy Area Sch. Dist. V. B.L.* 594 U.S. 180, 190 (2021). The concept of "protection" of the marketplace is challenging. There is the often-quoted adage "It can hardly be argued that either students or teachers shed their constitutional rights at the schoolhouse gate." *Tinker v Des Moines Independent Community School District* 393 U.S. 503, 506 (1969). But there is also the crucially important task inside the schoolhouse gate to "inculcate the habits and manners of civility as values in themselves conductive to happiness and as indispensable to the practice of self-government in the community and the nation." *Bethel School District vs. Fraser* 478 U.S. 675, 681 (1986) citing C. Beard and M. Beard, New Basic History of the United States at 228 (1968). The crux of this case -and almost all school speech cases- is balancing a student's first amendment rights in light of, as coined in *Tinker* at 506, "the special characteristics of the school environment" which can grant the schools authority to regulate speech in certain circumstances.

I.     **Schools have the authority under their jurisdiction to regulate vulgar speech -not just swearing- regardless of where it falls on the hierarchy of protected speech.**

Although people laud (and revile) *Tinker* as establishing free speech rights for students it is, in fact, a recognition that schools have the authority to regulate speech in schools in certain circumstances. When *Tinker* was decided in 1969, the Supreme Court created the substantial disruption test in response to the question of whether students could passively wear black armbands in protest of the conflict in Vietnam.

> A student's rights…do not embrace merely the classroom hours. When he is in the cafeteria, or on the playing field, or on the campus during the authorized hours, he may express his opinions, even on controversial subjects like the conflict in Vietnam, if he does so without 'materially and substantially interfer[ing] with the requirements of appropriate discipline in the operation of the school' and without colliding with the rights of others. But conduct by the student, in class or out of it, which for any reason -- whether it stems from time, place, or type of behavior -- materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech.

*Tinker* at 513 (citations omitted). To more succinctly put it:

> The Constitution says that Congress (and the States) may not abridge the right to free speech. This provision means what it says. *We properly read it to permit reasonable regulation of speech-connected activities in carefully restricted circumstances.*

*Id.* (Italics added for emphasis).

Although the Supreme Court established this initial, high bar test for

regulation of speech in schools, it is not the only test that the Court has created. [1]

On point to the case at hand, in 1983, Matthew Fraser gave a speech at a school

assembly to endorse Jeff Kuhlman for A.S.B. vice-president. The speech was:

> I know a man who is firm. He's firm in his pants. He's firm in his
> shirt, his character is firm – but most…of all, his belief in you, the
> students of Bethel, is firm. Jeff Kuhlman is a man who takes his point
> and pounds it in. If necessary, he'll take an issue and nail it to the
> wall. He doesn't attack things in spurts – he drives hard, pushing and
> pushing until finally – he succeeds. Jeff is a man who will go to the
> very end – even the climax, for each and every one of you. So vote for
> Jeff for A. S. B. vice-president – he'll never come between you and
> the best our high school can be.

*Fraser* at 687 (Brennan Concurring).  In 1986, the Supreme Court held that a

"school district acted entirely within its permissible authority in imposing

sanctions upon Fraser in response to his offensively lewd and indecent speech."

*Fraser* at 685. In performing its analysis, the Court stated:

> The First Amendment guarantees wide freedom in matters of adult
> public discourse. A sharply divided Court upheld the right to express
> an antidraft viewpoint in a public place, albeit in terms highly
> offensive to most citizens. See *Cohen* v. *California*, 403 U.S. 15
> (1971). It does not follow, however, that simply because the use of an
> offensive form of expression may not be prohibited to adults making
> what the speaker considers a political point, the same latitude must be

---

[1] Subsequent to the Supreme Court ruling in *Fraser* that schools have the authority to regulate vulgar speech regardless of *Tinker*, the Court decided two additional cases addressing student speech rights in schools. In 1987, the Court specifically used a standard different than *Tinker* holding schools could exercise editorial control over the style and content of student speech in school sponsored expressive activities so long as their actions were reasonably related to legitimate pedagogical concerns. *Hazelwood School District v Kuhlmeier* 484 U.S. 260 (1987). In 2007, a sharply divided Court again deviated from Tinker to allow for schools to prohibit students from using speech that promotes illegal drug use *Morse v Frederick*, 551 U.S. 393 (2007).

permitted to children in a public school. In *New Jersey* v. *T. L. O.*, 469 U.S. 325, 340-342 (1985), we reaffirmed that the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings. As cogently expressed by Judge Newman, 'the First Amendment gives a high school student the classroom right to wear Tinker's armband, but not Cohen's [Fuck the Draft] jacket.' *Thomas* v. *Board of Education, Granville Central School Dist.*, 607 F.2d 1043, 1057 (CA2 1979) (opinion concurring in result).

Surely it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse. Indeed, the 'fundamental values necessary to the maintenance of a democratic political system' disfavor the use of terms of debate highly offensive or highly threatening to others. Nothing in the Constitution prohibits the states from insisting that certain modes of expression are inappropriate and subject to sanctions. The inculcation of these values is truly the 'work of the schools.' Tinker, 393 U.S., at 508; see *Ambach v. Norwick*,[441 U.S. 68 (1979)] supra. The determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board.

*Id.* at 682.

It is important to note that the speech above, did not directly use profanity or swearing. Nor did it use any sanitizing words or common euphemisms for sexual activity. But the speech was interpreted by the school, and the Court, as being a ribald, lewd speech full of sexual references inappropriate for a school assembly setting. That the speech itself *was* political speech -endorsement of a candidate for an office can hardly be considered anything but political speech- was irrelevant. The court specifically addressed this point in stating "Unlike the sanctions imposed on the students wearing armbands in *Tinker, the penalties imposed in this case were unrelated to any political viewpoint*. The First Amendment does not prevent the

school officials from determining that to permit a vulgar and lewd speech such as respondent's would undermine the school's basic educational mission." *Id* at 685 (Italics added for emphasis). In essence, the Court stated so long as the reasoning behind the penalty is based on the vulgarity of the speech, and not the message behind it, the school is able to regulate the speech in question, regardless of where it may fall on the hierarchy of protected speech.

It should be noted that the decision in *Boroff v. Van Wert City Board of Education,* 220 F.3d 465 (CA 6, 2000) Cert. Denied 532 U.S. 920, (2001), the Sixth Circuit reinterpreted *Fraser.* In *Boroff,* the court affirmed a school district's ability to prohibit a student from wearing a Marilyn Manson T-shirt with a three-headed Jesus picture, the words "See No Truth, Hear No Truth, Speak No Truth" on the front, and the word "Believe" with "Lie" highlighted in the middle of it on the back. In its analysis, the Sixth Circuit read *Fraser* as the Supreme Court holding that the Bethel School District:

> …acted within its permissible authority in disciplining a student who gave an offensively lewd and indecent speech at a school assembly. In reaching its conclusion, the Court noted 'the marked distinction between the political 'message' of the armbands in *Tinker* and the sexual content of respondent's speech in this case.' *Fraser*, 478 U.S. at 680. The Court recognized 'that the constitutional rights of students in public schools are not automatically coextensive with the rights of adults in other settings.' *Id***.** at 682. It distinguished *Tinker* because the vulgar and offensive speech at issue was 'unrelated to any political viewpoint.' *Id***.** at 685. The Court ultimately held that the school

district had the authority to determine that the vulgar and lewd speech
at issue would undermine the school's basic educational mission. *Id.*
*Boroff* at 468.

By cutting away "the penalties imposed in this case were" from the phrase,

which clearly states "the penalties imposed in this case were unrelated to any

political viewpoint," the Sixth Circuit altered *Fraser* to no longer be about

whether a school may regulate vulgar language, but instead to be about whether the

language is political speech or not, which under *Fraser* is irrelevant, and whether it

is offensive to the school's educational mission, which is viewpoint discrimination.

Briefs -including this one- often quote the "schoolhouse gate" sentence of

*Tinker (supra)*. But many of them -not including this one- give short shrift to the

much more important sentence right before it. "First Amendment rights, applied *in*

*light of the special characteristics of the school environment*, are available to

teachers and students." *Tinker* at 506 (italics added for emphasis). While the court

did not define "special characteristics," the basis stems from the concept that to

function -i.e. provide education, training, and teaching the "fundamental values

necessary to the maintenance of a democratic political system" (*see Fraser at 684),*

schools must have the authority to regulate their students within their jurisdiction

in ways greater than may be allowed outside of it. "[T]he Court appeared to take it

for granted that 'the special characteristics of the school environment' justified

8

special rules (citations omitted). Why the Court took this for granted is not hard to imagine. As a practical matter, it is impossible to see how a school could function if administrators and teachers could not regulate on-premises student speech, *including by imposing content-based restrictions in the classroom*." *Mahanoy Area School District v B.L.* 594 U.S. 180, 196 (2021) (Alito concurring opinion) (emphasis added).

Ultimately, "…it is well settled that schools can punish "vulgar" speech – at least when it occurs on campus. *Mahanoy.* at 215 (Thomas dissenting opinion).

## II.     Based on its etymology, the phrase "Let's Go Brandon" means "Fuck Joe Biden."

"Let's Go Brandon" entered the lexicon at a NASCAR race in October 2021 when NBC's sports reporter Kelli Stavast was interviewing Brandon Brown at the Talladega Superspeedway after his first career win. Ms. Stavast commented the crowd was chanting "Let's Go Brandon" when they were clearly chanting "Fuck Joe Biden" and a new euphemism was born. https://youtu.be/u9UjgITXUJ4.

A euphemism is defined as "an alternative term or phrase intended to be less offensive or in some other way more acceptable than the term it replaces. *Black's*

*Law Dictionary,* 11th Ed. It is why we say things like "I have to use the restroom," or "senior citizen" instead of giving graphic descriptions of toileting needs or calling someone old. Euphemisms are way for people to attempt to say something they are uncomfortable saying or feel they may cause or get into trouble for saying directly.[2] Importantly, the use of a euphemism only works when the intent and meaning of the speaker is understood. "Passed away" could not be a euphemism for death if the collective didn't know what it meant. Almost everyone knows that "Let's go Brandon" simply means "Fuck Joe Biden." What makes it so well-known is the pervasiveness of the phrase and its etymology. The crowd at a NASCAR event was chanting "Fuck Joe Biden" and a reporter failed in an effort to cover it up by saying they were chanting "Let's Go Brandon." It is actually less of a euphemism and more of a double entendre, which is defined as "a word or phrase that can be interpreted in two different ways." *Blacks.*   Almost everyone is in on the joke, including the plaintiffs (See *Amended Opinion and Order Granting Defendants Motion for Summary Judgement and Denying Plaintiffs' Motion for Summary Judgement* at page 23 "Albeit using different words, Let's Go Brandon, means F*** Joe Biden, a personal insult containing a swear word. Defendants both interpreted the phrase as having a profane meaning, Both D.A. and X.A.

---

[2] In the magical world of Harry Potter, Dumbledore consistently refers to Voldemort by name even though it makes others uncomfortable. He even chastises Harry when he tries to use the euphemism "You-Know-Who" saying "Call him Voldemort, Harry. Always use the proper name for things. Fear of a name increases fear of the thing itself." See *e.g.,* J.K. Rowling, *Harry Potter and the Sorcerer's Stone* p. 298 (Scholastic Books 1997).

thought the phrase was funny because it meant a profanity." See also *Defendants, Tri County Area Schools, Andrew Buikema and Wendy Bradford's Motion for Summary Judgment* at pages 2-3 "During his deposition D.A. admitted that he was not honest with Buikema and that **he knew that the phrase 'Let's Go Brandon' meant 'Fuck Joe Biden' at the time he wore the apparel in February of 2022** (Ex 1. Page 12)" and page 14 "Both D.A. and X.A. admitted that the phrase 'Let's Go Brandon' means 'Fuck Joe Biden', and they were aware of this profane meaning when they wore the sweatshirts to school. (Ex. 1p.10-11; Ex.2 p.8)"). The issue in this case is not whether the sanitization of the words "Fuck Joe Biden" with the phrase "Let's Go Brandon" makes it ok to say in schools. "Let's Go Brandon" is simply a poor veneer for the vulgar phrase "Fuck Joe Biden."

**III.    Not allowing students to wear vulgar sweatshirts that have a euphemism for "Fuck Joe Biden" is not a violation of the student's First Amendment right to free speech.**

Contrary to the Plaintiffs-Appellants' position, the Defendants-Appellees are not policing "thought" by prohibiting vulgarity. "The education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not federal judges." *Hazelwood School District v Kuhlmeier,* 484 U.S. 260, 273 (1988) referencing *Board of Education of Hendrick Hudson Central*

*School Dist. v. Rowley*, 458 U.S. 176, 208 (1982); *Wood v. Strickland*, 420 U.S. 308, 326 (1975); and *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968).  In a school speech case where a district limits or restricts a student's expression, the court must determine whether the interpretation of the restriction by the district is reasonable. See *Morse v Frederick,* 551 U.S. 393 at 401 (2007).  As discussed in section II above, it is eminently reasonable to recognize the plausibility of the interpretation that "Let's Go Brandon" means "Fuck Joe Biden."

Plaintiffs-Appellants certainly have many other options to denigrate Joe Biden with abandon. Under *Guiles v Marineau*, 461 F.3d 320 (2nd Cir. 2006) The appeals court held a T-shirt worn by a student that represented President George W. Bush as a "Chicken Hawk In Chief" with a martini in one "wing" and lines of cocaine with a straw by the other wing. The back of the shirt had language accusing President Bush of being a Crook, Cocaine Addict, AWOL Draft Dodger, and Lying Drunk Driver. It also had pictures of military patches on the sleeves with one being a man drinking from a bottle and the other depicting a chicken with a bottle and lines of cocaine and a razor. As the Court stated "Without question Guiles's T-shirt uses harsh rhetoric and imagery to express disagreement with the President's policies and to impugn his character." *Guiles* at 321. The court specifically determined *Fraser* was not applicable to the case, pointing out that the imagery of a martini glass, a bottle and a glass, a man drinking from a

12

bottle, and lines of cocaine did not rise to the level of offensive. Notably, in *Morse*

the Supreme Court specifically determined that the same thing stating:

> Petitioners urge us to adopt the broader rule that Frederick's speech is
> proscribable because it is plainly "offensive" as that term is used
> in *Fraser*. We think this stretches *Fraser* too far; that case should not
> be read to encompass any speech that could fit under some definition
> of "offensive." After all, much political and religious speech might be
> perceived as offensive to some. The concern here is not that
> Frederick's speech was offensive, but that it was reasonably viewed as
> promoting illegal drug use.

*Morse* at 409 citation removed.

Plaintiffs-Appellants could have worn shirts that said "Crooked Joe" which

is a euphemism for the concept that Joe Biden is a criminal. They could have worn

shirts calling the president "Sleepy Joe Biden" which is a euphemism that Joe

Biden is suffering the effects of aging and has low energy. They could have worn

shirts calling to question the number of President Biden's grandchildren or

promoted that President Biden's son Hunter Biden's legal and drug issues raised

serious security questions for our nation. All of these issues called into question

Joe Biden's fitness for the presidency, and none of them involve phrasing that is

vastly known and understood to mean "Fuck Joe Biden."

## IV.    Conclusion

As stated above, the crux of this case is balancing students First Amendment free speech rights against the special characteristics of the school. Our schools have the awesome responsibility of helping preserve our democracy by teaching our children about the freedoms we are fortunate to have under our constitutional republic and teaching our children how to interact within the parameters of those freedoms in society at large. We have placed the responsibility on our schools to teach our students the skills to express their opinions in ways greater than the lowest of crass demeanor which offends even though it is protected speech. Because of this special characteristic of the school environment, it has been recognized that certain aspects of rights for students may be carefully curtailed when appropriate. Under *Fraser* it is clear that one of those aspects is vulgarity.

The phrase "Let's go Brandon" is simply a stand-in for the phrase "Fuck Joe Biden" and is a vulgarity. For schools to be able to educate and encourage our students to argue their points more eloquently, they must be able to curtail vulgar language, including its obvious stand-ins. Based on the etymology of the "Let's Go Brandon" phrase, the court should find *Fraser* applies and uphold the District Court's decision.

Dated: March 3, 2025

/s/ *Daniel Feinberg*
Daniel Feinberg (P69956)
*Counsel of Record*
Brad Banasik (P57420)
MICHIGAN ASSOCIATION
OF SCHOOL BOARDS
1001 Centennial Way, Ste 400
Lansing, MI 48917

(517) 327-5900
dfeinberg@masb.org

*Attorneys for Amicus Curiae*

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT</u>

1. This *Amicus Curiae* brief complies with the type-volume limitations of the Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7). Excluding parts of the brief exempted by Federal Rules of Appellate Procedure 32(f), this document contains 3,170 words according to Microsoft Word.

2. This *Amicus Curiae* brief complies with the typeface requirements of the Federal Rules of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in 14 point Times New Roman font.

Dated: March 3, 2025                                    /s/ *Daniel Feinberg*
                                                       Daniel Feinberg

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on January 27, 2025, an electronic copy of the foregoing *amicus curiae* brief was filed with the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system. The undersigned also certifies all parties in this case are represented by counsel who are registered CM/ECF users and that service of the brief will be accomplished by the CM/ECF system.


Dated: March 3, 2025                    /s/ *Daniel Feinberg*
                                        Daniel Feinberg

## DESIGNATION OF RELEVANT CIRCUIT COURT DOCUMENTS

Pursuant to Sixth Circuit Rules 28(b)(1)(A)(i) and 30(g)(1), *Amicus Curiae* designates the below documents from the district court's electronic record for the purpose of this brief.

**U.S. District Court**
**Western District of Michigan (Southern Division)**
**CIVIL DOCKET FOR CASE #: 1:23-cv-00423**

| Record Entry # | Description of Document | Page ID Range |
|---|---|---|
| 38 | Defendant's Motion for Summary Judgement | 355-397 |
| 58 | Opinion | 943-969 |