NO. 24-1769

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

B.A., mother of minors D.A. and X.A.

D.A., a minor, by and through his mother, B.A.
X.A., a minor, by and through his mother, B.A.

*Plaintiffs – Appellants*

v.

TRI COUNTY AREA SCHOOLS,  ANDREW BUIKEMA, in his individual capacity, WENDY
BRADFORD,  in her individual capacity

*Defendants – Appellees*

**On Appeal from the United States District Court
for the Western District of Michigan
Southern Division**

**DEFENDANTS-APPELLEES'  RESPONSE BRIEF ON APPEAL
*** ORAL ARGUMENT REQUESTED***

Submitted by:

TIMOTHY J. MULLINS (P28021)
KENNETH B. CHAPIE (P66148)
ANNABEL F. SHEA (P83750)
GIARMARCO, MULLINS & HORTON, P.C.
Attorneys for Defendants-Appellees
101 W. Big Beaver Road, 10th Floor
Troy, MI 48084-5280
(248) 457-7020
tmullins@gmhlaw.com
kchapie@gmhlaw.com
ashea@gmhlaw.com

## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

Pursuant to Fed. R. App. P. 26.1, Defendants-Appellees makes the following disclosure:

1.      Are said parties a subsidiary or affiliate of a publicly owned corporation?

   NO

2.      Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

   NO

**TABLE OF CONTENTS**

DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST ................................................................................ i

TABLE OF AUTHORITIES ................................................... v

STATEMENT IN SUPPORT OF ORAL ARGUMENT .................................. viii

STATEMENT OF JURISDICTION .................................................. ix

STATEMENT OF THE ISSUES PRESENTED .................................... x

STATEMENT OF THE CASE ................................................. 1

    1.    Background ................................................................. 1

    2.    Defendants Buikema and Bradford's Appropriate Response to Plaintiffs D.A. and X.A. Wearing their "Let's Go Brandon" Apparel to the Middle School ............................................................. 2

    3.    The Dress Code at Tri County Middle School ......................................... 4

    4.    There Was No Categorical District-Wide Ban on "Let's Go Brandon" Apparel ................................................................. 5

    5.    Procedural Posture ................................................. 6

SUMMARY OF ARGUMENT ........................................................ 9

ARGUMENT ................................................................. 12

I.    THE DISTRICT COURT PROPERLY CONCLUDED THAT BUIKEMA AND BRADFORD DID NOT VIOLATE THE FIRST AMENDMENT. ....................................................................................... 12

    A.    *Fraser* Does Not Apply Only to the Use of "Overt" or "Plain" Profanity. ....................................................................................... 25

    B.    *Fraser* Does Not Equate Student Speech Equal to that in Congress, the Radio or Television. ............................................................ 26

    C.    The District Court Properly Declined to Extend *B.H.* to this Case and Justice Alito's Concurrence in *Morse* Does Not Alter this Conclusion. ....................................................................................... 30

    D.    Plaintiffs' Approach to Student Speech is Inconsistent with what the Framers Intended. ............................................................... 36

II.    DEFENDANTS BUIKEMA AND BRADFORD ARE ENTITLED TO QUALIFIED IMMUNITY. .................................................................... 39

III.    PLAINTIFFS ABANDONED THEIR *MONELL* CLAIM ON APPEAL. ....................................................................................... 45

IV.    THIS COURT SHOULD DECLINE TO REVIEW PLAINTIFFS' CLAIM FOR INJUNCTIVE AND DECLARATORY RELIEF WHICH WAS WAIVED IN THE DISTRICT COURT. ................................................. 45

CONCLUSION ................................................................................ 46

CERTIFICATE OF COMPLIANCE ................................................ 47

CERTIFICATE OF ELECTRONIC SERVICE ................................ 47

ADDENDUM ................................................................................ 49

# TABLE OF AUTHORITIES

## _Cases_

_Aldini v. Johnson_, 609 F.3d 858 (6th Cir. 2010) ................................. 40

_Alexander v. Sandoval_, 532 U.S. 275 (2001) ................................... 35

_Allstate Ins. Co. v. Global Medical Billing, Inc._, 520 Fed. Appx. 409 (6th Cir. 2013) ................................................................................ 46

_Ashford v. Raby_, 951 F.3d 798 (6th Cir. 2020) ................................ 41

_B.H. ex rel. Hawk v. Easton Area School District_, 725 F.3d 293 (3rd Cir. 2013) ................................................................................ passim

_Barr v. Lafon_, 538 F.3d 554 (6th Cir. 2008) .......................... 19, 33, 35

_Beck v. Hamblen Cty. Tennessee_, 969 F.3d 592 (6th Cir. 2020) ............... 41, 42

_Bethel Sch. Dist. No. 403 v. Fraser_, 478 U.S. 675 (1986) .......................... passim

_Bickel v. Korean Air Lines Co._, 96 F.3d 151 (6th Cir. 1996) ........................ 45

_Boim v. Fulton Cnty. Sch. Dist._, 494 F.3d 978 (11th Cir. 2007) ................... 33

_Boroff v. Van Wert City Bd. of Educ._, 220 F.3d 465 (6th Cir. 2000) ........... passim

_Castorina ex rel. Rewt. v. Madison County School Bd._ 246 F.3d 536 (6th Cir. 2001) ................................................................................ 19

_Clark v. Cmty. For Creative Non-Violence_, 468 U.S. 288 (1984) .................... 12

_Comstock v. McCrary_, 273 F.3d 693 (6th Cir. 2001) .......................... 43

_Corder v. Lewis Palmer Sch. Dist. No. 38_, 566 F.3d 1219 (10th Cir. 2009) ..... 33

_Cunningham v. Shelby County_, 994 F.3d 761 (6th Cir. 2021) .................... 10, 40

_D.J.M ex rel. D.M. v. Hannibal Pub. Sch. Dist. No. 60_, 647 F.3d 754 (8th Cir. 2011) ................................................................................ 33

_DeCrane v. Eckart_, 12 F.4th 586 (6th Cir. 2021) ............................. 42

_Defoe v. Spiva_, 625 F.3d 324 (6th Cir. 2010) ....................... 32, 33, 35

_Deskins v. Gose_, 85 Mo. 485 (1885) ....................................... 37

_District of Columbia v. Wesby_, 583 U.S. 48, 138 S.Ct. 577 (2018) ................. 43

_Doninger v. Niehoff_, 642 F.3d 334 (2nd Cir. 2011) .......................... 32

_Hall v. Navarre_, 118 F.4th 749 (6th Cir. 2024) .............................. 42

_Hardwick v. Heyward_, 711 F.3d 426 (4th Cir. 2013) .......................... 32

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988) ..........................passim

*Hill v. Blue Cross & Blue Shield of Mich.*, 409 F.3d 710 (6th Cir. 2005) .. viii, 45

*Kisela v. Hughes*, 138 S.Ct. 1148 (2018)........................................................ 42

*Knott v. Sullivan,* 418 F.3d 561 (6th Cir. 2005)...................................... viii, 45

*Kutchinski as next friend to H.K. v. Freeland Cmty. Sch. Dist.*, 69 F.4th 350 (6th Cir. 2023) ......................................................................................... 12

*Lander v. Seaver*, 32 Vt. 114, 115 (1959)......................................................... 37

*MacIntosh v. Clous*, 69 F.4th 309 (6th Cir. 2023) ........................................... 43

*Mahonoy Area Sch. Dist. v. B.L. ex rel Levy*, 141 S. Ct. 2038 (2021)13,  25,  29, 35

*Malley v. Briggs*, 475 U.S. 335 (1986)............................................................. 39

*Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444 (6th Cir. 2003) ............. 45

*Marks v. United States*, 430 U.S. 188 (1977) ............................................. 31, 32

*McKoy v. North Carolina*, 494 U.S. 433 (1990)............................................... 34

*Monell v. Dep't of Social Services, 436 U.S. 658 (1978)* ..........................passim

*Moore v. Oakland County, Michigan*, 126 F.4th 1163 (6th Cir. 2025) ............. 43

*Morse v. Frederick*, 551 U.S. 393 (2007)....................................................passim

*Neague v. Cynkar*, 258 F.3d 504 (6th Cir. 2001).............................................. 40

*Novus Group, LLC v. Prudential Financial, Inc.*, 74 F.4th 424 (6th Cir. 2023) ............................................................................................................... 46

*Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. # 204*, 523 F.3d 668 (7th Cir. 2008)........................................................................................................ 35

*Pearson v. Callahan*, 555 U.S. 223 (2009)...................................................... 40

*Radvansky v. City of Olmsted Falls*, 395 F.3d 291 (6th Cir. 2005)........... viii, 45

*Redding v. Safford Unified Sch. Dist. No. 1*, 531 F.3d 1071 (9th Cir. 2008)..... 33

*Rote v. Zel. Custom Mfg. L.L.C.*, 816 F.3d 383 (6th Cir. 2016) ....................... 33

*Saucier v. Katz*, 533 U.S. 194 (2001) .............................................................. 40

*Stevens-Rucker v. City of Columbus,* 739 F. App'x 834 (6th Cir. 2018)............ 43

*Stewart v. City of Euclid, Ohio*, 970 F.3d 667 (6th Cir. 2020).......................... 41

*Tahlequah v. Bond*, 142 S.Ct. 9, 11 (2021) ...................................................... 42

vi

*Tarter v. Metropolitan Nashville Airport Authority*, No. 22-5432, 2023 WL 5322418, at *5 (6th Cir.  Aug. 18, 2023)................................................. 42

*Thaddeus-X v. Blatter*, 175 F.3d 378,403 n. 18 (6th Cir. 1999) ....................... 45

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969)...........passim

*United States v. Huntington Nat'l Bank*, 574 F.3d 329 (6th Cir. 2009)...... viii, 46

*Vasquez v. Hillery*, 474 U.S. 254 (1986) ......................................................... 32

*White v. Pauly*, 580 U.S. 73 (2017)................................................................. 42

*Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874 (7th Cir. 2011) .. 33

## *Rules*

Fed. R. App. P. 26.1................................................................................... i

Fed. R. App. P. 28.................................................................................. 45

Fed. R. App. P. 34.................................................................................. vii

Fed. R. App. P. 32.................................................................................. 47

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Defendants-Appellees request oral argument on this matter pursuant to Fed. R. App. P. 34(a)(1). The applicability of the First Amendment in the context of this specific case as well as Defendants-Appellees' defenses to liability, namely qualified immunity, are based on complex areas of the law. Defendants-Appellees believe that this Court would benefit from oral argument, so that Defendants-Appellees can address any questions that this Court may have.

# STATEMENT OF JURISDICTION

The district court concluded that Plaintiffs-Appellants abandoned their claim in Count III seeking injunctive and declaratory relief based on a "Let's Go Brandon" categorical clothing ban that Plaintiffs-Appellants conceded did not exist. (Opinion, RE 58, Page ID # 952). This Court lacks jurisdiction to review claims that Plaintiffs-Appellants failed to preserve for appeal. *See United States v. Huntington Nat'l Bank*, 574 F.3d 329, 332 (6th Cir. 2009).

Similarly, Plaintiffs-Appellants' *Monell* claim in Count II was not analyzed in Plaintiffs-Appellants' Appeal Brief rendering it waived on appeal. *See Knott v. Sullivan,* 418 F.3d 561, 568 *n. 2* (6th Cir. 2005); *Hill v. Blue Cross & Blue Shield of Mich.*, 409 F.3d 710, 716 n. 2 (6th Cir. 2005); *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 310-11 (6th Cir. 2005).

## STATEMENT OF THE ISSUES PRESENTED

**Issue One:** There is no dispute that the phrase "Let's Go Brandon" means "Fuck Joe Biden." Given that Defendant-Appellees Bradford and Buikema reasonably interpreted the phrase as profane and not appropriate for middle school children, did the district court properly conclude that Bradford and Buikema had the authority to ask X.A. and D.A. to remove their Let's Go Brandon sweatshirts at school without offending the First Amendment under *Fraser* ? **YES**

**Issue Two:** This case is distinguishable from *Tinker* given that *Tinker* involved a school's regulation of student dress <u>because it</u> expressed a political message rather than because it conveyed a profane meaning. Since *Tinker* is distinguishable, did Plaintiffs-Appellants fail to meet their burden of establishing that the specific right at issue was clearly established under *Tinker*? **YES**

**Issue Three:** Plaintiffs-Appellants' Brief on Appeal fails to meaningfully address Plaintiffs-Appellants' *Monell* claim since the claim is not contained in the issues presented for review or the argument section of their Brief. Given that a failure to address a claim that was denied on summary judgment in the appellant's brief renders that claim abandoned, should this Court treat Plaintiffs-Appellants' *Monell* claim as waived? **YES**

**Issue Four:** The district court found that Plaintiffs-Appellants failed to address their claim for injunctive and declaratory relief based a non-existent ban on "Let's Go Brandon" apparel, was waived. Should this Court decline to review Plaintiffs-Appellants argument regarding the alleged "Let's Go Brandon" ban which was waived in the district court and which was not preserved for appeal? **YES**

## STATEMENT OF THE CASE

### 1.     Background

This First Amendment case is brought by two minor Plaintiffs, X.A. and D.A., by and through their mother, B.A., against Defendants, Tri County Area Schools, Andrew Buikema, and Wendy Bradford. More specifically, Plaintiffs claim that Defendants did not have the authority to prohibit them from wearing "Let's Go Brandon" sweatshirts to school even though the phrase means "**Fuck Joe Biden**."

Plaintiffs X.A. and D.A., are two minor brothers that attended Tri County Middle School during the 2021-2022 school year. Tri County Middle School is a part of Defendant Tri County Area Schools, ("the District"). Defendant Andrew Buikema ("Buikema") was the Assistant Principal of Tri County Middle School during the 2021-2022 school year. Defendant Wendy Bradford ("Bradford") was a science teacher at Tri County Middle School during the 2021-2022 school year. (Complaint, RE 1, Page ID # 3-4).

The phrase "Let's Go Brandon" is a coined slogan that means mean "Fuck Joe Biden." It originated from a NASCAR race that took place in October 2021, in Talladega, Alabama. (Opinion, RE 58, Page ID # 945). Driver Brandon Brown won the race. Following the race, NBC Sports reporter, Kelli Stavast, was interviewing the winning driver. (*Id*). During the interview, the crowd was chanting "Fuck Joe Biden", however, the reporter indicating that the crowd was chanting "Let's Go

1

Brandon" during her live television interview. (Compl., RE 1, PageID 7). This reporter's comment inaccurately describing the crowd's chant went viral, and the slogan "Let's Go Brandon" was born. The video from the race is publicly available and can be viewed here: https://www.youtube.com/watch?v=_zUlhpaZkJw. (Defs. Mot. Summ. J., RE 38, PageID # 366).

Both X.A. and D.A. testified that they both watched the above video. (Defs. Mot. Summ. J., RE 38-2, Page ID # 404; RE 38-3, Page ID # 411). They also admitted that they knew that the slogan "Let's Go Brandon" means "Fuck Joe Biden". (RE 38-2 Page ID # 404; RE 38-3, Page ID # 411). On December 25, 2021, X.A. and D.A. received "Let's Go Brandon" sweatshirts from their mother as a Christmas present. (Pls. Mot. Summ. J., RE 39-6, Page ID # 599). **Both X.A. and D.A. testified that they thought the phrase "Let's Go Brandon" was funny because it meant "Fuck Joe Biden"**. (Defs. Mot. Summ. J., 38-2, Page ID # 404; RE 38-3, Page ID # 422).

## 2. Defendants Buikema and Bradford's Appropriate Response to Plaintiffs D.A. and X.A. Wearing their "Let's Go Brandon" Apparel to the Middle School

Following receipt of their "Let's Go Brandon" sweatshirts at Christmas, Plaintiffs D.A. and X.A. wore these sweatshirts to school in the Spring of 2022 on separate occasions. These incidents are explained in more detail below.

2

D.A. wore his "Let's Go Brandon" sweatshirt to Tri County Middle School in February of 2022. (Defs. Mot. Summ. J., RE 38-2, PageID # 433). In response, Buikema confronted D.A. about the sweatshirt, and asked D.A. if he knew what the phrase meant. (*Id*., RE 38-4 Page ID # 433). D.A. said "no". Buikema testified that he then explained the profane meaning and told D.A. that he could not wear the sweatshirt at school. (*Id*). Buikema then asked D.A. to remove the sweatshirt because the slogan "Let's Go Brandon" means "Fuck Joe Biden" which is profane and violated the Dress Code. (*Id.*). D.A. had a "Let's Go Brandon" t-shirt on underneath the sweatshirt. (*Id.*). He was then given another shirt to wear for the rest of the day. (*Id.*). D.A. was not disciplined since he complied with Buikema's request to remove the offending clothing. (RE 38-4, Page ID # 433, RE 38-2 Page ID # 405). During his deposition, D.A. admitted that he was not honest with Buikema, and that **he knew that the phrase "Let's Go Brandon" meant "Fuck Joe Biden" at the time he wore the apparel in February of 2022**. (RE 38-2, PageID # 433).

D.A. then explained that he wore his "Let's Go Brandon" sweatshirt again to school a few weeks later. (RE 38-2, PageID # 405). D.A. explained that he saw teacher Bradford in the hallway. (*Id*). D.A. stated that Bradford told him that he might want to take the sweatshirt off or go talk to an administrator. (*Id.*). D.A. admitted that Bradford did not order him to remove the sweatshirt and he was not disciplined for the interaction. This is consistent with Bradford's recollection of the

interaction. (RE 38-5, Page ID # 445-46).  Bradford testified that she was concerned with the fact that the message infers profanity since "Let's Go Brandon" means "Fuck Joe Biden." (Id. at Page ID # 446). Bradford testified that based on her common sense and experience, clothing that contains a message that infers a curse word like "Fuck" is not school appropriate for middle school children. (*Id.*).

X.A.  then wore his "Let's Go Brandon" sweatshirt to Tri County Middle School on one occasion in May of 2022. X.A. testified that he was called down to the front office to speak with Buikema. (RE 38-3, Page ID # 412 X.A. was then asked by Buikema to take off the sweatshirt because the slogan "Let's Go Brandon" means "Fuck Joe Biden" which is profane and violated the dress code. (RE 38-4, Page ID # 433). X.A. complied with the request. (*Id.*). X.A. admitted that he was not disciplined for this incident. (RE 38-3, Page ID # 411).

**3.      The Dress Code at Tri County Middle School**

During the 2021-2022 school year, the dress code applicable to Middle School and High School students prohibited "**[a]ttire with messages** or illustrations that are lewd, indecent, vulgar, **or profane**, or that advertise any product or service not permitted by law to minors." (Compl., RE 1-2, PageID #46; RE 1-3, PageID #62)(emphasis added).

4

In contrast, the Dress Code did not prohibit students from wearing clothing that contained messages expressing a political viewpoint or that related to a social cause.

Buikema testified that students can wear clothing with political messages at the Middle School. (Defs. Mot. Summ. J., RE 38-4, Page ID # 421). He recalled a student wearing a MAGA hat to school for example. (*Id*). Bradford testified that she has seen students wearing both pro-Biden and Trump shirts to school. (RE 38-5, Page ID # 440). The Middle School Principal, Joe Williams, similarly testified that he has seen students wearing clothing that expressed a particular political viewpoint. (RE 38-6, Page ID # 456). Both X.A. and D.A. testified that they saw kids wearing apparel that was in support of President Trump such as "Make America Great Again" or "MAGA" apparel as well as apparel with a rainbow flag in support of LGBTQ+ pride. (RE 38-2, Page ID #405; RE 38-3, Page ID # 412).

## 4. There Was No Categorical District-Wide Ban on "Let's Go Brandon" Apparel

There has never been an express policy or custom issued or otherwise ratified by the District prohibiting students to wear "Let's Go Brandon" clothing. (RE 38-6, Page ID # 469; RE 38-7, Page ID # 481; RE 38-8, Page ID # 498). In fact, based on the evidence contained in the record, only three students were ever asked to remove "Let's Go Brandon" clothing. All three incidents involved middle school students in

the Spring of 2022 and these requests were all made by <u>one</u> building administrator

–Buikema. (RE 38-4, Page ID # 429-431, 434; RE 38-6, Page ID #468).

**5.    Procedural Posture**

On May 27, 2022, Plaintiffs, through counsel, sent a cease and desist letter to

the District. (Pls. Mot. Summ. J., RE 39-28, Page ID # 711). The letter claimed that

the District violated D.A. and X.A.'s First Amendment rights when they were asked

to remove their "Let's Go Brandon" apparel. (*Id.* at Page ID #712). On June 9, 2022,

the District responded to the letter through its counsel. (*Id.* at RE 39-29, Page ID #

715). In the District's response letter, the District indicated that the phrase "Let's Go

Brandon" has a commonly understood profane meaning. (*Id.*). And because of this

profane meaning, the District had the authority to restrict students from wearing

clothing depicting the profane message at school under the Dress Code. (*Id.*).

In April of 2023, Plaintiff filed a lawsuit against the District and against

Buikema and Bradford in their individual capacities. (Compl., RE 1, Page ID # 1).

The Complaint contained the following claims: (1) Count I: First Amendment

Violation against Buikema and Bradford in their individual capacities, (2) Count II:

*Monell* Claim against the District under the First Amendment, (3) Count III:

injunctive and declaratory relief against the District for a violation of Plaintiff's First

Amendment rights, (4) Count IV: injunctive and declaratory relief against the

District claiming that the Dress Code was unconstitutionally vague, (5) Count V:

injunctive and declaratory relief against the District claiming that the Dress Code was unconstitutionally overbroad.

On June 23, 2023, Defendants filed their Answer. (Answer, RE 7, Page ID # 82-125). Following the completion of discovery, the parties filed cross motions for summary judgment. (Defs. Mot. Sum. J., RE 38, Page ID # 355-397; Pls. Mot. Sum. J., RE 39, Page ID 523-575). On April 26, 2024, the parties filed their Responses. (Pls. Resp. Defs. Mot. Sum. J., RE 44, Page ID # 465-815; Defs. Resp. Pls. Mot. Sum. J., RE 46, Page ID # 824-863). Then on May 17, 2024, the parties each filed a Reply. (Defs. Reply in Support of their Mot. Sum. J., RE 48, Page ID #824-863; Pls. Reply in Support of their Mot. Sum. J., RE 49, Page ID # 866-876).

On August 23, 2024, the district court issue its opinion granting Defendants' Motion for Summary Judgment and denying Plaintiffs' Motion for Summary Judgment. (Opinion and Order, RE 56, Page ID # 915-941; Am. Opinion and Order, RE 58, Page ID # 943-969). More specifically, the district court agreed with Defendants that this case was governed by *Fraser* rather than *Tinker*. The district court further concluded that Defendants were well within their authority when they asked X.A. and D.A. to remove their Let's Go Brandon sweatshirts because the phrase reasonably considered by school officials to be profane since it was undisputed that the phrase meant Fuck Joe Biden. Thus, the district court ultimately concluded that Plaintiffs failed to establish a constitutional violation. As a result, the

First Amendment claim against Buikema and Bradford in their individual capacities contained in Count I and the *Monell* Claim against the District contained in Count II. As for the injunctive and declaratory relief claim contained in Count III the district court concluded that Plaintiffs abandoned their claim in Count III seeking injunctive and declaratory relief based on a "Let's Go Brandon" categorical clothing ban that Plaintiffs conceded did not exist. (Opinion and Order, RE 58, Page ID # 952). Lastly, as to Plaintiff's overly broad and unconstitutionally vague claims contained in Counts IV and V, the district court agreed with Defendants that the Districts act of amending the dress code to remove the offending language rendered the claim moot.

That same day the district court entered Judgment in favor of Defendants dismissing Plaintiffs' case in its entirety with prejudice. (Judgement, RE 57, Page ID # 942).

On September 5, 2024, Plaintiffs filed their Notice of Appeal. (Notice of Appeal, RE 59, Page ID # 970-971). On December 4, 2024, Plaintiffs filed their Brief on Appeal. (Pls. Appeal Br., Doc. 21). Defendants are now filing their Brief on Appeal.

## SUMMARY OF ARGUMENT

"I know a man who is firm—he's firm in his pants, he's firm in his shirt, his character is firm—but most . . . of all, his belief in you, the students of Bethel, is firm . . . Jeff Kuhlman . . . So vote for Jeff for A.S.B. vice-president—he'll never come between you and the best our high school can be." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 687 (1986) (Brennan, J. concurring). These famous words were spoken by a high school student at an assembly for student counsel, and resulted in the seminal student speech decision by the Supreme Court called *Fraser*. In *Fraser* the Supreme Court determined that the high school student's use of sexual innuendo and double entendre, rendered the speech not protected by the First Amendment. The Supreme Court reasoned that the speech may constitute protected speech if uttered by adults in other public forums, but it was not similarly protected in the student speech context. This is because it was reasonably considered lewd, indecent, and plainly offensive given that it was spoken in a school in front of high school children.

As a result of *Fraser*, this Court has held that a school has the authority to prohibit student dress that is reasonably determined by the school official to be vulgar, lewd, profane, or offensive, and contrary to the school's educational mission without offending the First Amendment. *See Boroff v. Van Wert City Bd. of Educ.*,

220 F.3d 465, 470-71(6th Cir. 2000), cert. denied, 532 U.S. 920 (2001). This is true even if the student intended the dress to express a particular political viewpoint.

This case stems from two middle school students', Plaintiffs D.A. and X.A., claim that despite the Supreme Court's decision in *Fraser*, and despite this Court's decision in *Boroff*, that Defendants lacked the authority to request that these young students remove sweatshirts that displayed a message that means "Fuck Joe Biden."

Plaintiffs are wrong. The district court properly determined that there was no First Amendment protection for Plaintiffs' "Let's Go Brandon" apparel based on the phrase's undisputed meaning of "Fuck Joe Biden". The fact that the the profane insult is directed at the president is of no consequence. Instead, since Defendants Buikema and Brandford reasonably interpreted the phrase to have a profane meaning, and asked D.A. and X.A. to remove the sweatshirts on that basis alone, Defendants did not violate D.A. and X.A.'s constitutional rights. Thus, this Court should affirm the district court's decision as to Plaintiffs' First Amendment claim.

Moreover, even if this Court were to disagree, Defendants Buikema and Bradford are nevertheless entitled to qualified immunity since the right at issue was not clearly established. Plaintiffs have the burden of establishing that the right at issue is clearly established. *Cunningham v. Shelby County*, 994 F.3d 761, 765 (6th Cir. 2021). Plaintiffs have not met their burden. First, Plaintiffs define the right at issue with too high a degree of generality. Second, Plaintiffs point only to *Tinker*, in

10

support of their argument that the right at issue is clearly established. However, this case is factually distinguishable from *Tinker* since *Tinker* involved a school's regulation of student dress because the dress contained a message that supported a particular political viewpoint. This is not the case here. Defendant Buikema and Bradford's reasoning for asking Plaintiffs to remove the "Let's Go Brandon" apparel was unrelated to any particular political viewpoint, and was only related to the profane meaning of the message. Third, there is no sufficiently similar case on point that involves student dress that contains a profane message that is directed at a political figure. Therefore, the second prong of qualified immunity amounts to an alternative and additional basis to affirm the district court's decision.

Lastly, this Court should decline to review Plaintiffs' *Monell* claim and Plaintiffs' claim for injunctive and declaratory relief based on a non existent ban of "Let's Go Brandon" apparel. As to the *Monell* claim, Plaintiffs make no attempt to present any meaningful argument as to why the district court erred in granting summary judgment on Plaintiffs' *Monell* claim. Thus, Plaintiffs' Monell claim should be considered abandoned and waived on appeal. Similarly, as to Plaintiffs' claim for injunctive and declaratory relief, the district court determined that Plaintiffs waived that claim on summary judgment. So, this Court should decline to review that claim that was not preserved for appeal.

11

# ARGUMENT

## I.  THE DISTRICT COURT PROPERLY CONCLUDED THAT BUIKEMA AND BRADFORD DID NOT VIOLATE THE FIRST AMENDMENT.

The First Amendment prohibits the government from "abridging the freedom of speech." U.S. CONST. amend. I. Freedom of speech is not unlimited. *Kutchinski as next friend to H.K. v. Freeland Cmty. Sch. Dist.*, 69 F.4th 350, 356 (6th Cir. 2023). The Supreme Court held that speech, whether expressed orally, in writing, or symbolically by conduct, "is subject to reasonable time, place, or manner restrictions." *Clark v. Cmty. For Creative Non-Violence*, 468 U.S. 288, 293 (1984). "The schoolhouse is one such restriction." *Kutchinski*, 69 F.4th at 356. While students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," **their First Amendment rights are not coextensive with the rights of adults in other settings**. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969); *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986). Because of this, student's free speech rights apply "in light of the special characteristics of the school environment." *Tinker*, 393 U.S. at 506.

The Supreme Court has addressed the school's ability to regulate certain categories of student speech in five different contexts without violating the First Amendment. *See Tinker*, 393 U.S. at 513(discussing the standard applicable to a school official's ability to regulate student speech akin to pure protected); *see*

12

*Fraser*, 478 U.S. at 683-85 (discussing the standard applicable to a school official's ability to regulate student speech that is considered is incident, lewd, profane, vulgar, and objectively offensive); *see Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988)(discussing the standard applicable the regulation of student speech that others may reasonably perceive as bearing the imprimatur of the school such as that in a school-sponsored newspaper); *Morse v. Frederick*, 551 U.S. 393, 408 (2007)(discussing the standard applicable for the regulation of student speech uttered during a school sponsored activity that promotes illegal drug use); *see Mahonoy Area Sch. Dist. v. B.L. ex rel Levy*, 141 S. Ct. 2038, 2045 (2021)(discussing the standard for the regulation of student off-campus speech).

Here, this Appeal concerns whether the district court properly determined that the standard articulated in *Fraser* rather than *Tinker* applies to the facts of this case. For the reasons explained in detail below, the district court properly concluded that this case is governed by *Fraser*.

*Fraser* governs student speech that a school official reasonably interprets as incident, lewd, profane, vulgar, or objectively offensive. *See Bethel Sch. Dist. No. 403 v. Fraser,* 478 U.S. 675 (1986). Taking a closer look at the Supreme Court's case in *Fraser* is illustrative of this point. *Fraser* involved a student's speech during a high school assembly for student counsel where the student nominated his peer. *Fraser*, 478 U.S. at 677-78. The speech was as follows:

13

> I know a man who is firm—he's firm in his pants, he's firm in his shirt,
> his character is firm—but most . . . of all, his belief in you, the students
> of Bethel, is firm . . . Jeff Kuhlman [the candidate] is a man who takes
> his point and pounds it in. If necessary, he'll take an issue and nail it to
> the wall. He doesn't attack things in spurts, he drives hard, pushing and
> pushing until finally—he succeeds . . . . Jeff is a man who will go to the
> very end—even the climax, for each and everyone of you . . . . So vote
> for Jeff for A.S.B. vice-president—he'll never come between you and
> the best our high school can be.

*Fraser*, 478 U.S. at 687 (Brennan, J. concurring). Based on the student's use of

"elaborate, graphic and explicit sexual metaphor[s]" throughout the speech, the

school suspended Fraser and took him out of the running for graduation speaker. *Id*.

at 678.

The Supreme Court acknowledged that the student's speech did not contain

any word that was overtly vulgar, profane, lewd or indecent. Still, the overall effect

of the speech from the use of the sexual innuendo and double entendre rendered the

speech lewd, indecent, and plainly offensive given that the audience was high school

children. *Id.* at 683-684. The Court explained:

> The schools, as instruments of the state, may determine that the
> essential lessons of civil mature conduct cannot be conveyed in a school
> that tolerates lewd, indecent, or offensive speech and conduct such as
> that indulged in by this confused boy. The pervasive sexual innuendo
> in Fraser's speech was plainly offensive to both teachers and students—
> indeed to any mature person. By glorifying male sexuality, and in its
> verbal content, the speech was acutely insulting to teenage girl students.
> The speech could well be seriously damaging to its less mature
> audience, many of whom were only 14 years old and on the threshold
> of awareness of human sexuality. Some students were reported as
> bewildered by the speech and the reaction of mimicry it provoked.

*Id.* The Court explained that looking to the basis of the school official's regulation, the school did not regulate the speech because it expressed a particular viewpoint. *Id.* at 685. Instead, the imposition of discipline was due to the school **official's reasonably interpretation that the speech was lewd, vulgar, profane, and offensive**, which **the Court concluded could be prohibited outright in school since such speech** "would undermine the school's basic educational mission." *Id.* As the Court explained, "[a] high school assembly or classroom is no place for a sexually explicit monologue directed towards unsuspecting audience of teenage students. Accordingly, it was perfectly appropriate for the school to disassociate itself to make the point to pupils that vulgar speech and lewd conduct is wholly inconsistent with the 'fundamental values' of public school education.'" *Id.* at 685-86. The Court ultimately held that the school district had the authority to discipline Fraser for his speech without offending the First Amendment. *Id.* at 685. One of the main reasons for this holding was because school boards have the authority to determine "what manner of speech in the classroom or in school assembly is appropriate." *Id.* at 683.

In contrast, the Supreme Court's holding in *Tinker*, applies to a school official's ability to regulate pure speech such as that expresses a particular political viewpoint. *See Tinker v. Des Moines Independent Community School District,* 393 U.S. 503 (1969). A closer review of the Court's decision in *Tinker* is illustrative.

15

In *Tinker*, a group of students and parents had a plan to wear black armbands during the holiday season to publicize their objections of the Vietnam war. *Id.* at 504. The principals of Des Moines schools became aware of the plan to wear black armbands in protest of the Vietnam war. *Id.* The principals then adopted a policy that any student wearing black armbands would be asked to remove them and if the student refused then the student would be suspended. *Id.* Several students came to school wearing armbands, and as a result, the students were sent home and suspended. *Id.* The Supreme Court granted certiorari to determine the extent of the students' First Amendment rights in the context of the educational setting. *See Id.* at 505.

The Court first noted there was a need to balance the authority of school officials' control of student conduct in their schools with the First Amendment rights of students, and because of this courts should apply the First Amendment rights of the students in light of the special characteristics of the student environment. *Id.* at 506. In doing so, the Court looked to the <u>basis of the regulation, when addressing whether the regulation violated the First Amendment. *See Id.* at 507-508.</u> The Court determined that "[t]he school officials banned and sought to punish petitioners for a silent, **passive expression of <u>opinion</u>**" and that the school official's prohibition of **expression singled out one particular symbol**—"black armbands worn to exhibit opposition to this Nation's involvement in Vietnam." *Id.* at 509-510 (emphasis

added). So, since the regulation was directed primarily at the students' expression of a political viewpoint, which is akin to "pure speech", the Court found that additional protections were necessary for the school's regulation to be constitutionally permissible. *See Id.* at 508-509.

Then, balancing the interests of the school with that of the students, the Court then found the school officials could regulate pure protected speech like that of the armbands but that the regulation must "be justified by a showing that the students' activities would materially and substantially disrupt the work and discipline of the school." *See Id.* at 509-514. And since the record did not demonstrate facts that might reasonably have led to school authorities to forecast a substantial disruption of the school environment, then the regulation of the student's political expression was not permitted under the First Amendment. *Id.*

Based on the above, in both *Tinker* and *Fraser*, the Supreme Court applied the First Amendment in light of the limiting characteristics of the school environment. And while the speech at issue in both cases touched on a form of political speech, the Court explained that the differentiating factor between the regulation of the student speech in *Tinker* verses *Fraser*, was that in *Fraser* **the imposition of discipline was unrelated to any political viewpoint**. *See Fraser*, 478 U.S. at 685. Instead, the school official's regulation was based on their reasonable interpretation that the speech was vulgar, lewd, and plainly offensive for school children. *See Id.*;

17

*See Hazelwood*, 484 U.S. at 271 n.4 (holding that the Court's decision in *Fraser* rested on the fact that the student was disciplined because the character of the speech at issue was vulgar, lewd, and plainly offensive rather than the fact that it disrupted the school environment.); *see Morse*, 551 U.S. at 404-405. So, if the school official's regulation of student speech was based on the school official's reasonable interpretation that the speech was vulgar, lewd, profane or plainly offensive for school age children and unrelated to any political viewpoint, then *Fraser* applies and the speech can be prohibited even absent a reasonable forecast of substantial disruption of the school environment. *See Morse*, 551 U.S. at 404-405 ("*Fraser* established that the mode of analysis set forth in *Tinker* is not absolute. Whatever approach *Fraser* employed, it certainly did not conduct the "substantial disruption" analysis prescribed by *Tinker*.").

The case law analyzing the application of *Fraser* verses *Tinker* in the context of student dress from this Court confirms this conclusion. This Court has held that if the school regulated the student's dress because it was reasonably determined to be vulgar, lewd, profane, or offensive, and contrary to the school's educational mission, then *Fraser* applies. *See e.g., Boroff v. Van Wert City Bd. of Educ.*, 220 F.3d 465, 470-71(6th Cir. 2000), cert. denied, 532 U.S. 920 (2001). In such a case, the school district has the authority to categorically prohibit the offending student dress without violating the First Amendment. *Id.* In contrast, if regulation was

intended to suppress a particular protected viewpoint, then *Tinker* applies, which only allows regulation when the school reasonably believes that the speech will substantially and materially interfere with the school environment. *Id.* at 471; *see Castorina ex rel. Rewt. v. Madison County School Bd.* 246 F.3d 536, 542 (6th Cir. 2001); *see also Barr v. Lafon*, 538 F.3d 554, 577 n. 7 (6th Cir. 2008).

*Boroff* is illustrative. In *Boroff*, a high school senior student filed a First Amendment lawsuit against his school district based on his desire to wear Marilyn Manson t-shirts to school. 220 F.3d at 466. On one occasion the student wore a Marilyn Manson t-shirt to school and was told by the high school principal that the shirt was offensive and violated the dress code. *Id.* at 467. The student was then asked to turn the shirt inside out or go home and change. *Id.* The student opted to leave school. *Id.* He then came back the next day and wore another Marilyn Manson t-shirt to school. *Id.* In response, the student was called to the office to have a meeting with the high school principal, the superintendent and his parent. *Id.* During the meeting, the student was informed that students were not permitted to wear Marilyn Manson t-shirts on school grounds. *Id.* The student then proceeded to wear a Marilyn Manson t-shirt the next three school days. *Id.* Each day the student was informed that he would not be permitted to attend school if he was wearing the Marilyn Manson t-shirts. *Id.* The student then missed four days of school. On the fifth missed day, the student filed suit against the school. *Id.* The district court entered summary

19

judgment in favor of the school and dismissed the case. *Id*. The student then appealed

the case to the Sixth Circuit. *Id*.

On appeal, the student argued that the district court erred in finding that *Fraser*

applied claiming that it should have applied *Tinker*. The Sixth Circuit disagreed,

since the defendant did not prohibit the t-shirts based on their expression of a

particular viewpoint. *Id*. at 469. The Sixth Circuit explained:

> In our view, however, the evidence does not support an inference that
> the School intended to suppress the expression of Boroff's viewpoint,
> because of its religious implications. Rather, the record demonstrates
> that the school prohibited Boroff's Marilyn Manson T-shirts generally
> because this particular rock group promotes disruptive and
> demoralizing values which are inconsistent with and counterproductive
> to education.  The dissenting judge agrees that "[i]f the only T-shirts at
> issue in this case were the ones that simply displayed illustrations of
> Marilyn Manson largely unadorned by text, the judgment of the district
> court might be sustainable." He reasons, however, that the one T-shirt
> featuring the **distorted Jesus figure may have been prohibited
> because the School's disagreement with its religious message**. In our
> view, the School's treatment of the "three-headed Jesus" T-shirt and the
> others is not distinguishable. **The record establishes that all of the T-
> shirts were banned in the same manner for the same reasons—they
> were determined to be vulgar, offensive and contrary to the
> educational mission of the school.**

*Id*. at 471 (emphasis added). Based on the above, this Court did not find it

determinative that one of the images could have been interpreted to express a

religious viewpoint. Instead, it looked to the basis for the school's regulation of the

t-shirt. Since the t-shirt was regulated because the school interpreted it to be "vulgar,

offensive and contrary to the educational mission", this Court applied *Fraser*.

*Boroff* establishes that this Court has adopted a broad interpretation of *Fraser*, finding that *Fraser* provides school districts with wide latitude to categorically prohibit clothing that reasonably conveys a lewd, vulgar, profane, or offensive message that the school determines to be inappropriate and contrary to its educational mission.

Here, the regulation of "Let's Go Brandon" apparel fits squarely under *Fraser* and not *Tinker*. Looking to the basis of the regulation, X.A. and D.A. were asked to remove their "Let's Go Brandon" apparel because the phrase undeniably means "Fuck Joe Biden", which is a profane message and not appropriate for middle school age children. The reasonableness of this determination is evident from the record evidence. There is no dispute that the origin of the phrase case from a NASCAR race where the crowd was chanting "Fuck Joe Biden." X.A. and D.A. admitted in their depositions that they had seen the footage of the race and were aware of the origin of the phrase. They also admitted that they knew the phrase means "Fuck Joe Biden" and conceded that they thought this profane meaning was funny. Lastly, there is no dispute that X.A. and D.A. understood that the Dress Code prohibited clothing with profane messages and complied with Buikema's request to remove the offending clothing. Thus, the "Let's Go Brandon" message was reasonably viewed as profane for middle school children in violation of the Dress Code.

21

Moreover, it is consistent with the educational mission of Tri County Middle School to prohibit clothing with messaging that has a profane meaning. For example, Bradford testified that she recalled a student being asked to remove a hat that said "**Fet's Luck**", which means "Lets Fuck". (Defs Mot. Sum. J., RE 38-5, Page ID #441). A picture of the **Fet's Luck** hat is shown below.



Bradford testified that the message was inappropriate for middle school children since the rearranging the letters resulted in a lewd message. Similarly, Buikema testified that he has asked students to remove clothing that says "**Uranus Liquors**"

since it contains a lewd message. (Defs Mot. Sum. J., RE 38-4, Page ID #422). A picture of the **Uranus Liquors** logo is shown below.



The "Let's Go Brandon" sweatshirt is no different since it means **Fuck Joe Biden**.

Also, there is no evidence that Buikema or Bradford intended to regulate a particular political viewpoint. Instead, the evidence shows that Tri County Middle School students were permitted to express their political viewpoints through dress and could wear MAGA or pro Biden apparel to school. Thus, as in *Boroff*, this case is governed under *Fraser*. Therefore, Buikema and Bradford had the authority to ask X.A. and D.A. to remove their Let's Go Brandon Sweatshirts at school without a reasonable forecast of substantial disruption, without offending the First Amendment.

Lastly, the fact that the "Let's Go Brandon" phrase is associated with a President does not make it pure protected speech. As the district court correctly

concluded, the fact that student speech is capable of expressing a political viewpoint or even *intended* to express a political viewpoint is not determinative. Both *Fraser* and *Boroff* illustrate this point. As explained above, the speech in *Fraser* was delivered by a student in support of another student running for student council. In other words, the speech in *Fraser* was given for the express purpose of conveying a political viewpoint. Yet, in distinguishing Fraser's speech from the armbands in *Tinker*, the Court explained **"[u]nlike the sanctions imposed on the students wearing armbands in *Tinker*, the penalties imposed in this case were unrelated to any political viewpoint**." *Fraser*, 478 U.S. at 685. Thus, instead of focusing on the speaker's intent behind the particular message conveyed, <u>the Court looked to the basis for the school's regulation of the speech</u>. Since the school imposed penalties based on the vulgar and lewd nature of the speech rather than based on a particular political viewpoint, the Court found that the school acted well within its authority to control its public school students. *See also Morse,* 551 U.S. at 402 (disagreeing with dissent's focus on the student's motivation behind the banner which is irrelevant when looking to what the banner actually said).

Similarly, in *Boroff*, this Court addressed the fact that one of the t-shirts worn by the student contained a depiction of a Jesus figure. *Boroff*, 220 F.3d at 471. This Court disagreed that the regulation could be viewed as an attempt to regulate a religious viewpoint since the record established that the Jesus t-shirt was regulated

for the same reasons as the other t-shirts, based on the school official's reasonable determination that the t-shirts were "vulgar, offensive and contrary to the educational mission of the school." *Id.*

Thus, the district court properly held that *Tinker* does not apply to this case. Plaintiffs additional arguments made on Appeal do not alter the above conclusion for the reasons explained in more detail below.

A.     ***Fraser* Does Not Apply Only to the Use of "Overt" or "Plain" Profanity.**

The fact that the phrase "Let's Go Brandon" does not contain express profanity is of no consequence. First, as the Supreme Court explained the speech must be analyzed in the school context and "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *See Morse*, 551 U.S. at 404-405. Because of this, the sexual metaphors used in Fraser's speech may have constituted protected speech if delivered in a public forum outside the school context. However, in the school context, the school had the authority to prohibit such speech since the sexual metaphors **were considered lewd, vulgar, and plainly offensive to teenage children**. This is because courts must apply the First Amendment "in light of the special characteristics of the school environment." *Mahanoy Area School District v. B.L. by and through Levy*, 594 U.S. 180 (2021)(citing *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988)).

25

In reality, this case presents the same set of facts as those in *Fraser*. There is no real difference from the implied profanity in the phrase the "Let's Go Brandon" to the sexual sexual metaphors used in Fraser's speech. And when analyzing the implied profane message conveyed by the "Let's Go Brandon" apparel, "in light of the special characteristics of the school environment", Buikema and Bradford reasonably determined that since the phrase means Fuck Joe Biden, the apparel was not appropriate for middle school children to wear to school. This is especially true given that there is no dispute that everyone including Plaintiffs knew that the phrase has this profane meaning.  (RE 38-2, Page ID # 404, RE 38-3, Page ID # 411).

### B.   *Fraser* Does Not Equate Student Speech Equal to that in Congress, the Radio or Television.

*Fraser* does not suggest that the rules governing free speech for adults in Congress or on the Radio are the same rules applicable to student speech in a public school. *See Fraser*, 478 U.S. at 682. Instead, the Court in *Fraser* explained that public schools should at least be able to regulate offensive speech in the same manner as Congress can in the halls of Congress. *Id.* The Court stated: "[i]n our Nation's Legislative halls, where some of the most vigorous political debates in our society are carried on, there are rules prohibiting the use of expressions offensive to other participants in debate. . . . Can it be that what is proscribed in the halls of Congress is beyond the reach of school officials to regulate?" *Id.* Then the Court goes a step further, explaining that school officials have an <u>even greater authority to</u>

<u>regulate speech of school children</u> than government officials may have with regard to the regulation of adult speech in other public forums. *Id.*; *Morse*, 551 U.S. at 404-405. In explaining the policy reasons for providing public school officials with the ability to categorically restrict lewd, vulgar, profane, and offensive speech, the Court stated:

> Surely it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse . . . . Nothing in the Constitution prohibits the states from insisting that certain modes of expression are inappropriate and subject to sanctions. The inculcation of these values is truly the "work of the schools." **The determination of what manner of speech in the classroom or in school assembly is inappropriate and properly rests with the school board**.
>
> The process of educating our youth for citizenship in public schools is not confined to books, the curriculum, and the civics class; schools must teach by example the shared values of civilized social order. Consciously or otherwise, teachers—and indeed the older students—demonstrate the appropriate form of civil discourse and political expression by their conduct and deportment in and out of class. Inescapably, like parents, they are role models. The schools, as instruments of the state, may determine that the essential lessons of civil, mature conduct cannot be conveyed in a school that tolerates lewd, indecent, or offensive speech and conduct such as that indulged in by this confused boy.

*Fraser*, 478 U.S. at 683 (emphasis added)(internal citations omitted). Thus, while adults may have a Constitutional right to wear clothing with implied profanity or sexual innuendos in other settings such as on the Congressional floor, it does not alter the conclusion that school officials have the ability to prohibit school children from wearing such clothing at school. *See Id.; see Morse*, 551 U.S. at 404-405.

This is exactly what the Supreme Court said in *Morse* some 30 years later when analyzing is prior decision in *Fraser*. The Court stated that:

> *Fraser*'s holding demonstrates that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." **Had Fraser delivered the same speech in a public forum outside the school context, it would have been protected. In school, however, Fraser's First Amendment rights were circumscribed "in light of the special characteristics of the school environment."**

*Morse v. Frederick*, 551 U.S. 393, 404-05 (2007)(discussing *Fraser*)(emphasis added).

The special treatment of the First Amendment in the context of public schools was also explained by the Court in *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988). The Court explained:

> We have nonetheless recognized that the First Amendment rights of students in the public schools "are not automatically coextensive with the rights of adults in other settings, and must be "applied in light of the special characteristics of the school environment." A school need not tolerate speech that is inconsistent with its "basic educational mission," even though the government could not censor similar speech outside of school. Accordingly, we held in *Fraser* that a student could be disciplined for having delivered a speech that was "sexually explicit" but not legally obscene at an official school assembly, because the school was entitled to "disassociate itself" from the speech in a manner that would demonstrate to others that such vulgarity is "wholly inconsistent with the 'fundamental values' of public school education." We thus recognized "[t]he determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board," rather than with the federal courts.

*Id.* at 267 (internal citations omitted).

28

Just recently the Court reaffirmed this proposition when analyzing the First Amendment protections of vulgar and profane student speech uttered off-campus. *See Mahanoy Sch. Dist. v. B.L. by and through Levy*, 594 U.S. 180, 191-92 (2021). The Court explained that more First Amendment protections were provided for profane and vulgar speech uttered off-campus as in *Mahanoy*. *Id.* In doing so, the Court expressly contrasted the off-campus nature of the student speech in *Mahanoy* with the on-campus nature of the speech in *Fraser*. *Id.* (citing Morse, 551 U.S. at 405 (clarifying that a school can regulate a student's use of sexual innuendo in a speech given within the school but if the student gave the same speech outside of the school context in a different public forum, then it would be protected).

Therefore, the fact the "Let's Go Brandon" apparel may have first Amendment Protection in other public forums like on the congressional floor or on the radio is of no consequence to the legal issue presented before this Court. As the Supreme Court precedent outlined above makes clear, the fact that the Let's Go Brandon apparel was worn by young students in a public school is important since the regulation of student on-campus speech is treated differently than the regulation of adult speech in other public forums. As explained by the Supreme Court in *Fraser*, *Morse*, *Hazelwood* and *Mahanoy*, school officials have the ability to regulate student speech that conveys a profane message like that of Fuck Joe Biden. This is because, such a message is "wholly inconsistent with the 'fundamental values' of public

school education." *Hazelwood*, 484 U.S. at 267 (citing *Fraser*, 478 U.S. at 685). And to the extent that there is any debate over whether such message is appropriate for middle school children, this Court should give deference to the school officials. As the Supreme Court recognized numerous times, "[t]he determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board," rather than with the federal courts. *Hazelwood*, 484 U.S. at 267.

In sum, *Fraser*'s holding encompasses a school's ability to regulate phrases with an implied profane message and not just an explicit swear word. As the district court correctly explained:

> Plaintiffs' restrictive interpretation of the holding in *Fraser* ignores how language works and how courts have treated messages with profane meanings. **Words constitute profanity because of the meaning conveyed, not because of the specific letters used to form the word.** Under Plaintiff's approach, a school could not discipline a student for calling a teacher a "cretinous onager" or for telling the principal to "ingest fecal matter and pass away." Neither of combination of words contain a swear word, but both word combinations would convey profane content. **And directing the words towards a political figure instead of a teacher or principal does not make the content less profane.**

(Opinion and Order, RE 58, Page ID # 965-66)(emphasis added).

### C.    The District Court Properly Declined to Extend *B.H.* to this Case and Justice Alito's Concurrence in *Morse* Does Not Alter this Conclusion.

On Appeal, Plaintiffs rely almost entirely on *B.H. ex rel. Hawk v. Easton Area School District*, 725 F.3d 293 (3rd Cir. 2013), to support their argument that the

district court should have applied *Tinker* rather than *Fraser*. However, the district court properly declined to extend the Third Circuit's holding in *B.H.* for four reasons.

First, *B.H.* is a case from the Third Circuit, so it is not binding on the district court or on this Court. Moreover, contrary to Plaintiff's suggestion, the Third Circuit's interpretation of *Fraser* differs from this Court's interpretation of *Fraser*. *See Boroff v. Van Wert City Bd. of Educ.*, 220 F.3d 465, 470 (6th Cir. 2000). In fact, even the Third Circuit acknowledged this in *B.H. See B.H.*, 725 F.3d at 316 (discussing that the Sixth Circuit takes a broad interpretation of Fraser)(citing *Boroff*, 220 F.3d at 470). Thus, under *Boroff*, which remains good law and binding precedent, Plaintiffs' argument regarding the application of *B.H.* fails.[1]

Second, the Third Circuit was incorrect in concluding that Justice Alito's concurrence in *Morse* was controlling over Justice Robert's majority opinion under the narrowest grounds rule. The narrowest ground rule does not apply in situations like *Morse*, where Justice Robert's opinion was joined in full by four other justices. As the dissent explained in *B.H.*, "[c]ontrary to the Majority's holding today, neither *Marks* nor other Supreme Court decisions support the 'unprecedented argument that a statement of legal opinion joined by five Justices of th[e] Court does not carry the weight of law." *B.H.*, 725 F.3d at 326 (quoting *Vasquez v. Hillery*, 474 U.S. 254,

---

[1] Plaintiffs do not suggest, nor do they argue, that *Boroff* was wrongly decided or that it should be overturned. And any attempt by Plaintiffs to argue that *Boroff* should be overturned should be deemed waived.

261 n. 4 (1986)). This is because the narrowest grounds rule only applies when it is necessary to discern a single holding of the Court in cases **where <u>no opinion</u> on the issue in question could be gathered from the majority**. *See Id.*; *see Marks v. United States*, 430 U.S. 188, 193 (1977)("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those members who concurred in the judgments on the narrowest grounds.'")). That is not what happened in *Morse*.

In *Morse*, the majority of five justices rendered an opinion on the issue—i.e. that "a principal may, consistent with the First Amendment, restrict student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use." *Morse*, 551 U.S. at 403. This Court, along with eight other circuit courts, have cited this pertinent portion of Justice Robert's majority opinion as the ultimate holding of *Morse*. *See Defoe ex. rel. Defoe v. Spiva*, 625 F.3d 324, 332-33 (6th Cir. 2010)("As this Court already recognized, however, the *Morse* holding was a narrow one, determining no more than a public school may prohibit expression at school or at school-sponsored events during the school hours that can be 'reasonably viewed as promoting drug use.'")); *see Doninger v. Niehoff*, 642 F.3d 334, 345 (2nd Cir. 2011); *see Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 435 (4th Cir. 2013); *see Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 877 (7th

Cir. 2011); *see D.J.M ex rel. D.M. v. Hannibal Pub. Sch. Dist. No. 60*, 647 F.3d 754,

761 (8th Cir. 2011); *see Redding v. Safford Unified Sch. Dist. No. 1*, 531 F.3d 1071,

1094 (9th Cir. 2008), rev'd on other grounds, 557 U.S. 364 (2009*); see Corder v.

Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1228 (10th Cir. 2009); s*ee Boim v.

Fulton Cnty. Sch. Dist.*, 494 F.3d 978, 948 (11th Cir. 2007). Thus, there is no

controlling precedent that supports Plaintiffs' contention that *B.H.*'s determination

that Justice Alito's concurrence in *Morse* controls. *See also Rote v. Zel. Custom Mfg.

L.L.C.*, 816 F.3d 383 (6th Cir. 2016)(holding that a concurring opinion from one

judge in the Supreme Court is not binding and is only persuasive if the majority of

the Court does not concur in the opinion of that individual judge).

Contrary to Plaintiffs assertion, neither *Defoe ex rel. Defoe v. Spiva*, 625 F.3d

324 (2010) nor *Barr v. Lafon*, 538 F.3d 554 (2008) alters the above conclusion.

These cases do not indicate that this Court views Justice Alito's concurring opinion

as the controlling opinion over the majority. Instead, these cases merely cite to

Justice Alito's concurring opinion to illustrate the narrowness of the Supreme

Court's holding in its application to only student speech that advocates for illegal

drug use. *See Defoe*, 625 F.3d at 333; *see Barr*, 538 F.3d at 564.

Third, the Third Circuit in *B.H.* interpreted dicta from Justice Alito's

concurrence in *Morse* out of context, extending the concurrence beyond that of the

Majority opinion. Justice Alito's concurring opinion stated in pertinent part: "I join

33

the opinion of the Court on the understanding that . . . (2) it provides no support for any restriction on speech that can plausibly be interpreted as commenting on any political or social issue, including speech on issues such as 'the wisdom of the war on drugs or of legalizing marijuana for medical use.'" *Morse*, 551 U.S. at 422 (Alito, J., concurring). Based on this statement, the Third Circuit concluded that Justice Alito's concurrence controls and narrowed the holding of *Morse* to categorically prohibit student speech that advocates for illegal drug use unless it can be plausibly interpreted as addressing political or social issues. *B.H.*, 725 F.3d at 313-14.

However, the majority in *B.H.* improperly relies on a concurring justice's opinion to add to what the majority opinion holds and thereby bound the other four justices to what they have not said. *B.H.*, 725 F.3d at 310 (conceding that a concurring "justice's opinion 'cannot add to what the majority opinion holds' by 'binding the other four [j]ustices to what they have not said.'")(quoting *McKoy v. North Carolina*, 494 U.S. 433, 462 n.3 (1990)(Scalia, J., dissenting)). The majority in *Morse* affirmatively stated, "this is plainly not a case about political debate." *Morse*, 551 U.S. at 403. The majority then declined to address whether their decision would be different if the message on the banner had been political. *See Id.* *B.H.* effectively used Justice Alito's concurrence to provide a definitive controlling answer to one that the Court declined to address. As explained in the dissenting opinion in *B.H.*, this approach has been specifically rejected by the Supreme Court:

34

> The Court would be in an odd predicament if a concurring minority of the Justices could force the majority to address a point they found it unnecessary (and did not wish) to address, under compulsion of [the dissent's] new principle that silence implies agreement. Put another way, a majority holding is not made coextensive with the concurrence because [the majority] opinion does not expressly preclude (is "consistent with []" . . . ) the concurrence's approach.

*B.H.*, 725 F.3d at 327 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 285 n. 5 (2001)). Thus, *B.H.* improperly applied Justice Alito's concurrence out of context, extending it beyond that of which the majority intended. *See also Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. # 204*, 523 F.3d 668, 673 (7th Cir. 2008)(explaining that purpose of Justice Alito's concurring opinion).

Fourth, *B.H.* improperly relied on Justice Alito's concurrence as a basis to alter and limit the holding in *Fraser*. Both the Supreme Court and this Court have recognized that *Fraser* and *Morse* provide different regulatory standards for student speech. *See e.g., Mahanoy Area Sch. District v. B.L. by and through Levy*, 594 U.S. 180, 187-88 (2021); *see Defoe*, 625 F.3d at 332; *see Barr*, 538 F.3d at 564. And neither the Supreme Court nor this Court have ever held that Justice Alito's concurrence limits *Fraser* in the manner suggested by *B.H.* In fact, when looking to the Court's majority opinion in *Morse*, the majority opinion suggests the exact opposite—that the Court reaffirmed its holding in *Fraser* and did not modify it in any way. *See Morse*, 551 U.S. at 404-405. Also, B.H.'s proposition is illogical when

35

applying it to the facts of *Fraser* since there is no dispute that the speech was political given that it was a campaign speech for student council.

>   **D.    Plaintiffs' Approach to Student Speech is Inconsistent with what the Framers Intended.**

The fact that the framers of the Constitution did not intend the First Amendment to pertain to public schools should give this Court further pause in expanding the First Amendment in the student speech context in the manner suggested by Plaintiffs.

Justice Thomas in his concurring opinion in *Morse v. Frederick*, 552 U.S. 393, 410 (2007), explained "the history of public education suggests that the First Amendment, as originally understood, does not protect student speech in public schools." *Id*. at 410-411. Justice Thomas explained that when public schools were first                                                                created "teachers taught, and students listened. Teachers commanded, and students obeyed." *Id*. at 412. And when it came to regulating certain student behaviors such as the use of profanity, teachers relied on **discipline to maintain order**. *Id*.

It was through "the legal doctrine of *in loco parentis*, courts upheld the rights of schools to discipline students, enforce rules, and maintain order." *Id*. at 413. The doctrine of *in loco parentis* is rooted in English common law. Under the doctrine a parent's authority over their child is delegated to a tutor or instructor for the purpose of education. *Id*. The doctrine has been applied by courts to public schools from as

early as 1837. *Id.* A review of case law applying the doctrine to public schools shows that courts have long been reluctant to interfere in the routine business of public school administration. *Id.* at 414. Because of this, courts have deferred to public schools in allowing them to set and enforce rules to maintain order. *Id.* This included public schools' ability to regulate student speech under the doctrine of in loco parentis. *Id.*; *see e.g.*, *Lander v. Seaver*, 32 Vt. 114, 115, 121 (1959); *see Deskins v. Gose*, 85 Mo. 485, 487-88 (1885). In other words, courts routinely had a history of preserving the right of teachers to punish speech that teachers believed was contrary to the interest of the school and its educational mission. *Id.*

In sum, as Justice Thomas explained, the Framers never intended the Constitution to afford students the right of free speech in schools:

> In my view, petitioners could prevail for a much simpler reason: As originally understood, the Constitution does not afford students a right of free speech in public schools. In light of American public education, it cannot seriously be suggested that the First Amendment "freedom of speech" encompasses a student's right to speak in public schools. Early public schools gave total control to teachers, who expected obedience and respect from students. And courts routinely deferred to schools' authority to make rules and to discipline students for violating those rules. Several points are clear: (1) under *in loco parentis*, speech rules and other school rules were treated identically; (2) the *in loco parentis* doctrine imposed almost no limited on the types of rules that a school could set while students were in school; and (3) schools and teachers had tremendous discretion in imposing punishments for violations of those rules.

37

*Morse*, 551 U.S. at 419 (Thomas, J., concurring). *Tinker* then extended student speech rights beyond that of what the Framers intended and in a manner that conflicted with the traditional understanding of the judiciary's role given the doctrine of *in loco parentis*. As Justice Black criticized in his dissent in *Tinker*, "[T]axpayers send children to school on the premise that at their age they need to learn, not teach." *Tinker*, 393 U.S. at 522. Justice Black believed that *Tinker*, "surrender[ed] control of the American public school system to public school students." *Id.* at 526. Justice Thomas correctly viewed the Court's opinions in *Fraser*, *Hazelwood*, and *Morse* as an attempt to scale back *Tinker*'s standard. *Morse*, 551 U.S. at 419.

In this case, Plaintiffs essentially request that this Court expand student speech beyond that of *Tinker* in direct contravention of *Fraser*. This Court should decline such an extension, not only because it is contrary to *Fraser* and *Boroff*, but because it improperly extends student speech rights beyond what the Framers intended when they enacted the First Amendment.

Furthermore, it is worth noting that school administrators now face administrative and pedagogical challenges different from that of schools in the 19th century. There can be no dispute that the spread of information across the various electronic platforms such as social media, has created unique challenges for schools. Contrary to Plaintiffs assertion, the use of profane messaging in today's public

schools does not manifest in obvious examples like Cohen's "Fuck the Draft" Jacket. As the students in *Fraser* and *Boroff* illustrated, kids are more creative than that especially when in the context of student dress. Kids wear clothing that contains a double entendre or an implied meaning that is profane, vulgar, obscene, or lude. As the Supreme Court indicated several times, school boards have the authority to determine "what manner of speech in the classroom or in school assembly is appropriate." *Fraser*, 478 U.S. at 683; *Hazelwood*, 484 U.S. at 267. This Court, in comporting with the *in loco parentis* doctrine, understood the proper deference afforded to school administrators when regulating student dress that contains a profane message in the modern-day educational system. *See Boroff v. Van Wert City Bd. of Educ.*, 220 F.3d 465 (2000). For this reason, this Court held in *Boroff*, that when the student dress at issue is reasonably viewed by the school administration containing a profane, lewd, or obscene message, or otherwise promoting values contrary to the school's educational mission, then the school has the authority to regulate it without offending the First Amendment.

## II.    DEFENDANTS BUIKEMA AND BRADFORD ARE ENTITLED TO QUALIFIED IMMUNITY.

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). To determine whether a governmental official is entitled to qualified immunity a court should ask two questions. First, whether the government official's acts violated a

39

constitutional right. *Aldini v. Johnson*, 609 F.3d 858, 863 (6th Cir. 2010). If no constitutional right would have been violated, then the governmental official is entitled to qualified immunity, and it is unnecessary for the court to conduct further inquiry into qualified immunity analysis. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see Neague v. Cynkar*, 258 F.3d 504, 508 (6th Cir. 2001). If a violation could be made out, the second question is whether the right at issue was "clearly established". *Aldini*, 609 F.3d at 863. A court may proceed with considering either prong of the qualified immunity inquiry first, and either prong can serve as a basis for dismissal. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Here, as stated above, the district court properly concluded that Buikema and Bradford had the authority to ask X.A. and D.A. to remove their "Let's Go Brandon" apparel without offending the First Amendment. Based on this alone, Buikema and Bradford are entitled to qualified immunity.

Furthermore, even if this Court were to disagree and find that Buikema and Bradford violated the First Amendment, they should nevertheless be entitled to qualified immunity because the right at issue was not clearly established.

Plaintiffs have the burden of establishing that the right at issue is clearly established. *Cunningham v. Shelby County*, 994 F.3d 761, 765 (6th Cir. 2021). Plaintiffs misunderstand the very tough standard. Plaintiffs must point to "existing precedent" at the time of the incident at issue that "put[s] the illegality of [the school

officials'] conduct 'beyond debate'". *Ashford v. Raby*, 951 F.3d 798, 801 (6th Cir. 2020).

The "clearly established" analysis starts with examining United States Supreme Court and Sixth Circuit case law for similar cases. *See Stewart v. City of Euclid, Ohio*, 970 F.3d 667, 675 (6th Cir. 2020). Relying only on out-of-circuit decisions is insufficient. It is insufficient that the principle is merely suggested by the existing precedent[2]. *Ashford v. Raby*, 951 F.3d 798, 804 (6th Cir. 2020); *Beck v. Hamblen Cty. Tennessee*, 969 F.3d 592, 603 (6th Cir. 2020); *Stewart v. City of Euclid, Ohio*, 970 F.3d 675 (6th Cir. 2020). Also, the Supreme Court recently reminded lower courts that "clearly established law should not be defined at a 'high level of generality'—it 'must be particularized to the facts of the case.'" *White v.*

---

[2] Plaintiffs do not argue on Appeal that that any out of circuit opinions render the right at issue clearly established. However, in the district court Plaintiffs relied on *B.H. ex. Rel. Hawk v. Easton Area School District*, 725 F.3d 293 (3rd Cir. 2013) and *Guiles ex rel. Guiles v. Marineau*, 461 F.3d 320 (2nd Cir. 2006). Neither of these decisions can be used to show that the right at issue was clearly established since both cases have differentiating factual characteristics. *B.H. ex. Rel. Hawk v. Easton Area School District*, 725 F.3d 293 (3rd Cir. 2013) involved a school's ban on breast cancer awareness bracelets with the slogan "I ♥ boobies (KEEP A BREAST)". This is not the same thing as a school official regulating a sweatshirt with a slogan that has an implied profane meaning of "Fuck Joe Biden". *Guiles ex rel. Guiles v. Marineau*, 461 F.3d 320 (2nd Cir. 2006), involved a school's ban of a t-shirt that had alcohol and drug related images on it along with a picture of former President George W. Bush. While the t-shirt was associated with a President similar to the "Let's Go Bandon" slogan, unlike in the apparel at issue in this case, the t-shirt in *Guiles* was not interpreted by school officials as containing images or messages that were vulgar or profane. *See Id.* at 327.

41

*Pauly*, 580 U.S. 73, 79 (2017); see *Beck v. Hamblen Cty. Tennessee*, 969 F.3d 592, 599 (6th Cir. 2020). For example, merely recognizing that the Fourth Amendment bars the police from using excessive force is too general and will "not clearly establish that force was excessive on a particular occasion." *Beck*, 969 F.3d at 599.

Similarly, in *Hall v. Navarre*, 118 F.4th 749 (6th Cir. 2024), this Court explained that in the First Amendment context, a plaintiff cannot defeat qualified immunity "simply by arguing that they have a clearly established right not to suffer an 'abridgment' of the 'freedom of speech.'" *Id.* at 760 (citing *DeCrane v. Eckart*, 12 F.4th 586, 599(6th Cir. 2021). Instead in a First Amendment retaliation case, this Court indicated that the proper question was "whether [the officer] violated clearly established law by following an order to cite [the plaintiff] even where [the Officer], as the district court seemingly inferred, maintained a speech-based retaliatory animus." *Id.*

The "'existing precedent' must 'squarely govern' the specific facts at issue." *Tarter v. Metropolitan Nashville Airport Authority*, No. 22-5432, 2023 WL 5322418, at *5 (6th Cir. Aug. 18, 2023) (internal quotations omitted)(citing *Kisela v. Hughes*, 138 S.Ct. 1148, 1153 (2018)). This Court has explained that it is not enough that a right is "merely 'suggested by existing precedent'" and that "[s]pecificity is crucial*." Tarter,* 2023 WL 5322418, at *5*(citing *City of Tahlequah v. Bond*, 142 S.Ct. 9, 11 (2021); *see Moore v. Oakland County, Michigan*, 126 F.4th

42

1163 (6th Cir. 2025); *see e.g.*, *MacIntosh v. Clous*, 69 F.4th 309 (6th Cir. 2023)(relying on *Zilich*, a sufficiently similar since both cases involved a reasonable threat of harm and whether a reasonable government official would view that threat as not protected under the First Amendment).

Here, Plaintiffs failed to meet their burden of proving that the right at issue was clearly established for three reasons. First, Plaintiffs improperly attempt to define the constitutional right at issue with too high a degree of generality. *See Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001); *see District of Columbia v. Wesby*, 583 U.S. 48, 138 S.Ct. 577, 590 (2018); *see Stevens-Rucker v. City of Columbus,* 739 F. App'x 834, 839 (6th Cir. 2018). The right at issue is not whether the school officials could regulate political speech absent a substantial disruption. Instead, looking to the particularized facts of this case, the question is whether a school official can ask a student to remove a sweatshirt with a message that the school official interpreted as profane and not school appropriate, when that message also mentions the President.

Furthermore, it is inappropriate for Plaintiffs to rely on *Tinker* to argue that this general right is clearly established let alone the specific right at issue since *Tinker* does not govern this case. *Tinker* involved the school's regulation of a symbol that expressed a political viewpoint. *See Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 508-509 (1969); *see Castorina ex rel.*

43

*Rewt. v. Madison County School Bd.* 246 F.3d 536, 542 (6th Cir. 2001)(holding that *Tinker* applied to the school's ban of Confederate flags since the regulation targeted a passive expression of a racial viewpoint), *and Barr v. Lafon*, 538 F.3d 554, 564 (6th Cir. 2008)(same); *see Defoe ex rel Defoe v. Spiva*, 625 F.3d 324, 332 (6th Cir. 2010)(same). In this case, the regulation at issue did not target a particular viewpoint protected by the First Amendment. In fact, each and every witness testified that students are able to wear clothing that express their political viewpoints to school. Thus, *Tinker* does not squarely govern this case and cannot be used as a basis show that the right at issue was clearly established.

Second, applying the proper analysis and looking at the right at issue based on the particularized facts of this case, existing precedent from the Supreme Court and this Court does not suggest that the right at issue was clearly established. In fact, there are no cases from the Supreme Court or this Court that address the particular right at issue. For this reason alone, Buikema and Bradford are entitled to qualified immunity.

Third, looking to the most factually similar cases from the Supreme Court and this Court—*Fraser* and *Boroff*—it cannot be said that it is beyond debate that any reasonable school official would know that requesting a student to remove clothing containing a message with an implied profane meaning is illegal. If anything, *Fraser* and *Boroff* suggest the opposite—that based on *Fraser* and *Boroff,* a reasonable

44

school official would believe that they have the authority to ask a student to remove clothing with an implied profane meaning. *See Fraser*, 478 U.S. at 683-84; *see Boroff*, 220 F.3d at 470-47.

## III.   PLAINTIFFS ABANDONED THEIR *MONELL* CLAIM ON APPEAL.

The Federal Rules of Appellate Procedure require an appellant's brief to contain a statement of the issues presented for review and an argument on each issue presented for review. Fed. R. App. P. 28(a); *see Bickel v. Korean Air Lines Co.*, 96 F.3d 151, 153 (6th Cir. 1996), cert. denied, 519 U.S. 1093 (1997). This Court has explained that a failure to address a claim dismissed on summary judgment in the appellant's appeal brief renders that claim abandoned and waived on appeal. *See Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 310-11 (6th Cir. 2005); *see Thaddeus-X v. Blatter*, 175 F.3d 378,403 n. 18 (6th Cir. 1999)(en banc); *see Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 462 (6th Cir. 2003); *see Bickel*, 96 F.3d at 153-54. *see Knott v. Sullivan,* 418 F.3d 561, 568 n. 2 (6th Cir. 2005); *Hill v. Blue Cross & Blue Shield of Mich.*, 409 F.3d 710, 716 n. 2 (6th Cir. 2005). Here, Plaintiff's *Monell* claim in Count II was not analyzed in Plaintiffs' Appeal Brief. Therefore, this Court should deem the claim abandoned and waived on this Appeal.

## IV.   THIS COURT SHOULD DECLINE TO REVIEW PLAINTIFFS' CLAIM FOR INJUNCTIVE AND DECLARATORY RELIEF WHICH WAS WAIVED IN THE DISTRICT COURT.

This Court has explained that when a plaintiff fails to address a claim in their motion for summary judgment without even a minimum level of argumentation, then the issue is waived and not preserved for appeal. *See United States v. Huntington Nat'l Bank*, 574 F.3d 329, 332 (6th Cir. 2009); *see Allstate Ins. Co. v. Global Medical Billing, Inc.*, 520 Fed. Appx. 409, 412 (6th Cir. 2013). In such an instance, this Court declines to review claims waived in the district court unless there are exceptional circumstances that present a plain mischarge of justice. *See Novus Group, LLC v. Prudential Financial, Inc.*, 74 F.4th 424, 428 (6th Cir. 2023) (holding that arguments waived in the district court and then raised on appeal are forfeited since they are technically raised for the first time on appeal).

Here, the district court concluded that Plaintiffs abandoned their claim in Count III seeking injunctive and declaratory relief based on a "Let's Go Brandon" categorical clothing ban that Plaintiffs conceded did not exist. (Opinion, RE 58, Page ID # 952). This case is not one that presents an exceptional circumstance where a plain mischarge of justice would result from the waiver of the claim. This is because no such ban exists. Therefore, this Court should decline to review Plaintiffs' claim for injunctive and declaratory relief properly deemed waived by the federal district court and is now forfeited for purposes of this Appeal.

## CONCLUSION

46

For all the reasons stated above, this Court should affirm the district court's grant of summary judgment.

DATED: March 5, 2025

/s/ANNABEL F. SHEA
GIARMARCO, MULLINS & HORTON, PC
Attorney for Defendants-Appellees

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), the undersigned counsel certifies that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7). The brief was prepared in Microsoft Word 2010, using a Times New Roman 14 pt. font. Microsoft Word 2010 has a function that calculates the number of words in a document. According to that function, there are 12,391 words in this brief.

/s/ANNABEL F. SHEA
GIARMARCO, MULLINS & HORTON, PC
Attorney for Defendants- Appellees

## CERTIFICATE OF ELECTRONIC SERVICE

ANNABEL SHEA states that on March 5, 2025, she did serve a copy of

47

**DEFENDANTS-APPELLEES' RESPONSE BRIEF ON APPEAL** via the

United States Sixth Circuit Court of Appeals' electronic transmission.

/s/ANNABEL F. SHEA
GIARMARCO, MULLINS & HORTON, PC
Attorney for Defendants-Appellees
101 W. Big Beaver Road, 10th Floor
Troy, MI 48084-5280
(248) 457-7081
ashea@gmhlaw.com
P83750

**ADDENDUM**

Pursuant to Sixth Circuit Rule 29, Defendants-Appellees designate the following filings in the United States District Court for the Western District of Michigan for inclusion in the Record on Appeal:

| Description of Record Entry | Filed Date | Record Entry No. | Page ID |
|---|---|---|---|
| Complaint | 4/25/2023 | 1 | 1-29 |
| Answer | 6/23/2023 | 7 | 82-125 |
| Defs. Motion for Summary Judgment | 3/22/2024 | 38 | 355-397 |
| Index of Exhibits | 3/22/2024 | 38-1 | 398 |
| Ex. 1: Deposition transcript of D.A. | 3/22/2024 | 38-2 | 399-406 |
| Ex. 2: Deposition transcript of X.A. | 3/22/2024 | 38-3 | 407-413 |
| Ex. 3: Deposition transcript of Andrew Buikema | 3/22/2024 | 38-4 | 414-434 |
| Ex. 4: Deposition transcript of Wendy Bradford | 3/22/2024 | 38-5 | 435-448 |
| Ex. 5: Deposition transcript of Joseph Williams | 3/22/2024 | 38-6 | 449-469 |
| Ex. 6: Deposition transcript of Timothy Goheen | 3/22/2024 | 38-7 | 470-482 |
| Ex. 7: Deposition transcript of Ryan Biller | 3/22/2024 | 38-8 | 483-504 |
| Ex. 8: Tri-County High School Handbook 2023-24 | 3/22/2024 | 38-9 | 505-513 |

| Ex. 9: Tri-County Area Schools Meeting Minutes March 11, 2024 | 3/22/2024 | 38-10 | 514-518 |
|---|---|---|---|
| Ex. 10: Policy regarding Dress and Grooming 3/9/20 | 3/22/2024 | 38-11 | 519-520 |
| Ex. 11: Policy regarding Dress and Grooming 9/27/22 | 3/22/2024 | 38-12 | 521-522 |
| Pls. Motion for Summary Judgment | 3/22/2024 | 39 | 523-575 |
| Index of Exhibits | 3/22/2024 | 39-1 | 576-577 |
| Pls. Ex. 1 | 3/22/2024 | 39-2 | 578-581 |
| Pls. Ex. 2 | 3/22/2024 | 39-3 | 582-584 |
| Pls. Ex. 3 | 3/22/2024 | 39-4 | 585-590 |
| Pls. Ex. 4 | 3/22/2024 | 39-5 | 591-595 |
| Pls. Ex. 5 | 3/22/2024 | 39-6 | 596-600 |
| Pls. Ex. 6 | 3/22/2024 | 39-7 | 601-602 |
| Pls. Ex. 7 | 3/22/2024 | 39-8 | 603-612 |
| Pls. Ex. 8 | 3/22/2024 | 39-9 | 613-628 |
| Pls. Ex. 9 | 3/22/2024 | 39-10 | 629-644 |
| Pls. Ex. 10 | 3/22/2024 | 39-11 | 645-657 |
| Pls. Ex. 11 | 3/22/2024 | 39-12 | 658-661 |
| Pls. Ex. 12 | 3/22/2024 | 39-13 | 662-673 |
| Pls. Ex. 13 | 3/22/2024 | 39-14 | 674-680 |
| Pls. Ex. 14 | 3/22/2024 | 39-15 | 681 |
| Pls. Ex. 15 | 3/22/2024 | 39-16 | 682 |
| Pls. Ex. 16 | 3/22/2024 | 39-17 | 683 |
| Pls. Ex. 17 | 3/22/2024 | 39-18 | 684 |
| Pls. Ex. 18 | 3/22/2024 | 39-19 | 685 |
| Pls. Ex. 19 | 3/22/2024 | 39-20 | 686 |
| Pls. Ex. 20 | 3/22/2024 | 39-21 | 687 |
| Pls. Ex. 21 | 3/22/2024 | 39-22 | 688 |
| Pls. Ex. 22 | 3/22/2024 | 39-23 | 689 |
| Pls. Ex. 23 | 3/22/2024 | 39-24 | 690-693 |
| Pls. Ex. 24 | 3/22/2024 | 39-25 | 694-697 |

| Pls. Ex. 25 | 3/22/2024 | 39-26 | 698-702 |
|---|---|---|---|
| Pls. Ex. 26 | 3/22/2024 | 39-27 | 703-709 |
| Pls. Ex. 27 | 3/22/2024 | 39-28 | 710-713 |
| Pls. Ex. 28 | 3/22/2024 | 39-29 | 714-718 |
| Pls. Ex. 29 | 3/22/2024 | 39-30 | 719-720 |
| Pls. Ex. 30 | 3/22/2024 | 39-31 | 721-722 |
| Pls. Ex. 31 | 3/22/2024 | 39-32 | 723-747 |
| Pls. Ex. 32 | 3/22/2024 | 39-33 | 748-753 |
| Pls. Response to Defs. Motion for Summary Judgment | 4/26/2024 | 44 | 765-815 |
| Pls. Ex. A | 4/26/2024 | 44-1 | 816-817 |
| Pls. Ex. B | 4/26/2024 | 44-2 | 818-819 |
| Defs. Response to Pls. Motion for Summary Judgment | 4/26/2024 | 46 | 824-863 |
| Defs. Reply in Support of their Motion for Summary Judgment | 5/17/2024 | 48 | 866-876 |
| Pls. Reply in Support of their Motion for Summary Judgment | 5/17/2024 | 49 | 877-899 |
| Pls. Ex. 34 | 5/17/2024 | 49-1 | 900-902 |
| Order Granting Defs. Mot. Summ. J. and Denying Pls. Mot. Summ. J. | 8/23/2024 | 56 | 915-941 |
| Judgment | 8/23/2024 | 57 | 942 |
| Amended Order Granting Defs. Mot. Summ. J. and Denying Pls. Mot. Summ. J. | 8/23/2024 | 58 | 943-969 |
| Notice of Appeal | 9/4/2024 | 59 | 970-971 |