## CASE NO. 24-1769

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE SIXTH CIRCUIT

B.A., mother of minors D.A. and X.A.;

D.A., a minor, by and through his mother, B.A.;
X.A., a minor, by and through his mother, B.A.,

*Plaintiffs-Appellants,*

v.

TRI COUNTY AREA SCHOOLS;
ANDREW BUIKEMA, in his individual capacity;
WENDY BRADFORD, in her individual capacity,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of Michigan
(1:23-cv-00423)

## APPELLANTS' REPLY BRIEF

SARA E. BERINHOUT
FOUNDATION FOR INDIVIDUAL
 RIGHTS AND EXPRESSION
510 Walnut St., Ste. 900
Philadelphia, PA 19106
(215) 717-3473
sara.berinhout@thefire.org

CONOR T. FITZPATRICK
 *Counsel of Record*
FOUNDATION FOR INDIVIDUAL
 RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, D.C. 20003
(215) 717-3473
conor.fitzpatrick@thefire.org

*Counsel for Appellants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... iii

INTRODUCTION ........................................................................................ 1

ARGUMENT ................................................................................................ 3

    I.    Wearing "Let's Go Brandon" Apparel is Protected,
          Non-Disruptive Political Speech. ............................................ 3

          A.    Defendants' reliance on *Fraser* is misplaced................ 5

          B.    The Supreme Court consistently emphasizes
                 that political speech stands on a higher
                 plane. ........................................................................... 7

          C.    Defendants seek a degree of authority over
                 student speech expressly rejected by *Tinker*. ............. 10

          D.    With *Tinker* as a backstop to prevent
                 disruption, courts can and should narrowly
                 interpret exceptions to students' free speech
                 rights. ......................................................................... 12

    II.   It is Not "Reasonable" to Equate Sanitized
          Euphemism with Explicit Profanity. ................................... 15

    III.  The Third Circuit's Framework in *B.H.* Provides
          the Appropriate Test for "Ambiguously" Profane
          Speech................................................................................. 19

          A.    The Third Circuit's framework is a
                 straightforward application of *Tinker*, *Morse*,
                 and *Fraser*. ................................................................ 21

          B.    Justice Alito's *Morse* concurrence is
                 controlling and further reinforces the Third
                 Circuit's approach........................................................ 22

C.    *Boroff* is inapposite and was overruled by *Morse*. ............................................................. 24

D.    Judges, not individual teachers and administrators, decide whether the First Amendment protects students' non-disruptive political expression. ................................... 26

IV.    Defendants Misstate the Relevant Constitutional Question for Qualified Immunity ............................................ 29

V.    D.A. and X.A. "Waived" Nothing ............................................ 31

CONCLUSION ............................................................... 33

# TABLE OF AUTHORITIES

## Cases

*B.H. ex rel. Hawk v. Easton Area Sch. Dist.*,
  725 F.3d 293 (3d Cir. 2013) ...........................................................passim

*Barr v. Lafon*,
  538 F.3d 554 (6th Cir. 2008) ................................................... 22, 29

*Berkshire v. Dahl*,
  928 F.3d 520 (6th Cir. 2019) ............................................................. 31

*Bethel School Dist. No. 403 v. Fraser*,
  478 U.S. 675 (1986) ...........................................................passim

*Boroff v. Van Wert City Bd. of Educ.*,
  220 F.3d 465 (6th Cir. 2000) ................................................... 6, 9, 25, 33

*Bridges v. California*,
  314 U.S. 252 (1941) ............................................................................. 8

*Brown v. Bd. of Ed. of Topeka*,
  347 U.S. 483 (1954) ........................................................................... 11

*Castorina ex rel. Rewt v. Madison Cnty. Sch. Bd.*,
  246 F.3d 536 (6th Cir. 2001) ........................................................... 29

*Citizens United v. FEC*,
  558 U.S. 310 (2010) ........................................................................... 14

*Defoe ex rel. Defoe v. Spiva*,
  625 F.3d 324 (6th Cir. 2010) ..................................................... 23, 28

*FEC v. Wisc. Right to Life, Inc.*,
  551 U.S. 449 (2007) ........................................................................... 14

*Hazelwood Sch. Dist. v. Kuhlmeier*,
  484 U.S. 260 (1988) ................................................................... 28, 29

*Holzemer v. City of Memphis*,
  621 F.3d 512 (6th Cir. 2010) ........................................................... 30

*Lowery v. Euverard,*
   497 F.3d 584 (6th Cir. 2007) ................................................................. 29

*M.A.L. ex rel. M.L. v. Kinsland,*
   543 F.3d 841 (6th Cir. 2008) ................................................................. 29

*Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy,*
   594 U.S. 180 (2021) ........................................................................passim

*Morgan v. Swanson,*
   659 F.3d 359 (5th Cir. 2011) ................................................................... 4

*Morse v. Frederick,*
   551 U.S. 393 (2007) ........................................................................passim

*N.Y. Times Co. v. Sullivan,*
   376 U.S. 254 (1964) ................................................................................. 8

*Sypniewski v. Warren Hills Reg'l Bd. of Educ.,*
   307 F.3d 243 (3d Cir. 2002) ..................................................................... 4

*Thompson v. Ragland,*
   23 F.4th 1252 (10th Cir. 2022) ................................................................ 4

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
   258 F. Supp. 971 (S.D. Iowa 1966) ....................................................... 27

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
   393 U.S. 503 (1969) ........................................................................passim

*W. Va. St. Bd. of Educ. v. Barnette,*
   319 U.S. 624 (1943) ............................................................................... 15

*Zamecnik v. Indian Prairie Sch. Dist. No. 204,*
   636 F.3d 874 (7th Cir. 2011) ................................................................. 25

## Other Authorities

Erwin Chemerinsky, *Teaching That Speech Matters: A Framework
   for Analyzing Speech Issues in Schools*, 42 U.C. Davis L. Rev.
   825 (2009) ............................................................................................. 28

Jessie Henninger, "Miss Susie Had a Steamboat: II. Evolution,"
*The Raveled Sleeve* (Nov. 2008) ............................................................ 17

Liz H. Conant, *Putting Shakespeare on the High School Stage*,
University of Central Missouri ProQuest Dissertations & Theses
(Dec. 2011) ............................................................................................. 18

Marjorie Heins, *Not in Front of the Children: "Indecency,"
Censorship, and the Innocence of Youth* (2001) .................................. 18

NurseryRhymes.org, "Miss Susie Had a Steamboat (Hello
Operator)," available at https://www.nurseryrhymes.org/miss-
susie-had-a-steamboat-hello-operator.html ........................................ 17

PS Quick, *100 Playground Games for Children* (2014) ......................... 17

Vikram David Amar, *Morse, School Speech, and Originalism*, 42
U.C. Davis L. Rev. 637 (2009) ............................................................. 12

## INTRODUCTION

Students D.A. and X.A. engaged in speech at the heart of the First Amendment's protection when they silently wore sweatshirts with the "Let's Go Brandon" political slogan. True, their expression might be described as satirical or even cheeky, but the Supreme Court recognized that protecting free speech is not just the rule, it is "the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508–09 (1969). For that reason, "vigilant protection of constitutional freedom is nowhere more vital than in the community of American schools." *Id*. at 512 (quotation omitted).

Exceptions to this baseline rule are recognized only in "carefully restricted circumstances." *Id*. at 513. And in that respect, Defendants ignore the core question in this case: How is "Let's Go Brandon" profane and thus regulable as an exception to the rule? D.A. and X.A.'s brief explained, *at length*, how the slogan is classic euphemism: an intentionally sanitized expression designed to be appropriate for all ages, like a radio edit of a popular song. Six amicus briefs, including one from

a group of distinguished linguistic scholars, explained why "Let's Go Brandon" is not "profanity" under any historical or common-sense metric.

Defendants' response? Silence.

It is Defendants' burden to justify an exception to students' First Amendment right to nondisruptive political expression. *Id.* at 511. Yet they offer no argument for *why* "Let's Go Brandon" satisfies the narrow exception for profanity set forth in *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986). Defendants' brief does not even mention "euphemism" or "sanitized expression."

Instead, Defendants repeat their mantra that "Let's Go Brandon" "means 'Fuck Joe Biden.'" (Response Br., COA R. 70, Page ID ## 11, 13–16, 22, 33–35, 38.) This proves Plaintiffs' point. Boiled down, "heck" *means* "hell." And "gosh darn" *means* "God damn." That is how euphemism works: by replacing profane phrases with age-appropriate substitutes.

Under Defendants' view, schools could censor Michigan students wearing shirts reading "Fix the Darn Roads" on the basis it *means* Governor Gretchen Whitmer's "Fix the Damn Roads" slogan. Defendants

provide no support for such a radical redefinition of "profanity" and no basis for so diluting *Tinker*'s protection of nondisruptive political speech.

Instead, Defendants lay their cards on the table and insist *Tinker* was wrongly decided. This astonishing proposition ignores that the Supreme Court has never suggested any inclination to reconsider *Tinker*—and instead *reaffirmed* it just four years ago in *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180 (2021).

Defendants stand alone, without a single case in support, insisting that no matter how careful students are to express their political views in a school-appropriate, sanitized way, schools may censor their expression if it might cause someone to *think* about the uncensored original. America's students are not so fragile, and the First Amendment is not so brittle. This Court should reverse.

## ARGUMENT

### I. Wearing "Let's Go Brandon" Apparel is Protected, Non-Disruptive Political Speech.

Fifty-six years ago, the Supreme Court addressed the question presented here: Does the First Amendment protect the right of public-school students to wear non-disruptive political apparel to school? The

answer and "unmistakable holding of this Court for almost 50 years" was *yes. Tinker*, 393 U.S. at 506 (collecting cases). It has not changed since.

Contrary to Defendants' attempts to diminish *Tinker*, it remains the "seminal case addressing freedom of speech in the school context." *Thompson v. Ragland*, 23 F.4th 1252, 1256 (10th Cir. 2022). It has been cited 93 times by the Supreme Court and 64 times by this Court.

*Tinker* sets forth the "general rule" applicable in student speech cases that, to censor student speech, schools must establish actual or reasonably forecasted substantial disruption or interference with the rights of others. *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 254 (3d Cir. 2002). *Fraser*, *Hazelwood*, and *Morse* are narrow "exceptions" to that general rule, allowing schools to censor plainly profane, lewd, or obscene speech, advocacy of illegal drug use, and speech bearing the school's imprimatur. *Morgan v. Swanson*, 659 F.3d 359, 387 (5th Cir. 2011) (en banc). *Tinker* places the burden on a school to justify an incursion onto students' First Amendment rights. *Tinker*, 393 U.S. at 509. Defendants fail to meet their burden.

### A.    Defendants' reliance on *Fraser* is misplaced.

*Tinker* ensured that public schools would not become "enclaves of totalitarianism" by protecting speech, including "personal intercommunication among the students … even on controversial subjects," so long as it did not substantially disrupt the school's function or invade others' rights. *Id.* at 511, 512–13.  *Fraser*'s narrow exception regarding profane and sexually explicit expression, reached in the context of a lewd student council speech at a mandatory school assembly, simply does not apply to non-disruptive political expression like the anti-war armbands in *Tinker* or Plaintiffs' "Let's Go Brandon" sweatshirts.

The Supreme Court emphasized that *Fraser*, unlike *Tinker*, involved (1) a "sexually explicit" student address, (2) without a political message, (3) made to "a captive audience" at a mandatory school assembly, (4) using language that would be "proscribed in the halls of Congress." *Fraser*, 478 U.S. at 682–84. Each factor *Fraser* used to distinguish its facts from *Tinker* equally distinguishes Plaintiffs' "Let's Go Brandon" apparel. (*See* Opening Br., COA R. 21, Page ID ## 43–48.)

Defendants nonetheless strain to liken this case to *Fraser*. They first argue *Fraser* cannot be distinguished on political speech grounds,

arguing, "there is no dispute that the speech [in *Fraser*] was political given that it was a campaign speech for student council." (Response Br., COA R. 70, Page ID # 48.) Defendants are wrong.

*Fraser* was unambiguous that its holding turned in large part on the non-political nature (in the Court's view) of Fraser's student council speech. It stressed the "marked distinction between the political 'message' of the armbands in *Tinker* and the sexual content of [Matthew Fraser's] speech," which it lamented was "given little weight by the Court of Appeals." *Fraser*, 478 U.S. at 680. In *Morse*, the Court explained *Fraser* "was plainly attuned to the [non-political] content of Fraser's speech," *Morse v. Frederick*, 551 U.S. 393, 404 (2007) (cleaned up). This Court, too, in a case Defendants rely upon heavily, confirmed *Fraser* "distinguished *Tinker* because the vulgar and offensive speech at issue was 'unrelated'" to political speech. *Boroff v. Van Wert City Bd. of Educ.*, 220 F.3d 465, 468 (6th Cir. 2000).

Elsewhere, Defendants argue that whether "Let's Go Brandon" is permissible "on [the] congressional floor or on the radio" is "of no consequence," since student speech is "treated differently than the regulation of adult speech in other public forums." (Response Br., COA

R. 70, Page ID # 41.) Defendants miss the point in three respects. First (and most obviously), *Fraser* also involved student speech, so Defendants' discussion of regulating adults' speech is a red herring. Second, Plaintiffs' argument is not that "Let's Go Brandon" is permissible in various public forums and therefore permissible in public schools. Rather, it is that these specific forums, including radio, broadcast television, and the congressional floor, enforce "strict rules of decorum" including categorical prohibitions on profanity, yet allow "Let's Go Brandon." (Opening Br., COA R. 21, Page ID # 16.) And third, Defendants ignore that Plaintiffs are simply using the Supreme Court's guideposts in *Fraser*. Defendants fail to explain why *Fraser*'s narrow exception should apply if <u>every</u> factor the Court used to distinguish *Tinker*'s anti-war armbands from *Fraser* equally distinguishes D.A.'s and X.A.'s "Let's Go Brandon" sweatshirts from *Fraser*.

## B.   The Supreme Court consistently emphasizes that political speech stands on a higher plane.

Defendants' brief fails to account for the fact that non-disruptive political speech is afforded special protection in America's public schools. It is a "prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions." *Bridges v.*

*California*, 314 U.S. 252, 270 (1941). The Constitution embodies America's "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

Defendants argue the political message of Plaintiffs' "Let's Go Brandon" sweatshirts "is of no consequence." (Response Br., COA R. 70, Page ID # 22.) The Supreme Court says otherwise. The Court's decisions in *Tinker*, *Fraser*, *Morse*, and *Mahanoy* each make clear that political speech is entitled to a higher degree of protection than non-political expression. *Mahanoy*, 594 U.S. at 190; *Morse*, 551 U.S. at 398–99, 403; *Fraser*, 478 U.S. at 680; *Tinker*, 393 U.S. at 511–13. That is because engaging in political discussions at school and learning how to resolve differences of opinion is "an important part of the educational process." *Tinker*, 393 U.S. at 512.

*Fraser* and *Morse* carefully distinguished the student expression at issue in each (a sexual student council speech in *Fraser* and a "BONG HiTS 4 JESUS" banner in *Morse*) from the political message of the

Tinkers' anti-war armbands. *Fraser*, 478 U.S. at 680; *Morse*, 551 U.S. at 403. Lack of a political message also distinguishes Defendants' primary authority, *Boroff*.  (*See* Response Br., COA R. 70, Page ID ## 21, 22, 30, 31, 33, 35–37, 43, 50, 51, 56, 57 (relying on *Boroff*).) *Boroff*, like *Fraser*, did not involve political speech. Instead, it addressed a student wearing a Marilyn Manson band T-shirt. *Boroff*, 220 F.3d at 469–70. As explained in Plaintiffs' Opening Brief, *Boroff* is no longer good law post-*Morse*. (Opening Br., COA R. 21, Page ID # 48.); *see also B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293, 316 (3d Cir. 2013) (en banc) (listing Boroff as an example of a case that "before *Morse* ... adopted th[e] broad interpretation" of *Fraser*, but is now "incompatible with the Supreme Court's teachings"). But even if it were, *Boroff* would not guide the Court's analysis in a case involving the "pure speech" of political advocacy. *Tinker*, 393 U.S. at 505.

The Court will note that Defendants' brief fails to marshal a single case permitting censorship or punishment of lewd or profane <u>political</u> speech. To be clear, Plaintiffs acknowledge that, under *Fraser*, schools can likely prohibit plainly profane apparel reading, for example, "Fuck Biden" or "Fuck Trump." But Defendants fail to address the reality that

9

the Supreme Court and lower courts have consistently and intentionally placed political student speech in a superior position to non-political expression.

### C.    Defendants seek a degree of authority over student speech expressly rejected by *Tinker*.

Faced with *Tinker*'s ironclad protection for non-disruptive political expression and *Fraser*'s inapplicability, Defendants reveal their true position on students' First Amendment rights: They shouldn't have any. Defendants dedicate an entire section of their brief to asserting *Tinker* was wrongly decided and schools should have total authority over student expression. (Response Br., COA R. 70, Page ID ## 48–51.) Defendants' position has never garnered more than a single vote. *See Tinker*, 393 U.S. at 524 (Black, J., dissenting); *Morse*, 551 U.S. at 419 (Thomas, J., concurring); *Mahanoy*, 594 U.S. at 212 (Thomas, J., dissenting). If Defendants believe *Tinker* is wrong, they can petition the Supreme Court to overturn it. But it remains binding on this Court.

Echoing and citing Justice Thomas' solo dissents, Defendants urge this Court to examine schooling at the time of the "framers" to determine the scope of D.A.'s and X.A.'s rights. (Response Br., COA R. 70, Page ID ## 48–50.) The Supreme Court has already rejected this approach

because public schools as we know them today *did not exist* at the framing. *Brown v. Bd. of Ed. of Topeka,* 347 U.S. 483, 490 (1954). The Court explained "Education of white children was largely in the hands of private groups" and "Education of negros was almost non-existent." *Id.* Therefore, there is "little in the history of the Fourteenth Amendment relating to its intended effect on public education." *Id.*

Until the late 19th century, schools exercised total control over students because parents willingly (and contractually) delegated their parental authority to another, usually a private school or tutor. *See generally Mahanoy*, 594 U.S. at 198–200 (Alito, J., concurring) (discussing the evolution of school authority over students from the Blackstone era to the present). "Today, of course, the educational picture is quite different" because school attendance is mandatory and "parents and public schools do not enter into a contractual relationship." *Id.* at 199. Critically, "when a public school regulates student speech" it does so as an "arm of the state." *Id.* at 196. Importing the *in loco parentis* principles from 19th century private schools would permit "even blatant viewpoint discrimination in schools," where "Students could be disciplined for taking any even quiet position that diverges from the

political orthodoxy of school officials." Vikram David Amar, *Morse, School Speech, and Originalism*, 42 U.C. Davis L. Rev. 637, 649 (2009). That is precisely the approach *Tinker* rejected. *Id.*

America treats its public schools as "nurseries of democracy" where the "marketplace of ideas" is free to flourish unless expression substantially disrupts the school day. *Mahanoy*, 594 U.S. at 190. Defendants disagree with *Tinker* and desire the unquestioned authority over students that private school headmasters enjoyed in the 19th century. That era is over. *Tinker* reigns, binds this Court, and protects D.A.'s and X.A.'s freedom of speech.

### D.   With *Tinker* as a backstop to prevent disruption, courts can and should narrowly interpret exceptions to students' free speech rights.

*Tinker*'s general rule ensures schools retain authority to restrict student expression which "materially and substantially interfere[s] with the requirements of appropriate discipline in the operation of the school." *Tinker*, 393 U.S. at 509. Therefore, courts can and should interpret *Tinker* exceptions narrowly because reliance on an exception means the student's expression is not meaningfully impacting the school day.

Defendants assert a need to "balance the authority of school officials' control of student conduct in their schools with the First Amendment rights of students … in light of the special characteristics of the student environment." (Response Br., COA R. 70, Page ID #16.) But the Supreme Court already struck that balance in *Tinker* by adopting the substantial disruption test. 393 U.S. at 509.

Defendants repeatedly pluck *Tinker*'s "special characteristics" language out of context, seeking to turn it into a general, standardless watering-down of students' First Amendment rights. (Response Br., COA R. 70, Page ID ## 25, 28, 29, 37, 38, 40.) It is no such thing. The immediately preceding sentence makes clear that the "special characteristic" of a school is that, unlike a public park, schools have a need to maintain a disciplined academic environment. *Tinker*, 393 U.S. at 505–06. Here again, *Tinker* accounts for that "special characteristic" with the substantial disruption test.

If a student engages in political expression and is not disrupting school, courts should construe the *Fraser* "profanity" exception narrowly and resolve doubts in favor of the student. This is so for two reasons. First, "First Amendment standards … 'must give the benefit of any doubt

13

to protecting rather than stifling speech.'" *Citizens United v. FEC*, 558 U.S. 310, 327 (2010) (quoting *FEC v. Wisc. Right to Life, Inc.*, 551 U.S. 449, 469 (2007)). And second, if expression is not causing disruption—as Defendants concede here (Opening Br., COA R. 21, Page ID # 25)—that strongly indicates classmates are able to handle it, and the "marketplace of ideas" can remain open. *Mahanoy*, 594 U.S. at 190.

Defendants argue the Court should instead "adopt[] a broad interpretation of *Fraser*" and grant "wide latitude to categorically prohibit clothing … the school determines to be inappropriate and contrary to its educational mission." (Response Br., COA R. 70, Page ID # 33.) Such an expansive interpretation of *Fraser* effectively overturns *Tinker* by permitting administrators to censor expression not based on objective criteria like disruption or actual profanity, but on each school's subjective view of its "educational mission." Defendants' approach would grant school administrators authority akin to 19th century private school headmasters, each of whom no doubt believed *their* censorship was necessary to the school's "educational mission." That is not the law. *See, e.g.*, *Morse*, 551 U.S. at 409 (rejecting school's argument that *Fraser*

14

allows schools to subjectively deem speech "offensive," explaining that approach "stretches *Fraser* too far").

Public schools "have, of course, important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights." *W. Va. St. Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943). If a student's political expression is not disruptive, the government must meet a high bar to justify censorship. America's commitment to freedom of speech demands no less.

## II. It is Not "Reasonable" to Equate Sanitized Euphemism with Explicit Profanity.

Despite relying on *Fraser*'s "profanity" exception to censor D.A.'s and X.A.'s expression, Defendants still do not supply an explanation for *why* "Let's Go Brandon" is supposedly "profane." They just repeatedly insist it is because it "means 'fuck Joe Biden.'" (Response Br., COA R. 70, Page ID ## 11, 15, 16, 18, 19, 21–23, 27, 33, 38, 50, 51, 53 n.2, 55–57 (asserting this position without facts or further explanation).)

A substitute phrase which "means" another is the very definition of sanitized expression. Euphemism, by design, alters an original phrase for the purpose of making it suitable for all audiences. (Opening Br., COA R. 21, Page ID ## 38–39.) Defendants point to *nothing*: no cases, no scholars,

no agency opinions, nor anything else categorizing euphemisms as profanity. They accordingly fail to carry their burden to provide the Court a foundation for deeming sanitized euphemisms profane. *Tinker*, 393 U.S. at 509.

Allowing schools to equate sanitized euphemisms with their uncensored corollaries leads to absurd results. Phrases like "heck," "gosh darn," "fudge," and "shoot" would be censorable in America's schools because they "mean" something else. Not even the Victorians were so skittish. (*See* Amicus Brief of Linguistic Scholars in Support of Appellants, COA R. 43, Page ID ## 20–21.)

Consider the classic "Miss Susie Had a Steamboat" jump rope song:

> Miss Susie had a steamboat,
> The steamboat had a bell,
> Miss Susie went to heaven,
> The steamboat went to…
>
> Hello Operator,
> Please dial Number 9,
> And if you disconnect me,
> I'll kick you from…
>
> Behind the refrigerator,
> There lay a piece of glass,
> Miss Susie sat upon it,
> And cut her little…
>
> Ask me no more questions,

> Tell me no more lies,
> The boys are in the bathroom,
> Pulling down their…
>
> Flies are in the backyard,
> The bees are in the park,
> Miss Susie and her boyfriend
> Are kissing in the dark, dark, dark.

PS Quick, *100 Playground Games for Children*, 51–52 (2014).

This children's rhyme has been a mainstay across American playgrounds for generations.[1] It is ubiquitous across children's websites.[2] But if Defendants' position were correct and euphemistic proximity to profanity were sufficient to trigger *Fraser*, American *high schools*, in the year 2025, would be able to censor "Miss Susie Had a Steamboat." If sanitized euphemisms have a place in our nursery schools, they certainly have a place in our "nurseries of democracy." *Mahanoy*, 594 U.S. at 190.

Schools understand how sanitization works because they use it, too. Classic novels, like *Huckleberry Finn* and *Of Mice and Men* are

---

[1] *See, e.g.*, Jessie Henninger, "Miss Susie Had a Steamboat: II. Evolution," *The Raveled Sleeve* (Nov. 2008).

[2] *See, e.g.*, NurseryRhymes.org, "Miss Susie Had a Steamboat (Hello Operator)," available at https://www.nurseryrhymes.org/miss-susie-had-a-steamboat-hello-operator.html.

occasionally sanitized to replace racial slurs and profanity.[3] And modified drama performances of *Romeo and Juliet* and *Macbeth* omitting profanity are commonplace across middle and high school theatres.[4] Students still know what the speakers and characters "mean," but the profanity is sanitized. So too for "Let's Go Brandon."

During this litigation, Defendants justified their censorship of "Let's Go Brandon" by calling it "pornographic." (*See, e.g.*, Buikema Resp. to Pls.' Interrog. Nos. 1 and 3, RE 39-26, Page ID # 700.) First, that is not what that word means. Second, *Fraser*'s exception for "plainly" profane speech does not come with a carveout letting schools redefine "profane" as whatever phrases a school administrator finds unsettling. *Fraser*, 478 U.S. at 683; *see also id.* at 690 (warning of the dangers to free expression of a "prudish failure[] to distinguish the vigorous from the vulgar") (Brennan, J., concurring) (quotation omitted).

---

[3] Marjorie Heins, *Not in Front of the Children: "Indecency," Censorship, and the Innocence of Youth* (2001).

[4] Liz H. Conant, *Putting Shakespeare on the High School Stage*, University of Central Missouri ProQuest Dissertations & Theses (Dec. 2011).

Allowing schools to censor sanitized expression will inhibit political discussion, just as it does here. In Defendants' view, schools could punish Michigan teenagers for wearing "Fix the Darn Roads" shirts because it "means" Governor Whitmer's "Fix the Damn Roads" slogan. That is no way to prepare America's teenagers for the "hazardous freedom" of living in our "relatively permissive, often disputatious, society." *Tinker*, 393 U.S. at 508–09.

## III. The Third Circuit's Framework in *B.H.* Provides the Appropriate Test for "Ambiguously" Profane Speech.

Even though the "Let's Go Brandon" political slogan is not "profanity" under any legal, historical, or common-sense standard, to the extent the Court believes it is even ambiguously profane—the en banc Third Circuit's *B.H.* framework still renders it protected speech. *B.H.*, 725 F.3d at 319–20.

Under the Third Circuit's approach, "plainly" profane speech like curse words "may be categorically restricted regardless of whether it comments on political or social issues." *Id.* at 298. But *ambiguously* profane speech—speech that "a reasonable observer could interpret" as profane, while not plainly so—"may not be categorically restricted" if it comments on a matter of political or social concern. *Id.* This framework

19

not only ensures schools retain authority under *Fraser* to prohibit explicit profanity, it also honors the letter and spirit of *Tinker* by ensuring non-explicit political speech "is not suppressed by prudish failures to distinguish the vigorous from the vulgar." *Fraser*, 478 U.S. at 690 (Brennan, J., concurring) (internal quotation omitted).

Defendants nonetheless insist this Court should reject the Third Circuit's framework for two reasons: They claim the Third Circuit's approach relies on Justice Alito's concurrence in *Morse* being the controlling opinion, and they argue Justice Alito's concurrence does not control. (Response Br., COA R. 70, Page ID # 43.) They are mistaken on both fronts. Defendants also argue *Boroff* requires this Court to split from the Third Circuit. It does not, because *B.H.* simply applies *Morse*, which *Boroff* pre-dates. And Defendants' final argument that *Fraser* secretly overruled *Tinker* and granted limitless discretion to school districts similarly fails. No court, anywhere, has accepted it.[5]

_____

[5] This Court need not decide whether Justice Alito's *Morse* concurrence is controlling or whether to adopt the Third Circuit's test if, as Plaintiffs argue in Section II (and *six amici* briefs urge this Court to hold), the "Let's Go Brandon" political slogan is standard, non-profane euphemism.

### A.    The Third Circuit's framework is a straightforward application of *Tinker*, *Morse*, and *Fraser*.

The Third Circuit's approach in *B.H.* for assessing restrictions on ambiguously profane student expression—which places political speech in a preferred position while still restricting explicit profanity—is supported by the Supreme Court's majority opinions in *Tinker*, *Fraser*, and *Morse*. The Court in *Fraser* and *Morse* carefully distinguished the non-political speech at issue in those cases from the political message of the anti-war armbands in *Tinker*. *See Fraser*, 478 U.S. at 680; *Morse*, 551 U.S. at 398–404.

The *Morse* majority also rejected arguments mirroring those asserted by Defendants. Here, Defendants advocate for "a broad interpretation of *Fraser*" that "provides school districts with wide latitude to categorically prohibit clothing" that is "offensive … and contrary to [the school's] educational mission." (Response Br., COA R. 70, Page ID # 33.) In *Morse*, the Court expressly rejected "the broader rule that [the student's] speech is proscribable because it is plainly 'offensive.'" *Morse*, 551 U.S. at 409. The Court explained this interpretation "stretches *Fraser* too far" because it might "be read to encompass" things like "political and religious speech." *Id*. In short, the

*Morse* majority expressly declined to adopt an expansive reading of *Fraser* because it risked doing what Defendants advocate here. *Id.*

So even before Justice Alito's *Morse* concurrence comes into play, the Third Circuit's *B.H.* framework accurately reflects and faithfully applies *Tinker*, *Fraser*, and *Morse*.

### B.    Justice Alito's *Morse* concurrence is controlling and further reinforces the Third Circuit's approach.

Justice Alito's concurrence in *Morse*, however, is the controlling opinion, as this Court, and every Circuit except one, has repeatedly held. And most notably for present purposes, it makes plain *Fraser*'s inapplicability to ambiguously profane political speech. Defendants' argument that Justice Alito's *Morse* concurrence is not controlling should be rejected because it would mean: (1) ignoring this Court's prior opinions holding the opposite, (2) worsening a circuit split with this Court joining a lone holdout, and (3) *creating* a circuit split with the Third Circuit on the proper test for "ambiguously" profane and lewd student speech.

The first barrier to Defendants' argument that Justice Alito's concurrence does not control is that this Court said otherwise in *Barr* and *DeFoe. Barr v. Lafon,* 538 F.3d 554, 564 (6th Cir. 2008) (treating "Justice Alito's concurrence" as the basis for *Morse*'s "narrow" holding); *Defoe ex*

*rel. Defoe v. Spiva*, 625 F.3d 324, 332–33, 333 n.5 (6th Cir. 2010) (same). It was right to do so. Justices Alito's and Kennedy's votes were necessary to comprise a majority in *Morse*. And their joining the majority was expressly conditioned on their "understanding that … [the majority opinion] provides no support for any restriction of speech that can plausibly be interpreted as commenting on any political or social issue." *Morse*, 551 U.S. at 422 (Alito, J., concurring). That is why every circuit to address the question except one has determined his *Morse* concurrence controls. (*See* Opening Br., COA R. 21, Page ID ## 61–62 (collecting cases).)

Defendants argue neither *Barr* nor *Defoe* support the view that Justice Alito's concurrence controls. (Response Br., COA R. 70, Page ID # 45.) Yet they concede *Barr* and *Defoe* "cite to Justice Alito's concurring opinion to illustrate the narrowness of the Supreme Court's holding." (*Id*.) That is precisely what those decisions do—which makes sense only if Justice Alito's concurrence *narrows the majority's holding*. Defendants' argument proves Plaintiffs' point.

Justice Alito's controlling, "narrowing" *Morse* opinion makes explicit what the majority opinion already illustrates: The decision

23

"provides no support for any restriction of speech that can plausibly be interpreted as commenting on any political or social issue." 551 U.S. at 422. Contrary to Defendants' argument, the Third Circuit's framework in *B.H.* naturally follows from *Fraser* and *Morse*, whether the *Morse* majority opinion or Justice Alito's controlling concurrence. The Court should decline Defendants' invitation to hold otherwise.

### C.    *Boroff* is inapposite and was overruled by *Morse*.

Defendants cannot rely on this Court's decision in *Boroff* to support rejection of the Third Circuit's framework. They claim "the Third Circuit's interpretation of *Fraser* [in *B.H.*] differs from this Court's interpretation of *Fraser* [in *Boroff*]" and repeat that drumbeat throughout their brief. (Response Br., COA R. 70, Page ID # 43.) But *Boroff* is inapplicable on its own terms because it did not involve political speech. And all *B.H.* did is apply *Morse*, a case decided seven years after this Court decided *Boroff*. As other courts have held, *Morse* rendered *Boroff* a dead letter. (Opening Br., COA R. 21, Page ID ## 47–48, 48 n.18 (collecting cases).)

First, *Boroff* involved the non-political speech of a Marilyn Manson band T-shirt interpreted as advocating the use of illegal drugs. *Boroff*,

220 F.3d at 466; *Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 877 (7th Cir. 2011) (describing *Boroff*). So this Court would have had no need to apply *B.H.*'s framework because *Boroff* did not involve ambiguous *political* speech and involved advocacy of drug use.

Second, *Boroff* premised its holding on a supposed "educational mission" exception to student speech rights, which *Morse* rejected seven years later. *Boroff*, 220 F.3d at 468–71; *Morse*, 551 U.S. at 423 (Alito, J., concurring); (*see also* Opening Br., COA R. 21, Page ID # 48). As Justice Alito's controlling concurrence explained: "The opinion of the Court does not endorse the broad argument … that the First Amendment permits public school officials to censor any student speech that interferes with a school's 'educational mission.'" *Morse*, 551 U.S. at 423. Justice Alito further explained that argument "would give public school authorities a license to suppress speech on political and social issues" and "therefore, strikes at the very heart of the First Amendment." *Id.*

In any event, Defendants do not explain *how* a "Let's Go Brandon" sweatshirt is contrary to its "educational mission." Instead, their argument appears to boil down to, "We think 'Let's Go Brandon' is profane, and, since profanity runs against our educational mission, we

can ban it." Defendants' argument is circular and, if accepted, would eviscerate *Tinker* and the Supreme Court's carefully cabined exceptions. The scope of each exception would turn, not on the Supreme Court's holdings, but on each school district's asserted "educational mission." Students' constitutional rights do not, and must not, depend on which public school district they live in.

### D. Judges, not individual teachers and administrators, decide whether the First Amendment protects students' non-disruptive political expression.

Defendants' final misstep in resisting the Third Circuit's approach to ambiguously profane political speech is their attempt to turn *Fraser*'s aside that "determination of what manner of speech is inappropriate properly rests with the school board" into a total surrender of courts' authority to determine what expression the First Amendment protects. (Response Br., COA R. 70, Page ID ## 42, 49, 51 (quoting *Fraser*, 478 U.S. at 683).) In Defendants' view, once a school district *says* a student's speech is inappropriate, that makes it so, and courts are prohibited from questioning the school district's judgment. No court, anywhere, has interpreted *Fraser* that way.

To start, Defendants' approach would necessarily contradict *Tinker*, where the Des Moines School District insisted wearing anti-war armbands was inappropriate for a school setting. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 258 F. Supp. 971, 972 (S.D. Iowa 1966). It would also defy *Fraser*, because *Fraser* carefully applied *Tinker*; distinguished it based on the political message and lack of sexual content; then, rather than simply deferring to the school board, conducted *its own* analysis of whether First Amendment principles allowed a school to punish Fraser's speech. 478 U.S. at 682–86.

The Supreme Court conducted its own analyses in *Tinker*, *Hazelwood*, and *Morse*. In each, it independently examined the expression and weighed the reasonableness of the schools' censorship against the student's free speech rights. In *Tinker*, it noted "the record does not demonstrate any facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities, and no disturbances or disorders on the school premises in fact occurred." 393 U.S. at 514. In *Hazelwood*, it examined whether "members of the public might reasonably perceive" the students' newspaper "to bear the imprimatur of the school." *Hazelwood Sch. Dist.*

*v. Kuhlmeier*, 484 U.S. 260, 271 (1988). And in *Morse*, it assessed record evidence to determine whether it was "reasonable" for school officials to interpret a "BONG HiTS 4 JESUS" sign as "promoting illegal drug use." 551 U.S. at 401–02.

The blind deference to school administrator judgment Defendants promote is nowhere to be found. That is because the duty to determine, for example, whether a student's speech is "profane" sufficient to lose First Amendment protection, belongs to the courts. *See, e.g.*, *B.H.*, 725 F.3d at 308 ("It remains the job of judges … to determine whether a reasonable observer could interpret student speech" as plainly lewd or profane.) As Dean Erwin Chemerinsky explained, "it is not for a court to accept the claims of school officials about the need to stop the speech. The court must independently review the facts and determine whether there is sufficient evidence" to intrude on students' free speech rights. Erwin Chemerinsky, *Teaching That Speech Matters: A Framework for Analyzing Speech Issues in Schools*, 42 U.C. Davis L. Rev. 825, 839 (2009).

This Court, too, independently evaluates the reasonableness of a school's speech prohibition. *See, e.g.*, *Defoe*, 625 F.3d at 334 (analyzing

whether school provided sufficient support for its assertion it reasonably forecast substantial disruption under *Tinker*); *Barr*, 538 F.3d at 566 (same); *Lowery v. Euverard*, 497 F.3d 584, 593 (6th Cir. 2007) (same); *Castorina ex rel. Rewt v. Madison Cnty. Sch. Bd.*, 246 F.3d 536, 541 (6th Cir. 2001) (same); *M.A.L. ex rel. M.L. v. Kinsland*, 543 F.3d 841, 847 (6th Cir. 2008) (analyzing whether school's ban on hallway leafletting was "reasonable"). As the Supreme Court's and this Court's precedent demonstrate, a public school's subjective belief in the righteousness of its censorship does not dictate whether student expression receives First Amendment protection.

## IV. Defendants Misstate the Relevant Constitutional Question for Qualified Immunity.

This Court should reject the individual Defendants' effort to claim qualified immunity. *Tinker* clearly established D.A.'s and X.A.'s First Amendment right to engage in the "silent, passive expression of opinion" of wearing political apparel, 393 U.S. at 508, and the Supreme Court has repeatedly reaffirmed that right. *See, e.g.*, *Mahanoy*, 594 U.S. at 187; *Morse*, 551 U.S. at 403; *Hazelwood*, 484 U.S. at 271; *Fraser*, 478 U.S. at 680. Nothing in the subsequent five decades of First Amendment precedent has changed that.

Defendants attempt to reframe the issue as "whether a school official can ask a student to remove a sweatshirt with a message that the school official interpreted as profane and not school appropriate." (Response Br., COA R. 70, Page ID # 55.) But that does little to help their cause. School officials may not categorically ban political speech because they subjectively deem it profane—if the speech is not, in fact, profane. *Fraser*, 478 U.S. at 680.

Defendants' approach misses that qualified immunity is an objective test, turning on whether a constitutional right is "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Holzemer v. City of Memphis*, 621 F.3d 512, 527 (6th Cir. 2010) (citation omitted). Instead, Defendants try to turn it into a subjective test by asserting they "interpreted" "Let's Go Brandon" as profane and thus enjoy qualified immunity. That is not the law.

Moreover, Defendants still fail to explain how a "reasonable" official could deem a sanitized euphemism like "heck," "darn," or "Let's Go Brandon" profane. Six sets of *amici*, including a group of renowned linguistic scholars, submitted briefs supporting D.A. and X.A.'s position. (*Amicus* Brief of Linguistic Scholars, COA R. 43, Page ID ## 11–18, 27–

30

36; *Amicus* Brief of First Amendment Scholars, COA R. 45, Page ID ##

10–12, 20–24, 29–31; *Amicus* Brief of the Liberty Justice Center, COA R.

42, Page ID # 19; *Amicus* Brief of National Coalition Against Censorship,

COA R. 48, Page ID ## 11, 19–25, 32–37; *Amicus* Brief of Parents

Defending Education, COA R. 51, Page ID ## 7, 11, 13–18; *Amicus* Brief

of the Buckeye Institute, COA R. 31, Page ID ## 8–22.) But Defendants

offer no competing explanation of "profanity" and no examples of anyone,

anywhere, deeming euphemisms profane. Defendants provide nothing

upon which the Court can base a holding that a "reasonable" official

would deem "Let's Go Brandon" profane.

## V.    D.A. and X.A. "Waived" Nothing.

Defendants make a series of unfounded "waiver" arguments at the

close of their Response that the Court should reject.[6] Defendants assert

D.A. and X.A. "abandoned and waived" their *Monell* claim on appeal by

failing to analyze it in their brief.  (Response Br., COA R. 70, Page ID #

57.) Not so. *Monell* involves a factual inquiry, and the district court never

---

[6] Not least of all because Defendants appear to have confused "waiver" and "forfeiture." *See Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019) (clarifying the difference between "waiver," which is "affirmative and intentional," and "forfeiture," which is "a more passive failure to make the timely assertion of a right" (cleaned up).)

analyzed the facts supporting *Monell* liability because it erroneously found no constitutional violation. (Opinion and Order, RE 58, Page ID # 940.) Thus, there is no *Monell* holding for this Court to review. This is not a factfinding court and, as explained in Plaintiffs' opening brief, the proper avenue is for this Court to address the legal questions raised by the district court's dismissal and leave the resulting factual questions to the district court to consider in the first instance on remand. (*See* Opening Br., COA R. 21, Page ID # 68 n.19.)

Second, Defendants argue D.A. and X.A. "waived" their claims for injunctive and declaratory relief. (Response Br., COA R. 70, Page ID # 58.) We're befuddled. The district court dismissed Plaintiffs' equitable claim (claim III) by holding the political slogan "Let's Go Brandon" is not protected student expression. (Opinion and Order, RE 58, Page ID # 963.) Plaintiffs appealed that dismissal as well as the district court's denial of Plaintiffs' summary judgment motion on their own claims. (Notice of Appeal, RE 59, Page ID # 970.) With that holding reversed and summary judgment granted in Plaintiffs' favor, Plaintiffs prevail on the claim.

Defendants' argument that D.A. and X.A. "conceded" the "categorical clothing ban … did not exist" misunderstands how

constitutional challenges work. (Response Br., COA R. 70, Page ID ## 20, 58.) Plaintiffs merely acknowledged Defendants' prohibition of "Let's Go Brandon" apparel is not *written*—which does not matter. (Opinion and Order, RE 58, Page ID # 952.) The school in *Tinker* did not have a written ban on black armbands; *B.H.* did not have a written ban on "I ♥ Boobies" breast cancer awareness bracelets; and this Court's decision in *Boroff* did not involve a written ban on Marilyn Manson T-shirts. *See Tinker*, 393 U.S. 503; *B.H.*, 725 F.3d 293; *Boroff*, 220 F.3d 465. Rather, each school, like Defendants here, purported to enforce school rules to ban the apparel and students argued the prohibition violated their First Amendment rights. In this case, each summary judgment brief in the district court and every brief in this Court has revolved around whether the First Amendment protects "Let's Go Brandon" apparel in school. Any suggestion that this issue—the *sole issue* the parties have spent hundreds of pages briefing—is not properly before the Court is absurd.

## CONCLUSION

D.A. and X.A. respectfully request this Court reverse the district court's order denying their motion for summary judgment and granting Defendants' motion for summary judgment.

Dated: April 9, 2025

/s/ Conor T. Fitzpatrick

CONOR T. FITZPATRICK
   *Counsel of Record*
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, D.C. 20003
(215) 717-3473
conor.fitzpatrick@thefire.org

SARA E. BERINHOUT
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
510 Walnut St., Ste. 900
Philadelphia, PA 19106
(215) 717-3473
sara.berinhout@thefire.org

*Counsel for Appellants*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7) because, excluding the parts of the document exempted by the Fed. R. App. P. 32(f): this document contains 6,469 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

Dated: April 9, 2025

/s/ Conor T. Fitzpatrick
Conor T. Fitzpatrick
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 9, 2025, an electronic copy of Appellants' Reply Brief was filed with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF system. The undersigned also certifies all parties in this case are represented by counsel who are registered CM/ECF users and that service of the brief will be accomplished by the CM/ECF system.

Dated: April 9, 2025

/s/ Conor T. Fitzpatrick
Conor T. Fitzpatrick
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION