No. 24-1769

$\blacklozenge$

## IN THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

$\blacklozenge$

B.A., mother of minors D.A. and X.A., et al.,
*Plaintiffs-Appellants*,

v.

TRI COUNTY AREA SCHOOLS, et al.,
*Defendants-Appellees.*

$\blacklozenge$

On Appeal from the United States District Court
for the Western District of Michigan

$\blacklozenge$

## AMICUS CURIAE BRIEF OF THE BUCKEYE INSTITUTE IN SUPPORT OF PLAINTIFFS-APPELLANTS

$\blacklozenge$

David C. Tryon
  *Counsel of Record*
Alex M. Certo
J. Simon Peter Mizner
THE BUCKEYE INSTITUTE
88 East Broad Street, Suite 1300
Columbus, Ohio 43215
(614) 224-4422
D.Tryon@BuckeyeInstitute.org

*Attorneys for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 29 and 26.1 of the Federal Rules of Appellate Procedure, amicus states that it has no parent corporation and issues no stock, thus, no publicly held corporation owns more than ten percent of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................... i

TABLE OF AUTHORITIES ................................................................ iii

INTEREST OF AMICUS CURIAE ....................................................... 1

SUMMARY OF THE ARGUMENTS .................................................... 1

ARGUMENTS ................................................................................. 4

I.   En banc review is appropriate because this case created a Sixth Circuit "precedent-setting error of exceptional public importance" ...................................................................... 4

II.   Students cannot be punished for using profane language when their language is not profane .................................................. 8

    A. The school cannot sensor "Let's go Brandon" because it is not a lewd substitute ............................................................... 10

    B. "Let's go Brandon" is protected because the Supreme Court has acknowledged that student political speech deserves greater protection than non-political speech ........................... 11

III.  Appellants' conduct does not violate the Tinker standard because their shirts did not cause a disruption ........................................ 12

CONCLUSION ............................................................................... 13

# TABLE OF AUTHORITIES

## Cases

*Ambach v. Norwick,*
441 U.S. 68 (1979) ...................................................................................10

*B. A. v. Tri Cnty. Area Sch.,*
No. 24-1769, 2025 WL 2911071 (6th Cir. Oct. 14, 2025) ...............3, 4, 5

*B.H. ex rel. Hawk v. Easton Area School District,*
725 F.3d 293 (3d Cir. 2013) .................................................................. 5

*Bethel Sch. Dist. No. 403 v. Fraser,*
478 U.S. 675 (1986) ......................................................................4, 10, 13

*Connick v. Myers,* 461 U.S. 138 (1983) ................................................... 4

*Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.,*
No. 23-3630, 2025 WL 3102072 (6th Cir. Nov. 6, 2025) .............2, 4, 11

*In re MCP No. 165, Occupational Safety and Health
Administration, Interim Final Rule: COVID-19 Vaccination and
Testing,* 20 F.4th 264 (6th Cir. 2021) .................................................... 6

*Mahanoy Area Sch. Dist. v. B. L. by and through Levy,*
594 U.S. 180 (2021) ........................................................3, 7, 8, 11, 12

*Saxe v. State Coll. Area Sch. Dist.,*
240 F.3d 200 (3d Cir. 2001) ..................................................................12

*Snyder v. Phelps,*
562 U.S. 443 (2011) ...............................................................................11

*Tinker v. Des Moines Indep. Community Sch. Dist.,*
393 U.S. 503 (1969) .........................................................4, 7, 8, 12, 13

## Other Authorities

Colleen Long, *How 'Let's Go Brandon' became code for insulting
Joe Biden,* Associated Press (Oct. 30, 2021) ........................................11

Mark J. Perry, *English Has the Richest Vocabulary*, AEI (Oct. 18, 2006).............................................................................................. 2

*Profanity*, *Black's Law Dictionary* (12th ed. 2024)................................... 9

**Rules**

6 Cir. I.O.P. 35(a) ..................................................................................... 4

Fed. R. App. P. 35 ...................................................................................... 2

## INTEREST OF AMICUS CURIAE[1]

The Buckeye Institute was founded in 1989 as an independent research and educational institution—a think tank—to formulate and promote free-market policy in the states. The Buckeye Institute accomplishes its mission by performing timely and reliable research on key issues, compiling and synthesizing data, formulating free-market policies, and marketing those policy solutions for implementation in Ohio and replication across the country. The Buckeye Institute also files lawsuits and submits amicus briefs to fulfill its mission. The Buckeye Institute is a nonpartisan, nonprofit, tax-exempt organization, as defined by I.R.C. Section 501(c)(3).

## SUMMARY OF THE ARGUMENTS

School administrators' excessive restrictions on student speech infringes on the students' First Amendment rights. Should schoolteachers, principals, or even school boards be the arbiters of what speech is allowed and what is not based on what any one of them might think is "reasonable"? The panel majority says "yes." The dissent—rooted

---

[1] No counsel for any party has authored this brief in whole or in part and no person other than the amicus has made any monetary contribution to this brief's preparation or submission.

in Supreme Court precedent—would give those administrators clearer guidance with more protection to student speech.

The Court should rehear this case en banc because those are "question[s] of exceptional importance." Fed. R. App. P. 35. This Court recently resolved another school speech case en banc, *Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, No. 23-3630, 2025 WL 3102072 (6th Cir. Nov. 6, 2025), demonstrating its view that school speech cases are exceptionally important. That case involved coercing student speech—forced pronoun usage. This case is at least as important, as the panel's holding chills students' political speech.

This case exemplifies how the English language has a rich vocabulary that continues to expand. Mark J. Perry**,** *English Has the Richest Vocabulary*, AEI (Oct. 18, 2006).[2] The words speakers choose convey emotion, tone, setting, and other details that uniquely characterize the communication and message. Speakers can express concepts with different words, taking different audiences into consideration. Some people express concepts with impolite—or even profane—words or phrases, while others express the same concepts with (more) polite words

---

[2] https://www.aei.org/carpe-diem/english-has-the-richest-vocabulary/.

or phrases to avoid giving offense. In this case, the panel majority judged the words on a shirt as though the speakers said something else, not what they actually "said."

Like many phrases or political slogans, "Let's go Brandon" has taken on a life of its own. It is universally understood as representing dissatisfaction and discontent with President Biden and his administration. *See B. A. v. Tri Cnty. Area Sch.*, No. 24-1769, 2025 WL 2911071, at *1 (6th Cir. Oct. 14, 2025) (discussing meaning and Appellants' understanding).

The Supreme Court has held that schools can regulate student speech that is indecent, lewd, or vulgar when said at a school assembly, when student speech promotes illegal drug use, or when it may appear to be the speech of the school itself. *Mahanoy Area Sch. Dist. v. B. L. by and through Levy*, 594 U.S. 180, 187–88 (2021). But these are exceptions to the rule that schools cannot regulate non-disruptive speech. Even taking these exceptions to their maximum logical boundaries, "Let's go Brandon" does not fall into any recognized prohibition. Punishing speech for any reason that does not fall within one of the Supreme Court's approved exceptions is unacceptable.

## ARGUMENTS

### I. En banc review is appropriate because this case created a Sixth Circuit "precedent-setting error of exceptional public importance."

Speech on matters of public concern "occupies the highest rung of the hierarchy of First Amendment values and so receives special protection from the courts." *Defending Educ.*, 2025 WL 3102072, at *12 (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)). This case sits atop that highest rung. Its result impacts students' First Amendment rights and determines when and where school administrators get to set the limit on those rights. This creates a "precedent-setting error of exceptional public importance" that requires en banc correction. 6 Cir. I.O.P. 35(a).

First, this case sets a precedent within the circuit regarding protected student political speech. The majority's reasoning is largely based on *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986). But this case is more like *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503 (1969). After all, "[f]or a young person, wearing apparel with a political message can be the first point of entry to civic engagement." *B. A.*, 2025 WL 2911071, at *10   (Bush, J., dissenting). Treating the Appellants' speech more like a lewd high schooler's joke than an armband's passive message creates a convoluted precedent for the Sixth

Circuit that can only be corrected by two bodies—the en banc court and the Supreme Court.

Second, this decision creates a circuit split with the First, Second, Third, and Tenth Circuits, at least. *See, e.g., id.* at *15–16, *21 (Bush, J., dissenting). As Judge Bush's dissent points out, the Third Circuit "reinforces why *Fraser* must be read narrowly, and why *Tinker* governs here." *Id.* at *21 (Bush, J., dissenting) (citing *B.H. ex rel. Hawk v. Easton Area School District*, 725 F.3d 293 (3d Cir. 2013) (en banc)).

Consistent with Supreme Court precedent, under the Third Circuit's approach,

> (1) schools may categorically restrict plainly lewd speech, regardless of message; (2) they may restrict ambiguously lewd speech unless it plausibly comments on political or social issues; but (3) schools may not categorically restrict speech that is not plainly lewd and that could be seen as political or social commentary.

*Id.* (Bush, J., dissenting) (citing *B.H.*, 725 F.3d at 301). The Sixth Circuit should adopt this test too. It draws a clearer line between what student speech the First Amendment protects and what speech it does not protect.

Third, this is likely the end of the line for this case. The number of cases the Supreme Court takes up is miniscule. Despite this case's

importance, the Court is statistically unlikely to grant certiorari. That means it is up to the en banc court to properly adjudicate Sixth Circuit cases.

The Supreme Court cannot possibly correct every circuit court's legal errors. There are far too many cases at the courts of appeals. Rather, each circuit must recognize that it is the guardian of the law within that circuit. It is imperative that this circuit protect the constitutional rights of those over whom it has jurisdiction without waiting for the Supreme Court to intervene. And while "the existence of the en banc motion gives [ ] judges . . . the option to offer their perspectives . . ., in opinions concurring in the denial of initial hearing en banc or dissenting from it," a full opinion is even better—it sets precedent. *See In re MCP No. 165, Occupational Safety and Health Administration, Interim Final Rule: COVID-19 Vaccination and Testing*, 20 F.4th 264, 271 (6th Cir. 2021) (Sutton, C.J., dissenting from the denial of initial hearing en banc). En banc review can expedite the resolution of the questions presented and get the correct answer.

Fourth, this case is critically important to the millions of students throughout the Sixth Circuit. The importance of their First Amendment

rights cannot be overstated. Unfortunately, teachers, administrators, and school boards—not unreasonably—tend to prefer control over freedom out of "fear of a disturbance" in the classroom. *See, e.g., Tinker*, 393 U.S. at 508. But that does not excuse illegal censorship. "America's public schools are the nurseries of democracy. Our representative democracy only works if we protect the marketplace of ideas." *Mahanoy Area Sch. Dist.*, 594 U.S. at 190.

Schools are *supposed* to teach students how to be responsible, civically engaged citizens. Stifling speech, especially political speech, curbs human growth and flourishing. And doing so on the grounds of any particular administrator's subjective, and wrong, interpretation is all the worse. Under the panel's majority opinion, any principal, teacher, or other administrator would have near carte blanche authority to sanction speech they do not like and "reasonably interpret" to violate school rules. The panel's grant of authority takes the Supreme Court's precedent too far.

Thus, this Court should grant en banc review to clarify that where actual profanity is absent, the disruption test laid out in *Tinker* is the standard. The school fails to meet that standard here.

## II. Students cannot be punished for using profane language when their language is not profane.

Regulating speech under the First Amendment should constitute a rare exception. In the context of this case, certain words or phrases are so profane or vulgar that the government does not allow them in school, or in radio or TV broadcasts for that matter. But schools cannot prohibit non-profane words conveying the same message. Polite society avoids, and schools can prohibit, certain words but generally not the sentiment behind the words.

In *Mahanoy Area Sch. Dist.*, the Supreme Court explicitly set out the "categories of student speech that schools may regulate in certain circumstances." 594 U.S. at 187. Those categories are:

> (1) "indecent," "lewd," or "vulgar" speech uttered during a school assembly on school grounds; (2) speech, uttered during a class trip, that promotes "illegal drug use,"; and (3) speech that others may reasonably perceive as "bear[ing] the imprimatur of the school," such as that appearing in a school-sponsored newspaper.

*Id.* at 187–88 (citations omitted). Further, *Tinker* upheld a school's decision to discipline a student for actions that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *Id.* at 188 (quoting *Tinker*, 393 U.S. at 513).

For the students in this case, the vulgarity and profanity exceptions are the only ones remotely applicable—but even they fail. The panel majority mischaracterized the profanity exception to allow the school to ban language that has a "profane meaning." The panel explained that "a euphemism is not the same as the explicitly vulgar or profane word it replaces. 'Heck' is not literally the same word as 'Hell.' But the word's communicative content is the same even if the speaker takes some steps to obscure the offensive word." *B. A.*, 2025 WL 2911071, at *3, *5.

Profanity includes "obscene, vulgar, or insulting language." *Profanity*, *Black's Law Dictionary* (12th ed. 2024). But the panel majority's expansion of "profanity" would include virtually all "clean" substitutes for profanity including heck, darn, shoot, or even butt. This "meaning" test relies on school administrators' subjective interpretation rather than linguistic meaning. Regardless, the assistant principal's interpretation in this case was wrong because it ignored the greater political movement that propelled "Let's go Brandon." School administrators do not have the latitude to ban all interjections that the school might "reasonably interpret" as having a profane meaning.

### A. The school cannot sensor "Let's go Brandon" because it is not a lewd substitute.

In *Fraser*, the Court affirmed the school's punishment because Mr. Fraser's conduct "undermine[d] the school's basic educational mission. A high school assembly or classroom is no place for a sexually explicit monologue directed towards an unsuspecting audience of teenage students." *Fraser*, 478 U.S. at 685. The overall speech was "offensively lewd and indecent." *Id.*

That is not the case here. Rather, Appellants' use of euphemism was to convey a political opinion—not make a sexual pass at President Biden. Generally, public schools' educational missions include the inculcation of "fundamental values necessary to the maintenance of a democratic political system." *Id.* at 681 (quoting *Ambach v. Norwick*, 441 U.S. 68, 76–77 (1979)). Wearing a "Let's go Brandon" shirt does not undermine that mission.

### B. "Let's go Brandon" is protected because the Supreme Court has acknowledged that student political speech deserves greater protection than non-political speech.

"Let's go Brandon" is political speech. *See* Appellants' Pet. at 3; *See also* Colleen Long, *How 'Let's Go Brandon' became code for insulting Joe Biden*, Associated Press (Oct. 30, 2021).[3] Appellants and politicians alike have used the phrase to express anger or dissatisfaction—not a sexual act. Here, the students expressed their political message in a manner appropriate in a school setting.

Indeed, "there is a category of speech that is almost always beyond the regulatory authority of a public school." *Mahanoy Area Sch. Dist.*, 594 U.S. at 205. Speech "that addresses matters of public concern, including sensitive subjects like politics, religion, and social relations . . . lies at the heart of the First Amendment's protection." *Id.*; *see also Defending Educ.*, 2025 WL 3102072, at *12 (explaining that "[e]xpression about matters of public concern . . . falls at the heart of the First Amendment's protections" (quoting *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011)).

Every day, people choose to express themselves by using clean(er) language instead of swear words. Appellants' shirt choice conveyed a

---

[3] https://apnews.com/article/lets-go-brandon-what-does-it-mean-republicans-joe-biden-ab13db212067928455a3dba07756a160.

political message without using profanity and fits squarely within the Court's "category of speech that is almost always beyond the regulatory authority of a public school." *Mahanoy Area Sch. Dist.*, 594 U.S. at 205. The students' comparatively civil speech should be encouraged because, otherwise, students learn that society does not value self-censorship to avoid profane language. And that undermines any attempt to encourage civil discourse on issues of public importance.

## III. Appellants' conduct does not violate the *Tinker* standard because their shirts did not cause a disruption.

Speech falling outside of the Court's limited categories of lewd, vulgar, or profane language "is subject to *Tinker's* general rule: it may be regulated only if it would substantially disrupt school operations or interfere with the right of others." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 214 (3d Cir. 2001). Although the panel majority likens this case to *Fraser*, *Tinker* is a better comparison. Like the armbands in *Tinker*, Appellants' "Let's go Brandon" apparel expressed their political opinion and "neither interrupted school activities nor sought to intrude in the school affairs or the lives of others." *Tinker*, 393 U.S. at 514. "In [these] circumstances, our Constitution does not permit officials of the State to deny their form of expression." *Id.*

Even the *Fraser* Court acknowledged the "marked distinction between the political 'message' of the armbands in *Tinker* and the sexual content of [Fraser's] speech." *Fraser*, 478 U.S. at 680. Central to *Tinker* is whether the student conduct disrupts school activities. *Tinker*, 393 U.S. at 514.

The "disruptive conduct" that is vital to the *Tinker* analysis is missing here and without it, the school has no justification for punishing Appellants' non-profane speech. The school had no "important policy" it advanced by punishing Appellants—it simply suppressed speech.

## CONCLUSION

Amicus respectfully requests that this court grant the Appellants' Petition for Rehearing En Banc and reverse the panel's decision.

Respectfully submitted,

*/s/ David C. Tryon*
David C. Tryon
  *Counsel of Record*
Alex M. Certo
J. Simon Peter Mizner
THE BUCKEYE INSTITUTE
88 East Broad Street, Suite 1300
Columbus, Ohio 43215
(614) 224-4422
D.Tryon@BuckeyeInstitute.org

November 19, 2025

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Fed. R. App. Rule 29 because, excluding the parts of the document exempted by Fed. R. App. P. 32, this document contains 2,402 words.

This document complies with the typeface requirements of Fed. R. App. R. 32(a)(5) and the type-style requirements of Fed. R. App. R. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for the most current version of Office 365 in 14-point type, Century Schoolbook.

  /s/ David C. Tryon
David C. Tryon
*Attorney of record for*
*The Buckeye Institute*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the above amicus brief was served on all counsel of record via the Court's electronic filing system this 19th day of November 2025.

 /s/ David C. Tryon
David C. Tryon
*Attorney of record for*
*The Buckeye Institute*